**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**MARILYN BOOKER**, individually, and on behalf of    :
similarly situated Black female employees,            :
                                                      :       Civil Action No.**:**
                                   Plaintiff,         :
                                                      :       **COMPLAINT, COLLECTIVE**
                v.                                    :       **ACTION AND JURY DEMAND**
                                                      :
**MORGAN STANLEY & CO. LLC**, **JAMES**               :
**GORMAN,** in his individual and professional        :
capacities, and **BARRY KROUK,** in his individual    :
and professional capacities,                          :
                                                      :
                                   Defendants.        :
                                                      :
-------------------------------------------------------------------X

      Plaintiff Marilyn Booker, individually, and on behalf of a proposed collective of similarly situated Black[1] female employees at Morgan Stanley, brings claims for race and gender discrimination, retaliation and unequal pay against Defendants Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Firm"), James Gorman, in his individual and professional capacities ("Gorman"), and Barry Krouk, in his individual and professional capacities ("Krouk") (collectively "Defendants"), and hereby alleges as follows:

## PRELIMINARY STATEMENT AND SUMMARY OF CLAIMS

      1.      In a June 9, 2020 article appearing in the New York Post, James Gorman, Morgan Stanley's Chief Executive Officer ("CEO"), is described as being so "moved" by the protests and global outrage in the aftermath of the racist murder of George Floyd, that he created a new Institute of Inclusion group at the Firm aimed at promoting diversity within Morgan Stanley (which he would chair).  Gorman also announced that he would fast-track the promotions of two

---

[1]      Unless otherwise noted, the use of "Black" in this Complaint also refers to and includes individuals that identify as persons of color ("POC").

Black women; Carol Green-Vincent to the Firm's Operating Committee (making her its first and only Black member), and Susan Reid to the Firm's Management Committee.

2.      Gorman's announcements came on the heels of a heavily-publicized multi-million dollar donation by Morgan Stanley to the NAACP Legal Defense and Education Fund and an agreement to match donations of all U.S. employees to the organization.

3.      It is no surprise that Gorman would publicly announce these initiatives during a moment which he has described as a "turning point in race relations."  These measures would appear, on their face, to be genuine efforts at increasing inclusion and diversity at Morgan Stanley -- the Wall Street investment Firm synonymous with "Corporate America," which manages more than $3 trillion in assets, generated over $41 billion in revenue in 2019, employs tens of thousands of people worldwide (and many thousands in this country), but whose leadership is dominated by White executives and Board members.

4.      For decades, Morgan Stanley employees have helped elite wealthy Americans, primarily White people, invest their money so that they can earn more money.  However, like all companies in corporate America, Morgan Stanley has to make choices about its own employees and the policies that impact these employees.  It is, after all, employees that fuel its business of making more money for Americans that already have money.

5.      Unfortunately, time and time again, Morgan Stanley has utterly failed when it has had to actually look itself in the mirror and decide whether it wants to truly address its deep-seated racially unjust policies that have resulted in alarmingly low and disproportionate numbers of Black and other employees of color amongst its ranks, and, in particular, its executive ranks. Rather than seriously examine its own role in perpetuating inequalities in hiring, pay and promotion, and in fostering toxic workplace cultures and consumer discrimination, Morgan

Stanley has instead repeatedly stopped short of any meaningful major overhauls during prior opportunities for change.

6.     Most troubling, Morgan Stanley has, in true hypocritical fashion, actively sought to *silence* those who speak out and try to advocate for change when it comes to diversity and inclusion.

7.     Marilyn Booker was one such Morgan Stanley victim.  She paid the ultimate price by losing her job merely because she pushed too hard for reforms that would disrupt the *status quo* on White dominance and result in more Black and minority employees at Morgan Stanley, including among Morgan Stanley's Financial Advisor ("FA") and FA trainee ("Trainee") ranks.

8.     For **26 years** Ms. Booker, the former Global Head of Diversity and the sole Black female Managing Director ("MD") in the Wealth Management division at Morgan Stanley's New York City headquarters, raised her voice about the irrefutable and appalling patterns she saw regarding the hiring, retention and lack of advancement of Black employees, detailed, *infra*, ¶¶ 53-108.  Tirelessly, but to no avail, Ms. Booker tried to force Morgan Stanley's leadership, including Gorman, to address the systemic racial discrimination rampant at the Firm.

9.     While Gorman is quick to now pay lip service and throw money at the diversity problem at Morgan Stanley because he is suddenly "moved," when it was Ms. Booker's job to do just that – *i.e.*, to work with the Black community and increase both diversity in the workforce and the Firm's reputation around diversity in the community – Morgan Stanley did nothing but actively hamstring her ability to do so, such by steadily decreasing her budget year over year. Ms. Booker would request in writing, almost every year, for more money from Morgan Stanley to support her diversity efforts, but was constantly denied even though her budget would not amount to a drop in the bucket for Morgan Stanley when compared to the money it threw at other

initiatives and the massive revenue the Firm generated.  In some years Ms. Booker had to dip

into her own pocket and spend thousands of her own dollars just to attend events that promoted

diversity so that Morgan Stanley would not humiliatingly go unrepresented.

10.     Clearly, Black lives **_did not_** matter at Morgan Stanley.

11.     In one particularly vivid example of the racial discrimination and toxic harassing

environment to which she and other Black employees at Morgan Stanley were subjected, rather

than reward Ms. Booker for securing a client who brought in over $90 million into the Firm to

invest, Morgan Stanley stood by and did nothing when a White male executive who was upset

that he could not take credit for the client ran around and told employees that Ms. Booker:

**"Pulled my pants down and ripped me a new asshole."**

12.     Notably, in 2008, while still serving as Morgan Stanley's Global Head of

Diversity, Ms. Booker testified before the United States House of Representatives on the issue of

diversity in the financial services industry.   During her testimony, Ms. Booker made the

following ominous remarks, which horrifically and cruelly hold relevant and true today:

> In spite of the progress that has been made, and the presence of
> more women and minorities in the financial services sector, these
> groups still have skepticism about whether firms will care about
> them and their careers. … [Individuals from these minority groups]
> want to find out about your commitment to meritocracy.  They
> want to find out about your commitment to diversity, and they
> want to find out about your support systems.  Therefore, the firms
> that do not have the infrastructure to support this investment in
> time and to support building these relationships will not be as
> successful as those that do. …
>
> My final observation is that the management structure must be
> engaged in implementing meaningful diversity initiatives so that
> employees at large feel engaged.   We have all heard the
> expression, "People don't leave a company; they leave their
> manager." Diversity is no different.  An organization can have all
> the top leadership commitment there is; however, if this
> commitment is not communicated on a regular basis, the people

who are responsible for the day-to-day, the broader efforts to have
a more diverse workforce will be significantly challenged.

13.     Rather than heed her advice, Morgan Stanley exploited Ms. Booker as a "token response" and symbol of its purported commitment to diversity – trotting her out for publicity opportunities whenever it believed such showcasing was necessary or beneficial.

14.     Shockingly, 11 years after her remarks to Congress, in 2019, Morgan Stanley punished Ms. Booker for trying to address the systemic racial discrimination that permeates and is an open secret at the Firm – the very type of initiative that Gorman has recently planted media stories to pat himself on the back for being "woke" or "moved" enough to come up with.

15.     Specifically, Ms. Booker pushed for reforms to the *status quo* aimed at addressing the lack of diversity at Morgan Stanley, and in particular created a proposal to internally remedy the unequal and marginalized treatment she saw inflicted on employees of  color, including minority FAs and Trainees.  She would lose her job for doing so.

16.     Notably, among the Morgan Stanley wealth advisors recognized in the 2019 Forbes Top Wealth Advisors List, there are only five (5) Black FAs among the combined 487 FAs on all the teams.  Likewise, in a race discrimination lawsuit filed in 2016, seven former Morgan Stanley FAs recounted how White colleagues excluded them from conversations after team meetings and how managers refused to share potential clients with them.  *See Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 60 (S.D.N.Y. 2016).

17.     Throughout the fall of 2019, Ms. Booker repeatedly asked Firm leadership to simply listen to her plan.  Part of Ms. Booker's urgency was her belief that post-Gorman's appointment as CEO, the racial bias had increased in recent years rather than decreased.

18.     Indeed, under Gorman's helm between 2017 and 2019, there was a sudden mass exodus of 14 Black Managing Directors ("MD") out of the few dozen Black MDs that were at

Morgan Stanley.  Upon information, while one of these Black MDs retired, Morgan Stanley made no effort to convince the other departing Black MDs to remain at the Firm.

19.     In fact, Gorman is infamous for saying, "**If you don't like it, then leave.**"

20.     For Black MDs departing Morgan Stanley, the sentiment at the Firm was "good riddance" and "glad to see you go," rather than, "why are they leaving us?" or "how could we do better?"  In contrast, when White MDs left or sought to leave, the Firm made significant efforts to retain them.

21.     Despite initially feigning interest and support about Ms. Booker's plan for diversifying the FA and Trainee ranks, Morgan Stanley consistently and humiliatingly ignored and evaded her.  Finally, after her continued tenacious requests to be heard, on November 18, 2019, Ms. Booker met with two female employees in the diversity department -- not senior leaders with whom she was walled off from meeting -- to go over a draft presentation of her project.  At this meeting, Ms. Booker repeated her desire that she present her plan before senior leadership.

22.     Not only did Morgan Stanley leaders refuse to merely *listen* to a plan to remedy rampant bias against Black FAs and Trainees, but it swiftly engaged in its own despicable discrimination against Ms. Booker.

23.     In horrifying fashion, on December 9, 2019, Morgan Stanley ruthlessly fired Ms. Booker after nearly **<u>26 years</u>** of dedicated and loyal service.  Having had no performance issues, Ms. Booker was blindsided.  No explanation for her firing was given other than typical corporate posturing that her position – which was primarily to help Black people and people of color – was simply being eliminated.

24.     Morgan Stanley once again made it clear that Black employees did not, in fact, matter and silenced a brave employee that dared speak out about the economic injustice she knew existed.

25.     Despite the Firm's hollow promises and orchestrated "photo opportunities," through its *actions* taken against Ms. Booker, it is clear that diversity is the last thing Morgan Stanley cares about.   Nowhere is this truth clearer than in the facts underlying Ms. Booker's claims.   Notwithstanding Morgan Stanley's attempts to silence Ms. Booker, she intends to cast light on the bias that has caused harm to her and countless numbers of Black employees, particularly Black female employees at Morgan Stanley.

26.     It is clear that once the curtain is pulled aside and the deftly-crafted public messages are scrutinized, the truth is that Morgan Stanley has, and has had, no interest whatsoever in disrupting the *status quo* that has kept power and control of the Firm in the hands of White men.

27.     Rather than lead and be brave, under Gorman's rule, Morgan Stanley weakly continues to follow the herd.

## APPLICABLE LAWS

28.     Ms. Booker brings this action to redress the unlawful employment practices committed against her, including Defendants' discriminatory treatment towards her due to her gender, race and/or color (Black), as well as unlawful retaliation due to her complaints of discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL").

29.     Ms. Booker also brings this action individually and on behalf of a collective of Black female employees to redress Morgan Stanley's discriminatory pay practices as well as retaliation for complaining about the unlawful practices, in violation of the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA") and the New York State Pay Equity Law, N.Y. Lab. Law § 193 *et seq*. ("New York Labor Law").

## JURISDICTION AND VENUE

30.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 1981 ("Section 1981"), and under the federal Equal Pay Act, 29 U.S.C. § 206 *et seq*.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

31.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendants operate substantial business in this district, a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district, and because Morgan Stanley is incorporated in the state of New York and Defendants Gorman and Krouk are officers of Morgan Stanley.

## PARTIES

32.     Plaintiff Marilyn Booker is a former employee of Morgan Stanley, who at all relevant times, worked at Morgan Stanley in New York City.  Throughout her employment at Morgan Stanley, Ms. Booker serviced and interacted with numerous Morgan Stanley clients and prospective clients that were based in this district, including, but not limited to, the non-profit organization called Brooklyn Community Services, to whose constituents she taught financial education and was able to convert into a Morgan Stanley client.  Due to Ms. Booker's efforts,

8

Morgan Stanley now manages Brooklyn Community Services' eight-figure pension fund.  Ms. Booker is a U.S. citizen, who resides in the State of New Jersey, and at all relevant times herein, met the definition of an "employee" under all relevant statutes throughout her employment with Defendants.

33.     Founded in 1935, Defendant Morgan Stanley operates in approximately 41 countries and is a publicly traded company, listed on the New York Stock Exchange as "MS."

34.     Morgan Stanley is incorporated in the state of New York, with its principal executive office located at 1585 Broadway, New York, New York 10036.  The Firm operates multiple offices throughout this district.

35.     Defendant James Gorman is an adult resident of New York and currently Morgan Stanley's CEO.

36.     Defendant Barry Krouk is an adult resident of New Jersey and is currently Managing Director, Chief Administrative Officer, Field Management at Morgan Stanley, within its Wealth Management division.

37.     At all times relevant herein, Morgan Stanley, Gorman and Krouk were and are "employers" of Ms. Booker and all putative collective members whom she seeks to represent under all relevant statutes.

## ADMINISTRATIVE PREREQUISITES

38.     Simultaneous with this filing, Ms. Booker will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Ms. Booker's submission will include facts supporting collective claims brought on behalf of Black female employees.

39.     Once the EEOC completes its investigation into Ms. Booker's Charge of Discrimination and/or issues Ms. Booker a Notice of Right to Sue, Ms. Booker will seek leave to amend this Complaint to assert causes of action under Title VII.

40.     Following commencement of this action, a copy of this Complaint will be served upon both the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of the New York City Administrative Code.

41.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I.     Morgan Stanley's White Male-Centric Leadership

42.     There is no question that historically and through the present White men run Morgan Stanley and its various businesses, including its Wealth Management division.

43.     The lack of diversity with respect to gender and race within Morgan Stanley's Operating Committee is abundantly clear.  Prior to Gorman's recent announcement regarding Carol Greene-Vincent's fast-tracked promotion, 13 of the 16 (81.3%) Operating Committee members were men, and only three (18.8%) were women.  Furthermore, 14 of 16 (87.5%) members were White, two (12.50%) were Asian, and *none* were Black.

44.     Morgan Stanley's Operating Committee includes, among others, Gorman – CEO (male, White), Jeff Brodsky – Chief Human Resources Officer (male, White), Eric Grossman – Chief Legal Officer (male, White), and Andy Saperstein – Head of Wealth Management (male, White).

45.     With regard to Ms. Greene-Vincent, Gorman's alleged timeline of her promotion to the Operating Committee is highly suspect.  Ms. Greene-Vincent was hired in June 2018 at

which time Gorman announced that she would start in the Fall of 2018, would report functionally to the Audit Committee and administratively to Gorman, and would also serve on the Management Committee, which is the larger, less prestigious group of senior leaders (on which Gorman has now placed Susan Reid[2]) than the Operating Committee.

46.    Upon information, whereas Gorman claims that for some reason Ms. Greene-Vincent was not set to join the Operating Committee until December 2020, each other member of the Operating Committee was put onto the committee either as soon as they were hired or immediately after being promoted to it – there was never any "waiting period" as there supposedly was for Ms. Greene-Vincent, whose initial role as Audit Director has not changed.

47.    Notably, in May 2018, Gorman announced the promotions of two White executives – Rob Rooney to Head of Technology and Clare Woodman, to Head of Europe, Middle East, and Africa ("EMEA") – but made it clear that they would both "continue to sit on the Firm's Operating Committee."  In other words, these two White executives had already been on the Operating Committee well before they were promoted to these new bigger and more visible roles.

48.    This chain of events begs the question: why did Ms. Greene-Vincent need to wait almost two years to be put on the Operating Committee?  Did she have to undergo some sort of a probationary period to see whether she "worked out"?  Indeed, upon information, none of the other White Operating Committee members have had to wait before taking their spot on the

---

[2]    Notably, Ms. Reid, the current Global Head of Diversity, has repeatedly confided in Ms. Booker about how her job was akin to "pushing a rock up a hill" due to the difficultly she was facing in creating an impact at the Firm.  In fact, just in July 2019, a little over four months before Ms. Booker was fired, Ms. Reid spoke on a Wealth Management division panel and praised Ms. Booker for laying the foundation for diversity at Morgan Stanley without which she would not be able to do her job – a sentiment that others on the panel echoed.

Operating Committee once a decision was made. This is yet another striking example of how Black employees at Morgan Stanley have to work harder, be smarter and even more talented just to get the nod to be on a prestigious committee like the Operating Committee.

49.    Disgustingly, it took a national tragedy and public outcry to get one Black woman a seat on the Operating Committee.

50.    Morgan Stanley's Board of Directors, unfortunately, suffers from the same lack of diversity as its Operating Committee.  Within the Board of Directors, as of January 1, 2020, ten of 14 (71.4%) members are men.  Moreover, ten of 14 (71.4%) members are White, three (21.4%) are Asian, and just one (7.2%) is Black.  Notably, since Morgan Stanley's inception in 1935, the Firm has only had *two* Black persons on its Board of Directors: Rayford Wilkins, Jr., who currently sits on the Board, and Charles Phillips, who was a Board member from 2006 to 2010.

51.    The lack of representation of Black individuals in leadership roles at Morgan Stanley is further exacerbated when looking at the demographic make-up of their Managing Directors. Since 2012, Morgan Stanley has appointed **1,382 MDs**.  The total number of MDs at Morgan Stanley is not publicly known, but is likely multiple times this number.  However, there are **only 41 Black MDs** at the Firm.

52.    Upon belief, in 2020, the Firm refuses to be transparent about the diversity of its MD ranks **because less than 3% of the 1,382 MDs appointed since 2012 are Black, while around 97% are White**.

53.    Such a gross disparity is appalling.  Morgan Stanley's employees, clients and the public deserve accountability.

II.   **Plaintiff Marilyn Booker**

54.   By any measure, Ms. Booker is one of the most highly-qualified, decorated and accomplished Black executives in corporate America today.

55.   Ms. Booker received her Bachelor of Arts degree in Political Science from Spelman College, graduating *magna cum laude.*   She then attended the Illinois Institute of Technology, Chicago-Kent College of Law, where she received her law degree.

56.   Ms. Booker then became the first Black law clerk for a judge (who was White) on the Illinois Appellate Court.

57.   Then, as a practicing attorney, Ms. Booker served as an Assistant Public Defender at the Cook County Public Defender's office in Chicago.   She then practiced at two private law firms -- Hinshaw & Culbertson LLP in its Municipal Finance Department, and Altheimer and Gray in its Bankruptcy Department.

58.   Ms. Booker continued her career in service by serving as Senior Vice President of Minority Business Development for James H. Lowry & Associates, a role she held until she joined Morgan Stanley in 1994 (where she would remain for the next 26 years).   In this role, Ms. Booker worked to promote minority and women-owned businesses by working with major corporations to develop strategies to increase their level of sourcing to such businesses, and to identify growth areas in which she matched minority and women-owned businesses with corresponding contracting opportunities.

59.   Ms. Booker is also a qualified financial investment advisor and holds Series 7, 9, 10 and 66 licenses.

60.   Further demonstrating her commitment to improving the lives and financial wellbeing of minorities -- not only at Morgan Stanley but in the financial sector as a whole --

Ms. Booker has also spoken on the subjects of diversity and wealth in a range of prestigious venues.

61.      For instance, in February 2008, Ms. Booker testified before the United States House of Representatives Financial Services Subcommittee on "Diversity in the Financial Services Sector."  She has also appeared on NPR during a program entitled "The State of Black America", in 2019, on The Steve Harvey Morning Show, and on ABC World News Tonight during a segment on "Women and the Workforce".

62.      Ms. Booker has also been recognized as one of National Urban League's 2019 Women of Power, as Harvard College Black Men's Forum's "Woman of the Year," as a Stillman College "Alabama Female Firsts - Women's Dimensions of Leadership" Awardee, as a Savoy magazine "Top 100 Most Influential Blacks in Corporate America," as one of Uptown Professional "100 Top Executives in America," and by Network Journal as one of its "25 Influential Black Women in Business."

63.      Ms. Booker has also been appointed to serve as a Member of the Executive Leadership Council, a Co-Chair of the Apollo Theater's Women's Committee, a Trustee of the Morgan Stanley Foundation, a Member of the Morgan Stanley Benefit Plan Administrative Committee, a Board Member of the New York Urban League, and a Board Member of the Arthur Ashe Institute of Health.

64.      Ms. Booker has also published numerous articles in Morgan Stanley Today, including an article entitled, *On a Mission to Make A Difference: Marilyn Booker Empowers Communities* (February 2018).  She has also been featured in various books, including in a chapter entitled "Mo' Money, Mo' Problems – The Economics of Being Black and Buying Black" in *Conversations in Black* by Ed Gordon (2020), and in a chapter entitled "Changing the

Face of Wall Street" in *Change Agent: A Life Dedicated to Creating Wealth for Minorities,* by James H. Lowry (2019).

65.     Within the past three years alone, Ms. Booker has been asked to write at least four articles for, and has been profiled several times, in Morgan Stanley Today.  Very few, if any, of her White peers, including White male peers within the Wealth Management division, have enjoyed such fanfare.  Notably, on December 9, 2019, the day she was notified that her employment would be terminated, Ms. Booker was putting the final touches on two additional articles that Morgan Stanley was to publish.  The articles were eventually published on December 17, 2019 and December 23, 2019.

A.     **Ms. Booker's Employment at Morgan Stanley**

i.     **Ms. Booker Serves as Morgan Stanley's First Global Head of Diversity, and Then Leads the Urban Markets Group**

66.     In 1994, Ms. Booker was hired as Morgan Stanley's first diversity officer and held the title of Global Head of Diversity.  From 1994 to 2010, Ms. Booker grew the diversity department from one assistant to a team of over 15.  The programs Ms. Booker initiated during this time received recognition and awards from numerous external organizations, and her relentless work towards advocating for minority employees at Morgan Stanley enjoyed wide success.

67.     Ms. Booker also fulfilled multiple additional roles during this time, which included Head of Supplier Diversity, Work Life, Human Resources Policy and she was the Equal Employment Opportunity (EEO) Officer for the Firm.   In these roles, Ms. Booker worked to:

- Develop strategic diversity initiatives;

- Design and deliver career development and diversity training programs;

- Manage Firm-wide diversity campus recruiting;

- Develop a lateral diversity recruiting program;

- Provide guidance on compensation and promotion issues relative to the Firm's diverse employees;

- Conduct analysis of diversity metrics to keep business units apprised of progress or lack thereof;

- Work with Morgan Stanley's Legal and Human Resources departments to manage risk on sensitive employee relations issues;

- Create and manage the Firm's Supplier Diversity Program and assist minority and women-owned businesses in securing procurement opportunities with Morgan Stanley;

- Manage Human Resources Policy and draft an Employee Policy Handbook, and

- Manage the Firm's Affirmative Action Plans, community outreach and contributions to diverse communities.

68.     In particular, Ms. Booker was very involved in the compensation and promotion process.  She was often able to get minority employees placed on lists for promotions who were not initially on those lists, and was able to secure raises in compensation for employees of color to levels that were commensurate to that of White employees, particularly White men, with similar roles and performance achievements.

69.     Ms. Booker had the backing of, and did very well under, the regimes of three different CEOs -- Dick Fisher, Phil Purcell and John Mack.

70.     In 2010, Gorman became CEO of Morgan Stanley.  Before his promotion to CEO, Gorman was co-President and responsible for overseeing the Firm's Global Wealth Management and Investment Management businesses.

71.     Shortly after the change in leadership, inexplicably, Gorman removed Ms. Booker as Global Head of Diversity.   She was moved into a brand-new group called the Office of Development.

72.     Ms. Booker was told that in this new position, she was to focus on teaching financial literacy and developing external relationships with community minority groups.

73.     Tellingly, Morgan Stanley's lack of commitment to diversity at the time was clear, as the Office of Development was eliminated in 2011.  As a result, Ms. Booker's "new" position was short-lived.

74.     The elimination of this department forced Ms. Booker to search for a new job. Recognizing Ms. Booker's undeniable value to the Firm, John Mack, Morgan Stanley's outgoing CEO, helped create a position for Ms. Booker to lead yet another newly created group called the Urban Markets Group ("Urban Markets").

75.     In this capacity, Ms. Booker was tasked with leading a small "team" of minority Financial Advisors into minority communities to advocate and message about fiscal responsibility.   Ms. Booker devised and delivered financial education programs to urban communities in partnership with individuals, non-profit organizations, small businesses, trade organizations and financial, educational and health institutions.

ii.     **Ms. Booker's Revolving Door of White Male Bosses**

76.     Unfortunately, Morgan Stanley believed that the Urban Markets department, tasked with meaningfully impacting minority communities, needed to be supervised by White men.  Perhaps this was so because there simply were no employees of color at such senior levels. Regardless, shockingly, from the creation of the Urban Markets group until her firing, Ms. Booker had *eight* different bosses during her eight-year tenure.

77.     It was a virtual revolving door of White men (and one token White woman) to whom Ms. Booker had to answer.  It was clear from this constant turnover that Morgan Stanley's management never fully supported Urban Markets.

78.     Sadly, what also is clear is that none of these White men or the lone White woman believed that lingering too long as the supervisor of the head of Urban Markets was a positive career move.  If Morgan Stanley leadership actually valued this initiative, such rampant turnover never would have happened.

79.     Regardless, no one at Morgan Stanley truly cared about the diversity initiatives Ms. Booker spearheaded, nor felt compelled to be associated alongside her work.  Morgan Stanley intended on doing nothing more than to pay lip service to its supposed commitment to helping minority communities or minority employees.

80.     Ms. Booker was left to navigate this series of disinterested supervisors and operate the Urban Markets group without meaningful feedback or continuity of leadership.  Not surprisingly, her small "team" never amounted to more than two FAs hired early in her tenure.

81.     Equally concerning is the fact that from the time she started in Urban Markets, her salary was essentially held flat.  At the same time, the Firm slashed her budget, year over year.  The economic reality was that the compensation Morgan Stanley paid Ms. Booker was "less than" what was paid to similarly-situated males, particularly White males.

82.     Had Ms. Booker been a male employee at Morgan Stanley, she would have been paid almost twice what Morgan Stanley paid her (and likely more).  Ms. Booker is entitled to an award for this pay inequity differential.

            iii.     <u>Repeated Efforts to Force Change Are Ignored by Morgan Stanley Leaders</u>

83.      As Morgan Stanley knows, in recent years Ms. Booker internally made repeated attempts to force awareness of racial inequality and create change.

84.      For instance, in 2013, Ms. Booker, with the support of television personality Steve Harvey, proposed creating a mass mutual fund initiative to market to Black and minority communities to help constituents in those communities begin to and become educated in investing.  To have mass market appeal, the minimum investment was set at just $5,000.  Ms. Booker coordinated several meetings and performed a tremendous deal of analysis, only to hit a brick wall at Morgan Stanley.  In fact, Ms. Booker was told by the current Chief Marketing Officer that Steve Harvey was not "consistent with our brand or our audience," and thus, she did not support having him as a spokesperson for any Morgan Stanley initiative.  Ms. Booker's initiative was dead on arrival and never allowed to go anywhere.[3]

85.      Moreover, for years, Ms. Booker tried to convince Morgan Stanley to work with a prominent Black National Basketball Association ("NBA") legend who had become a highly successful businessperson, referred to as Player A.  She brought Player A into the Firm for a luncheon with several of the Firm's Management Committee members.  She tried to get him put on the docket to speak at some of Morgan Stanley's conferences.  She even tried to convince Morgan Stanley to sponsor a business conference Player A organized, which would have gotten Morgan Stanley tremendous exposure in the Black community, with Player A serving as a *de*

---

[3]      Disgustingly, four years later, in 2017, Morgan Stanley launched an initiative called "Access Investing" -- a mass mutual fund product with a minimum investment of $5,000.  The target demographic for this promotion, however, was Millennials, *i.e.*, persons who generally reached adulthood in the early 21st century.  Morgan Stanley had totally ripped off Ms. Booker's proposal aimed at financially empowering the Black and minority communities.  To add insult to injury, no one at Morgan Stanley even so much as asked Ms. Booker whether she was interested in managing the initiative (her idea originally), much less to even be on the team.

*facto* spokesperson for the Firm.  Once again, Ms. Booker's efforts at marketing Morgan Stanley to the Black and minority communities with the goal of financially empowering its constituents hit a brick wall.

86.    Notably, while Ms. Booker got zero traction in trying to bring Player A into the fold, Morgan Stanley did not hesitate to hire White professional golfer Justin Rose as a spokesperson.  It goes without saying that Mr. Rose was believed to be better recognized among the community of White male affluent golf aficionados, and not most members of the Black and minority communities.

87.    Ms. Booker also made repeated complaints about the outrageously low number of Morgan Stanley clients who were Black.  Indeed, even though Steve Harvey was a Morgan Stanley client (only because of Ms. Booker's efforts), she could not even get the Firm's Investment Banking Division to do a deal with him.  This was emblematic of Ms. Booker's constant struggle at trying to get Morgan Stanley to market to and work with Black people.

88.    Importantly, as Ms. Booker became more vocal internally about the need for Morgan Stanley to support Black employees and Black causes, her ability to effectuate change decreased under Defendant Gorman's leadership.  In particular, Ms. Booker's budget was inexplicably slashed each year, and by 2019, was 71% lower than what it had been at the time she started working in the Wealth Management division role, effectively handcuffing her ability to do her job.

89.    In fact, in 2017, the two White males overseeing Ms. Booker's role, Bill McMahon ("McMahon") and Rick Skae ("Skae"), cut her budget in half, severely curtailing her ability to do her job.  Tellingly, despite there being supposed "budgetary constraints," when McMahon's and Skae's roles were eliminated in mid-2017, and Ms. Booker was removed from

reporting to them, these same two White men were not fired or subject to pay cuts; instead, they were promoted to Vice Chairmen in the Wealth Management division.  With no explanation, Ms. Booker learned that these two White men would "continue to have a strong presence in the field and play critical senior leadership roles moving forward" despite not even having specific job functions.  Upon belief, they are still employed by Morgan Stanley.

90.     An example of what it means to enjoy "White privilege" could not be more vivid.

91.     Notably, since Gorman started as Morgan Stanley's CEO in 2010 the Firm's diversity efforts have gone noticeably <u>backwards</u>.

92.     Morgan Stanley is estimated to have **16,000 FAs**.  Upon belief, there are only around **100 Black FAs**.  That is, 0.63%, or **less than 1% of all FAs are Black, while about 99% of Morgan Stanley's FAs are White**.

93.     Disturbingly, the percentage of Black FAs is far less than it was when Ms. Booker was Global Head of Diversity from 1994 through 2010.

94.     Moreover, in 2010, when Gorman assumed the CEO role, Morgan Stanley had approximately 1,600 Managing Directors.  While Morgan Stanley does not publish data about the total number of MDs it has, the total number of MDs is likely double, if not triple, this figure currently.

95.     However, currently, there are just *41 Black* Managing Directors out of multiple thousands of MDs.  Currently, there are just four Black MDs in Wealth Management (including one Black female who was just promoted in January), and only two Black MDs in Investment Banking.  When Ms. Booker was Global Head of Diversity *over ten years ago*, Morgan Stanley had at least four Black MDs in Investment Banking.  The bulk of the Black MDs at Morgan

Stanley are in non-revenue areas like Operations and Finance, while only one Black MD is in the Legal department, and only one Black MD is in Research and has worked only in London.

96.      Clearly there has been absolutely no progress with respect to Morgan Stanley's diversity efforts under Gorman's leadership.  Instead, the Firm is backsliding.

iv.      The Marginalized and Disfavored Urban Markets Group

97.      For years, Morgan Stanley hurled blatant unequal treatment against the marginalized and disfavored Urban Markets group, and specifically towards Ms. Booker.

98.      By way of example only, Morgan Stanley subjected Ms. Booker and a Black male colleague to horrific and blatant discriminatory treatment in connection with the procurement of Webster University ("Webster") as a client, and Webster's investments of over $90 million with Morgan Stanley.

99.      Specifically, a White male Morgan Stanley executive and others at Morgan Stanley, including a White advisor from Morgan Stanley's Graystone Consulting Group, intentionally bulldozed Ms. Booker and her Black male colleague, in their attempts to take credit for the origination of Webster as a client and its tens of millions of dollars to invest.

100.    Ms. Booker expressly conveyed to multiple White Morgan Stanley managers and executives that this was happening *because* she and her Black male colleague were Black and being subjected to mistreatment based on their minority status.  Ultimately, Ms. Booker and her Black male colleague succeeded in securing Webster as a client.

101.    Rather than reward Ms. Booker for bringing in Webster and its $90 million to invest, Morgan Stanley stood by and did nothing when one of the White male executives ran around and told employees that Ms. Booker:

**"Pulled my pants down and ripped me a new asshole."**

102.    Egregiously, at that time and in the years since, Morgan Stanley failed to pay Ms. Booker even *one dollar* in commissions for the over $90 million of Webster's investment, or, for that matter, the many other millions in assets that she brought into the Firm.

103.    No non-discriminatory reasons motivated Morgan Stanley's conduct surrounding Webster, including the White male executive's disgusting statements.

v.      Project Genesis

104.    In June 2019, Barry Krouk, a White male, supervised Ms. Booker.  Ms. Booker told Krouk that she was troubled by the unequal and marginalized treatment she saw inflicted on minority FAs and Trainees.

105.    On too many occasions, Ms. Booker watched as White male leadership repeatedly advanced and supported White FAs and Trainees, while ignoring minority FAs and Trainees.

106.    In fact, Ms. Booker herself has, throughout the years, referred several qualified Black candidates for Morgan Stanley's FA training program, but only one person has ever been hired, and that was a person that she hired into her own group.  Whenever Ms. Booker would refer these qualified Black candidates, she would receive some vague feedback about how these individuals did not meet some initial criteria or did not pass some initial test that was being administered.  It was incredibly disheartening to Ms. Booker that the high number of qualified minority candidates she was sponsoring could not even get through the initial hiring process.

107.    Ms. Booker had a plan to help reduce the unlawful bias and told Krouk about her plan.  Specifically, Ms. Booker told Krouk that, in response to the rampant bias against minority FAs and Trainees, she wished to create "Project Genesis" to address their uniformly shared experiences, including, *inter alia*: (i) constant feelings of isolation and lack of support; (ii) inability to get onto FA teams; and (iii) barriers in their attempts to partner with White FAs on new business opportunities, such as repeatedly being subjected to unfair commission splits, and in some occasions, exclusion from new client meetings.

108.    Ms. Booker asked Krouk if Morgan Stanley would support this initiative, and if so, whether she could have help collecting and analyzing data needed for Project Genesis. Initially, Krouk identified a couple of analysts who could help Ms. Booker.  Krouk also told Ms. Booker that he wanted his Chief Operating Officer, Naeema Huq Abrar (a South Asian female), and the Head of Diversity for Wealth Management, Kara Underwood (a White female) to be present at meetings about Project Genesis.

109.    Although Ms. Underwood and Ms. Abrar appeared to support the initiative, it quickly became clear to Ms. Booker that, in keeping with the last eight years of the Urban Markets group, these women were disinterested and wanted to avoid any association with Project Genesis.  For example, between July and November 2019, Ms. Booker noticed that Ms. Abrar and Ms. Underwood would be increasingly unavailable to meet to discuss Project Genesis, or would cancel meetings at the last minute.

110.    Ms. Booker also found that Krouk was either unhelpful or resistant to her efforts to move forward with the project.  Tellingly, Krouk told Ms. Booker not to talk about Project Genesis with anyone else.  On this point, Krouk rejected Ms. Booker's request to present Project Genesis to senior management, falsely claiming that she needed to present to him first.

111.     On November 18, 2019, Ms. Booker finally met with Ms. Abrar and Ms. Underwood to go over a draft presentation of Project Genesis.  When Ms. Booker raised her desire to present it to senior management, Ms. Abrar and Ms. Underwood similarly resisted this proposal.  Instead, the two women told Ms. Booker that she needed to wait until after she presented it to Krouk, which would be sometime the following year.  Ms. Booker objected to this delay and indicated that she would talk to Krouk about moving forward sooner.

112.     A few weeks later, Ms. Booker and the analysts who were assigned to work on Project Genesis discussed *via* email an article in The Washington Post reporting that only two of the 15 largest banks agreed to share federal diversity reports.  Unsurprisingly, Morgan Stanley was not one of the two.

113.     Because the article discussed the systemic discriminatory treatment Blacks in wealth management constantly endure, the response to the article by one of the analysts noted that the article "speaks directly to everything you've been saying and the need for Genesis!"

114.      The article also discussed a 2016 discrimination lawsuit brought by seven Black FAs alleging they "were less likely than White peers to be connected with the clients of departing brokers and assigned to high-producing teams, making it more difficult for them to earn equal pay and remain at the firm."  The lawsuit at issue is *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 60 (S.D.N.Y. 2016).

115.     These concerns are precisely what Project Genesis intended to address.  Abhorrently, in the article, Morgan Stanley claimed it allocated "'substantial resources' to its diversity efforts" and was "making steady progress."  The utter hollowness of such a self-serving position is clear when, just days later, Morgan Stanley would unlawfully terminate Ms. Booker.

vi.    Ms. Booker's Termination Meeting

116.    A meeting was scheduled on December 9, 2019, for what Ms. Booker believed was a meeting about Project Genesis with Krouk.  When Ms. Booker arrived at his office, Krouk walked her to a nearby conference room where JoAnne Ceriello, a Managing Director in Human Resources, was waiting.  Shamefully, Krouk, too embarrassed to look Ms. Booker in the eye, immediately left, and Ms. Ceriello told Ms. Booker that she was fired.  Although Ms. Booker made requests about alternative positions, including as an FA with no base pay, Ms. Ceriello rejected her proposals and told Ms. Booker there were no other options.

117.    Ms. Booker was completely blindsided.

118.    At the time she was fired, Ms. Booker was the only Black female Managing Director in Morgan Stanley's Wealth Management division's New York City offices.  Despite her longevity, loyalty and stellar performance record, Morgan Stanley offered no explanation for her expulsion other than to vaguely say that her position – which is one that primarily helps Black people and people of color gain financial literacy and acumen – had to be eliminated.  Disturbingly, her forced exit came shortly after her complaints about the systemic mistreatment of Black FAs and Trainees.

119.    Notably, Morgan Stanley could have easily found a way to retain Ms. Booker.  In fact, she offered to work on 100% commission as an FA, yet Defendants still humiliatingly wanted her out.  Indeed, the head of the Apollo Group at Morgan Stanley, Steve Condos, said he would have taken Ms. Booker on his team in a heartbeat, but no one asked him or gave him notice that Ms. Booker was being terminated.  He even acknowledged that there was room to hire someone else on his team.  Yet, Morgan Stanley, in line with its repugnant track record, had

decided it had had enough of Ms. Booker and her efforts at addressing the systemic racial inequality that existed at the Firm once and for all.

120.    Furthermore, Morgan Stanley continued to retaliate against Ms. Booker between December 9, 2019 and her official last day, March 9, 2020, including by causing her unnecessary harm by removing her profile from the Morgan Stanley website when, at a minimum, she was set to remain working at the Firm until March 9, 2020.  Moreover, in January 2020, Morgan Stanley abruptly deactivated Ms. Booker's email account, office phone, and mobile work phone, which meant that she had to repeatedly request to gain access back to her email account and office phone just to be able to continue working until her official last day.  She ultimately was unable to get her mobile phone reactivated, which forced her to have to go into the office every day just to keep up with and respond to emails.

**III.    Ms. Booker is Not Alone in Her Experiences at Morgan Stanley**

121.    Sadly, Ms. Booker is not the only minority employee to face institutional barriers at Morgan Stanley.  Rather, throughout her tenure at the Firm, Ms. Booker watched as minority employees struggled to advance.

122.    Importantly, the EEOC previously commenced a class-wide lawsuit against Morgan Stanley alleging discrimination in promotion and compensation that involved allegations of systemic bias against female employees.  Specifically, the EEOC's lawsuit alleged that Morgan Stanley discriminated against women in its Institutional Equity Division ("IED") with respect to promotion, compensation and the terms, conditions and privileges of employment.  *See EEOC, et al., v. Morgan Stanley & Co., et al.*, No. 01 Civ. 8421 (S.D.N.Y. Sept. 10, 2001).  In 2004, a settlement was reached in the form of a Consent Decree, pursuant to which Morgan Stanley established a $40 million fund to compensate female employees that submitted similar

claims of discrimination.  As part of the settlement, Morgan Stanley agreed to designate at least $2 million towards internal programs designed to enhance the compensation and promotional opportunities for female employees within Morgan Stanley.  The lead class representative, Allison Schieffelin, received $12 million as part of the Consent Decree.[4]

123.    Notably, Ms. Booker was selected by the EEOC to serve as the Ombudsperson as part of Morgan Stanley's settlement with the EEOC.

124.    Worse, the horrific numbers about how many minority employees succeed at Morgan Stanley speak for themselves.  Among the Morgan Stanley wealth advisors recognized in the 2019 Forbes Top Wealth Advisors List, there are only five (5) Black FAs among the combined 487 FAs on all the teams.

125.    Additionally, one of the seven former Morgan Stanley advisors who brought claims of class-wide race discrimination against Morgan Stanley in 2016, Kwesi Coleman, recounted in a Washington Post article (referenced above) that "his white colleagues excluded him from conversations after team meetings and a manager only shared a potential client lead with him once - a database of alumni of historically Black colleges."  In the lawsuit, Mr. Coleman explained that he knew when joining Morgan Stanley that he would have to work harder because of his skin color, but what he "didn't expect was to be basically held back [and] to have opportunities withheld."

126.    Nadia Jones, who worked at Morgan Stanley as a Senior Diversity Officer from October 2014 through April 2016, distributed a departure memo shortly before she left the Firm

---

[4]      *See*  https://www.eeoc.gov/eeoc/newsroom/release/7-12-04.cfm.    Unfortunately,   the Consent Decree provided for an outside monitor to supervise Morgan Stanley's efforts towards the advancement of women for only three years after the settlement.

describing the resistance to diversity efforts and racist treatment that she encountered while at the

Firm.  Specifically, Ms. Jones wrote:

- You cannot begin to imagine how it feels for a woman of color to be constantly reminded that neither your credentials, nor your title, nor your professional accolades, nor your expertise gleaned both from your professional and social experiences as a woman of color, are enough to counteract the pervasive and systemic biases that run throughout this organization.

- Never in my 8 years of doing this work nor in my 38 years of being a Black woman have so many white people, men in particular, told me how to do my job and where best to focus my efforts to help diverse advisors--without consulting, mind you, a single diverse advisor in making that determination.

- The dismissal and/or punting of concerns that I have raised-whether that be around the process of strategic leads or syndicate, or whether diversity is a quantifiable premium in this industry (as it has suited managers to be compensated on diversity, but not the diverse advisors themselves)-illustrate this firm's lack of commitment to creating sustainable change. In fact, the vary [sic] notion of equity for diverse advisors and managers is oftentimes met with arrogant disapproval.

- Because this firm is not about deliberately taking a chance on a person of color (as you all have increasingly done for white women, though nowhere near the proportional rate you have done so for white men) by providing them with a safety net should they stumble, but more importantly by ensuring that you have provided them with the resources to succeed. Because D&I work in its purest form is more than the numbers--it's more than the scorecard. It's about what will truly help diverse advisors, not about moving the ever-present, yet mythical, needle.

- The net number of diverse advisors has barely changed in nearly a decade and that's because while we are focusing a lot of time on recruiting a diverse workforce, we have done little to nurture those very advisors who are already here.

127.    Ms. Jones left Morgan Stanley.

IV.     **Morgan Stanley Must Abolish Arbitration for Race Discrimination Claims**

128.    Shamelessly, in the wake of the public outcry after George Floyd's murder, as discussed above, Gorman has been on a new publicity campaign designed to cast Morgan Stanley as a corporation committed to diversity issues.[5]

129.    Notwithstanding this hollow talk, Morgan Stanley remains on the bottom rung of this social justice movement.

130.    Indeed, for over 20 years, Morgan Stanley has repressed its Black employees by forcing them to litigate race and national origin discrimination claims in secret, confidential arbitration.[6]

131.    Forced arbitration as a term of employment means that Black employees that experience discrimination because of the color of their skin have no choice but to hide their legal claims from the public, causing many to decline to even press their complaints knowing how the odds are already grossly stacked against them.

132.    This deliberately chosen, clandestine method of repression has systemically allowed Morgan Stanley to get away with the horrific marginalization and disparagement of its Black employees, and perpetuated the gross disparity between White employees and Black employees in the terms and conditions of their employment.[7]

---

[5]     *See* Morgan Stanley CEO Moved by Protests to Promote Two Black Staffers, by Thornton McEnery, N.Y. Post, June 9, 2020, accessible at https://nypost.com/2020/06/09/morgan-stanley-ceo-pushes-for-racial-equality; Morgan Stanley Commits $5 Million to NAACP Legal Defense and Education Fund (LDF), June 9, 2020, accessible at https://www.morganstanley.com/press-releases/morgan-stanley-commits--5-million-to-naacp-legal-defense-and-edu.

[6]     Morgan Stanley has systematically forced individual arbitration on employees since at least 2005, for all types of discrimination protected under federal, state and municipal laws.

[7]     For example, five Black Morgan Stanley employees recently lost their bid to litigate their racial discrimination claims against Morgan Stanley in court as a result of the judges in their case

133.    It is well-known that Black employees, who are told that it is the Firm's "policy" to litigate discrimination claims in confidential arbitration, do not believe any meaningful choice exists to object to such a policy, and fear that asking Morgan Stanley to exclude them (opt-out) from the mandatory arbitration policy will "rock the boat" and perhaps cast them as a troublemaker.   Indeed, there is no protection whatsoever afforded to Morgan Stanley employees who avail themselves of the proffered "opt-out" provision, meaning that such employees could be fired for refusing to agree to arbitrate their claims and there would be absolutely no recourse.

134.    Unless Morgan Stanley <u>abolishes forced arbitration for its Black employees, including members of Black EPA Collective</u> (described below), any purported claim to "meaningful efforts" to fight against racism means nothing.  Gorman, senior leaders, and Morgan Stanley's Board know how many tens of thousands of employees it has forced into mandatory arbitration agreements, and therefore they fully understand precisely how it systemically silences stories like Ms. Booker's and countless others before her.

135.    Even in the wake of #MeToo and the public's realization that forcing female employees that experience sexual assaults and battery at the workplace into arbitration is both tremendously harmful and contrary to all notions of justice, Morgan Stanley disgracefully continues the practice for all of its female employees and members of the Black EPA Collective.

136.    As such, Morgan Stanley continues to deny Black employees a basic and constitutional right to a jury of their peers in court.  No amount of "lip service" and feigned support for Black people and Black causes can undue this grave yet easily preventable injustice.

---

enforcing arbitration clauses that purportedly applied to them.  *See Lockette v. Morgan Stanley*, No. 18 Civ. 876 (JGK), 2018 WL 4778920, at *1 (S.D.N.Y. Oct. 3, 2018); *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 104 (S.D.N.Y. Nov. 29, 2018).

137.    It is the epitome of hypocrisy for Morgan Stanley to hold itself out to the public, shareholders, investors and clients as a company that is genuinely interested in advancing racial justice when it is hiding from public accountability and transparency.

138.    **If Morgan Stanley really wanted to do something to address racial injustice, they would make the decision <u>today</u> to eliminate arbitration of all discrimination claims going forward and release the thousands of Black employees bound by silence.**

139.    Upon belief, over 35,000 employees at Morgan Stanley are subject to confidential arbitration.

140.    Being an employer of that magnitude and scope carries with it a moral obligation to lead by example and be at the forefront of social justice movements.

141.    To be clear, and so there is no doubt, Ms. Booker is <u>not</u> subject to a binding arbitration agreement, despite any meritless arguments Morgan Stanley may raise to the contrary, as there was never any "meeting of the minds" between Ms. Booker and Morgan Stanley that any claims she held against Morgan Stanley, including those alleged herein, would be required to be asserted in arbitration.

<u>**COLLECTIVE ACTION ALLEGATIONS**</u>
**(Equal Pay Act Claims)**

142.    The Ninth Cause of Action alleged in this action is being prosecuted as a collective action pursuant to the Equal Pay Act, 29 U.S.C. §206 *et seq.*

143.    Ms. Booker incorporates by reference the allegations from the preceding paragraphs, including those alleging common patterns, practices and/or policies by Morgan Stanley resulting in unlawful discrimination and retaliation, as if fully set forth herein.

144.    Ms. Booker alleges claims under the Equal Pay Act on both an individual basis and on behalf of a collective of Black female employees who have been, are now or will be

employed by Morgan Stanley in New York at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Black EPA Collective"). This Collective, upon information and belief, consists of more than 40 Black females.

145. The discriminatory employment practices that disproportionately affect Black female employees and cause them to be paid less than similarly situated men at Morgan Stanley exist in connection with subjective decision-making about:

- Compensation, including hourly pay, salary base pay, discretionary bonuses;

- Hiring;

- Development;

- Advancement;

- Opportunities for mentor/mentee relationships;

- Promotions;

- Work assignments;

- Level of responsibility;

- Client introductions;

- Client pitches;

- Opportunities to socialize at company events;

- Opportunities to socialize at company events with clients;

- Internal committee appointments and/or the exclusion from such committees;

- Demotions;

- Failing to prevent, address, properly investigate and/or take remedial action regarding claims of discrimination against Black employees;

and

- Terminations, including through reductions-in-force ("RIFs").

146. The subjective decision-making about the items listed above regularly involves bias and unconscious bias by the individuals at Morgan Stanley that have the power and authority to render such decisions.

147. As such, the systemic discriminatory practices that disproportionately affect Black female employees' compensation as compared to similarly situated men at Morgan Stanley include, *inter alia*:

- Discretionary hiring practices that disfavor Black female employees;

- Discretionary compensation policies that disfavor Black female employees;

- Discretionary performance evaluation systems that disfavor Black female employees;

- Discretionary promotion systems that disfavor Black female employees; and

- Discretionary termination practices that disfavor Black female employees.

148. This discrimination is intensified and perpetuated by Morgan Stanley's repeated failures regarding the ability to prevent, address, properly investigate and/or take remedial action when Black female employees complain about discrimination.

149. Repeatedly, Morgan Stanley has failed to prevent, address, properly investigate and/or take remedial action when other employees report incidents to Morgan Stanley that suggest racially motivated bias.

150. Importantly, as set forth in this Complaint, based on the inexplicable, massive disproportionate lack of representation of Black employees, male and female, at every level of

Morgan Stanley's hierarchy (including, but to a somewhat lesser extent, the bottom-most tiers), Morgan Stanley was on notice but failed to take corrective action to remedy the horrific racial discrimination.

151.     The internal statistical data that shows that Black employees clearly were disfavored as compared to White employees is overwhelming and has existed for decades.

152.     Upon belief, in 2020, even less Black employees, male and female, are in managerial and leadership roles at Morgan Stanley than *in 2005*.  This backsliding contributed to and perpetuates the unequal pay given to Black female employees.

153.     Morgan Stanley claims that it supports Black female employees as they develop, but in reality, only those in leadership positions, predominantly White men, have the authority to make meaningful client contacts, engage in business pitches, invite potential clients or existing clients to exclusive social events, such as, by way of example only, outings at private golf clubs, charity golf tournaments at private country clubs and attendance at professional sports events.

154.     Without the same opportunities to secure substantial new business, network and maintain client relationships, as are given to White employees, primarily men, the perpetual state of lower compensation, lower levels of responsibilities, titles and roles for Black female employees at Morgan Stanley is a cruel reality.

155.     Such systemic failures allow managers and senior executives, predominantly White, to perpetuate race and gender discrimination against Black female employees that has and continues to cause them to experience the following, *inter alia*:

- Unequal hourly wages for substantially the same work as compared to male, primarily White employees;

- Unequal base salary for substantially the same work as compared to male, primarily White employees;

- Unequal performance evaluations as compared to male, primarily White employees;

- Unequal bonuses for substantially the same work as compared to male, primarily White employees;

- Unequal benefits and other forms of compensation as compared to male, primarily White employees;

- Unequal opportunities for business development opportunities as compared to male, primarily White employees; and

- Unequal opportunities for advancement as compared to male, primarily White employees.

156.   The above conduct resulted in subjecting Black female employees to lesser terms and conditions of employment.

157.   Upon belief, Morgan Stanley subjected Black female employees at all levels to such unequal pay, including, but not limited to, administrative assistants, associates, vice presidents and executive directors.  The pay disparity as compared to men, primarily White, is especially egregious for these Black women that occupy some of the lower paid positions at Morgan Stanley.

158.   Morgan Stanley's systemic discrimination against the Black EPA Collective is continuing in nature.  The Black EPA Collective members were paid less and denied promotions at a greater rate by Morgan Stanley than were similarly-situated male employees, primarily White, despite performing similar or the same work, and having comparable or better experience and qualifications.

159.   Morgan Stanley's discrimination against Plaintiff and the Black EPA Collective was the result of common patterns, practices and/or policies, and acquiescence to and ratification of such patterns, practices and/or policies.  The claims of Plaintiff stated herein are essentially the same as those of the other Black EPA Collective members.

160.    The Black EPA Collective is readily ascertainable, and the names and addresses of the Black EPA Collective members are readily ascertainable from Morgan Stanley's records and files.

161.    Common questions of law and fact predominate with respect to Plaintiff and the Black EPA Collective, who worked in New York and were subject to substantially similar Firm employment patterns, practice and/or policies.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**
***Against All Defendants***

162.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

163.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying her the equal terms and conditions of employment because of her race and/or color (Black) and subjecting her to a hostile work environment because of her race.

164.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

165.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

166.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**
*Against All Defendants*

167.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

168.     By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of Section 1981, including, most recently, terminating Plaintiff's employment.

169.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

170.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

171.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
*Against All Defendants*

172.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

173.     By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and

conditions of employment because of her race and/or color (Black), and gender, and subjecting her to a hostile work environment.

174.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

175.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of monetary damages and other relief.

176.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Retaliation in Violation of NYSHRL)**
***Against All Defendants***

177.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

178.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, terminating Plaintiff's employment.

179.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

180.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

181.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation**
**in Violation of the NYSHRL)**
***Against Defendants Gorman and Krouk***

182.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

183.    By the actions described above, among others, Defendants Gorman and Krouk knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

184.    As a direct and proximate result of Defendants Gorman and Krouk's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

185.    As a direct and proximate result of Defendants Gorman and Krouk's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

186.     Defendants Gorman and Krouk's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of NYCHRL)**
***Against All Defendants***

187.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

188.     By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her race and/or color (Black), and gender, and subjecting her to a hostile work environment.

189.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

190.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of monetary damages and other relief.

191.     Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
### *Against All Defendants*

192.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

193.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, most recently, terminating Plaintiff's employment.

194.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

195.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

196.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHT CAUSE OF ACTION
### (Aiding and Abetting Unlawful Discrimination and Retaliation
### in Violation of the NYCHRL)
### *Against Defendants Gorman and Krouk*

197.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

198.     By the actions described above, among others, Defendants Gorman and Krouk knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

199.     As a direct and proximate result of Defendants Gorman and Krouk's unlawful actions in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and severe emotional distress for which she is entitled to an award of damages.

200.     Defendants Gorman and Krouk's unlawful actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**(Violations of the Equal Pay Act)**
**(Individual and Collective Claims)**
***Against all Defendants***

201.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

202.     The claims brought herein under the Equal Pay Act, 29 U.S.C. § 206 *et seq*., are brought on behalf of Plaintiff and all members of the Black EPA Collective.

203.     During the period of the employment of Plaintiff and all members of the Black EPA Collective, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. § 206 *et seq*.  During that time, Defendants required Plaintiff and the members of the Black EPA Collective to perform the same or substantially the same job position as male, primarily White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and the members of the Black EPA Collective at a rate

of pay, including salary and bonus, less than such male, primarily White, employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

204.    Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiff and the members of the Black EPA Collective on the basis of their gender and by paying Plaintiff and the Black EPA Collective members a lesser rate of pay, including salary and bonus, than that paid to male, primarily White, employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

205.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. § 206 *et seq*.

206.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff and the Black EPA Collective members have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

207.    Plaintiff and the members of the Black EPA Collective are further entitled to liquidated damages, reasonable costs and attorneys' fees.

## TENTH CAUSE OF ACTION
### (Violations of New York Equal Pay Law)
#### *Against all Defendants*

208.    Plaintiff hereby repeats. reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

209.    During Plaintiff's period of employment, Defendants were subject to the provisions of the New York Pay Equity Law, New York Labor Law § 194 *et seq.* ("New York

Labor Law"). Defendants required Plaintiff to perform the same or substantially the same job position as male, primarily White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a *bona fide* factor other than gender, such as education, training, or experience.

210.    Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiff on the basis of their gender by paying them a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishment.

211.    By the actions described above, among others, Defendants have violated the New York Labor Law.

212.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

213.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Black EPA Collective, prays that the Court enter judgment in their favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the Black EPA Collective for all monetary and/or economic damages;

E. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the Black EPA Collective for all non-monetary and/or compensatory damages;

F. An award of liquidated damages;

G. An award of punitive damages;

H. Prejudgment interest on all amounts due;

I. An award of costs that Plaintiff and the Black EPA Collective incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: June 16, 2020
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By:

Jeanne M. Christensen
Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiff and the Proposed
Black EPA Collective*

47