UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

**MARILYN BOOKER**, individually, and on behalf of
similarly situated Black female employees,

                        Plaintiff,

              v.

**MORGAN STANLEY & CO. LLC**, **JAMES
GORMAN,** in his individual and professional
capacities, and **BARRY KROUK,** in his individual
and professional capacities,

                    Defendants.

-------------------------------------------------------------------X

Civil Action No.:
20 Civ. 02662 (KAM)(LB)

**SECOND AMENDED
COMPLAINT, COLLECTIVE
ACTION AND JURY DEMAND**

Plaintiff Marilyn Booker, individually, and on behalf of a proposed collective of similarly situated Black[1] female employees at Morgan Stanley, brings claims for race and gender discrimination, retaliation and unequal pay against Defendants Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Firm"), James Gorman, in his individual and professional capacities ("Gorman"), and Barry Krouk, in his individual and professional capacities ("Krouk") (collectively "Defendants"), and hereby alleges as follows:

**PRELIMINARY STATEMENT AND SUMMARY OF CLAIMS**

1.      In a June 9, 2020 article appearing in the New York Post, James Gorman, Morgan Stanley's Chief Executive Officer ("CEO"), is described as being so "moved" by the protests and global outrage in the aftermath of the racist murder of George Floyd, that he created a new Institute of Inclusion group at the Firm aimed at promoting diversity within Morgan Stanley (which he would chair). Gorman also announced that he would fast-track the promotions of two

---

[1]      Unless otherwise noted, the use of "Black" in this Complaint also refers to and includes individuals that identify as persons of color ("POC").

Black women; Carol Green-Vincent to the Firm's Operating Committee (making her its first and only Black member), and Susan Reid to the Firm's Management Committee.

2.      Gorman's announcements came on the heels of a heavily-publicized multi-million dollar donation by Morgan Stanley to the NAACP Legal Defense and Education Fund and an agreement to match donations of all U.S. employees to the organization.

3.      It is no surprise that Gorman would publicly announce these initiatives during a moment which he has described as a "turning point in race relations."  These measures would appear, on their face, to be genuine efforts at increasing inclusion and diversity at Morgan Stanley -- the Wall Street investment Firm synonymous with "Corporate America," which manages more than $3 trillion in assets, generated over $41 billion in revenue in 2019,[2] employs tens of thousands of people worldwide (and many thousands in this country), but whose leadership is dominated by White executives and Board members.

4.      For decades, Morgan Stanley employees have helped elite wealthy Americans, primarily White people, invest their money so that they can earn more money.  However, like all companies in corporate America, Morgan Stanley has to make choices about its own employees and the policies that impact these employees.  It is, after all, employees that fuel its business of making more money for Americans that already have money.

5.      Unfortunately, time and time again, Morgan Stanley has utterly failed when it has had to actually look itself in the mirror and decide whether it wants to truly address its deep-seated racially unjust policies that have resulted in alarmingly low and disproportionate numbers of Black and other employees of color amongst its ranks, and, in particular, its executive ranks.

---

[2]   On October 15, 2020, Morgan Stanley reported net revenues of $11.7 billion for the third quarter ending September 30, 2020 as compared with $10.0 billion a year ago.

Rather than seriously examine its own role in perpetuating inequalities in hiring, pay and promotion, and in fostering toxic workplace cultures and consumer discrimination, Morgan Stanley has instead repeatedly stopped short of any meaningful major overhauls during prior opportunities for change.

6.      Recently, and as detailed *infra*, New York City Comptroller Scott Stringer called on Morgan Stanley to be transparent and publicly disclose the <u>*actual employee headcount numbers*</u> for 10 categories of employees underlying its diversity statistics, rather than continue to disclose only <u>*manipulated figures demonstrating the percentages*</u> of racial, ethnic, and gender employee makeup.

7.      Most troubling, Morgan Stanley has, in true hypocritical fashion, actively sought to *silence* those who speak out and try to advocate for change when it comes to diversity and inclusion.

8.      Marilyn Booker was one such Morgan Stanley victim.  She paid the ultimate price by losing her job merely because she pushed too hard for reforms that would disrupt the *status quo* on White dominance and result in more Black and minority employees at Morgan Stanley, including among Morgan Stanley's Financial Advisor ("FA") and FA trainee ("Trainee") ranks.

9.      For **26 years** Ms. Booker, the former Global Head of Diversity and the sole Black female Managing Director ("MD") in the Wealth Management division at Morgan Stanley's New York City headquarters, raised her voice about the irrefutable and appalling patterns she saw regarding the hiring, retention and lack of advancement of Black employees, detailed, *infra*, Tirelessly, but to no avail, Ms. Booker tried to force Morgan Stanley's leadership, including Gorman, to address the systemic racial discrimination rampant at the Firm.

10.     While Gorman is quick to now throw money at the diversity problem because he is suddenly "moved," when it was Ms. Booker's job to do just that, Morgan Stanley did nothing but actively hamstring her ability to do so.

11.     Year after year under Gorman's leadership, Ms. Booker would request in writing, more money from Morgan Stanley to support diversity efforts.  Year after year, Morgan Stanley denied her requests. Shamefully, during some years, Ms. Booker spent thousands of her own dollars just to attend events that promoted diversity.

12.     Clearly, Black lives **_did not_** matter at Morgan Stanley.

13.     In one particularly vivid example of the racial discrimination and toxic harassing environment to which she and other Black employees at Morgan Stanley were subjected, rather than reward Ms. Booker for securing a client who brought in over $90 million into the Firm to invest in 2013, Morgan Stanley stood by and did nothing when a White male executive who was upset that he could not take credit for the client ran around and told employees that Ms. Booker:

**"Pulled my pants down and ripped me a new asshole."**

14.     Notably, in 2008, while still serving as Morgan Stanley's Global Head of Diversity, Ms. Booker testified before the United States House of Representatives on the issue of diversity in the financial services industry.   During her testimony, Ms. Booker made the following ominous remarks, which horrifically and cruelly hold relevant and true today:

> In spite of the progress that has been made, and the presence of more women and minorities in the financial services sector, these groups still have skepticism about whether firms will care about them and their careers. … [Individuals from these minority groups] want to find out about your commitment to meritocracy.  They want to find out about your commitment to diversity, and they want to find out about your support systems.  Therefore, the firms that do not have the infrastructure to support this investment in time and to support building these relationships will not be as successful as those that do. …

> My final observation is that the management structure must be engaged in implementing meaningful diversity initiatives so that employees at large feel engaged. We have all heard the expression, "People don't leave a company; they leave their manager." Diversity is no different. An organization can have all the top leadership commitment there is; however, if this commitment is not communicated on a regular basis, the people who are responsible for the day-to-day, the broader efforts to have a more diverse workforce will be significantly challenged.

15.    Rather than heed her advice, Morgan Stanley exploited Ms. Booker as a "token response" and symbol of its purported commitment to diversity – trotting her out for publicity opportunities whenever it believed such showcasing was necessary or beneficial.

16.    Shockingly, 11 years after her remarks to Congress, in 2019, Morgan Stanley punished Ms. Booker for trying to address the systemic racial discrimination that permeates the Firm.

17.    Specifically, in early 2019 Ms. Booker created an innovative program called "**Project Genesis**." Ms. Booker developed Project Genesis for the purpose of meaningfully increasing diversity at Morgan Stanley. Among the reforms was a proposal to internally remedy the unequal and marginalized treatment she saw inflicted on Black FAs and Trainees.

18.    Ms. Booker lost her job for creating Project Genesis.

19.    As alleged herein, at the time that Ms. Booker created Project Genesis, the lack of Black employees at senior management levels was appalling and without question, Black FAs could barely succeed. For example, among the Morgan Stanley wealth advisors recognized in the 2019 Forbes Top Wealth Advisors List, there are only five (5) Black FAs among the combined 487 FAs on all the teams (only 1% were Black, 99% were white).

20.     Given such shocking numbers, Ms. Booker was not the only individual that noticed.[3]

21.     Throughout the fall of 2019, Ms. Booker repeatedly asked Firm leadership to simply listen to her plan.  Part of Ms. Booker's urgency was her belief that under Gorman's leadership, racial bias had increased in recent years rather than decreased.

22.     For example, between 2017 and 2019, there was a sudden mass exodus of 14 Black MDs out of the few dozen Black MDs that were at Morgan Stanley.  Upon information, while one of these Black MDs retired, Morgan Stanley made no effort to convince the other departing Black MDs to remain at the Firm.

23.     In fact, Gorman is infamous for saying, "**If you don't like it, then leave.**"

24.     For Black MDs departing Morgan Stanley, including a Black female MD named Brooke Reid, whose story is detailed below, the sentiment at the Firm was "good riddance" and "glad to see you go," rather than, "why are they leaving us?" or "how could we do better?"  In contrast, when White MDs left or sought to leave, the Firm has made significant efforts to retain them.

25.     Despite feigning support about Ms. Booker's plan for diversifying the FA and Trainee ranks, Morgan Stanley consistently ignored and evaded her.  Finally, on November 18, 2019, Ms. Booker met with two female employees in the diversity department -- not senior leaders with whom she was walled off from meeting -- to go over a draft presentation of Project Genesis.  At this meeting, Ms. Booker repeated her desire that she present her plan before senior

---

[3]     In the ongoing action, *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 60 (S.D.N.Y. 2016), seven former Black FAs alleged facts shockingly similar to the reasons that supported Ms. Booker's development and advocacy of Project Genesis.  Allegations regarding the significance of this ongoing action are set forth below.

leadership, and objected to the obvious efforts at stymying her attempts to move forward with implementing Project Genesis.

26.     Not only did Morgan Stanley leaders refuse to merely *listen* to a plan to remedy rampant bias against Black FAs and Trainees, but it swiftly engaged in its own despicable discrimination against Ms. Booker.

27.     In horrifying fashion, on December 9, 2019, Morgan Stanley ruthlessly fired Ms. Booker after nearly **26 years** of dedicated and loyal service.  Having had no performance issues, Ms. Booker was blindsided.  No explanation for her firing was given other than typical corporate posturing that her position – which was primarily to help Morgan Stanley attract Black people and people of color looking to invest their money through initiatives aimed at increasing their financial and investment literacy – was simply being eliminated.

28.     The pretextual basis for the elimination is obvious.  In fact, since her termination, Morgan Stanley has advertised no less than four open positions for job descriptions that substantially match, if not are identical, to the work that Ms. Booker has performed at the Firm.

29.     Despite the Firm's hollow promises and orchestrated "photo opportunities," through its ***actions*** taken against Ms. Booker, it is clear that diversity is the last thing Morgan Stanley cares about.

30.     Rather than lead and be brave, under Gorman's rule, Morgan Stanley weakly continues to follow the herd.

## **APPLICABLE LAWS**

31.     Ms. Booker brings this action to redress the unlawful employment practices committed against her, including Defendants' discriminatory treatment towards her due to her gender, race and/or color (Black), as well as unlawful retaliation due to her complaints of

discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL").

32.     Ms. Booker also brings this action individually and on behalf of a collective and class of Black female employees to redress Morgan Stanley's discriminatory pay practices, in violation of the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA") and the New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq*. ("New York EPA").

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under 42 U.S.C. § 1981 ("Section 1981"), Title VII, and under the federal Equal Pay Act, 29 U.S.C. § 206 *et seq*.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

34.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendants operate substantial business in this district, a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district, and because Morgan Stanley is incorporated in the state of New York and Defendants Gorman and Krouk are officers of Morgan Stanley.

## PARTIES

35.     Plaintiff Marilyn Booker is a former employee of Morgan Stanley, who at all relevant times, worked at Morgan Stanley in New York City.  Throughout her employment at Morgan Stanley, Ms. Booker serviced and interacted with numerous Morgan Stanley clients and

prospective clients that were based in this district, including, but not limited to, the non-profit organization called Brooklyn Community Services, to whose constituents she taught financial education and was able to convert into a Morgan Stanley client.  Due to Ms. Booker's efforts, Morgan Stanley now manages Brooklyn Community Services' eight-figure pension fund.  Ms. Booker is a U.S. citizen, who resides in the State of New Jersey, and at all relevant times herein, met the definition of an "employee" under all relevant statutes throughout her employment with Defendants.

36.     Founded in 1935, Defendant Morgan Stanley operates in approximately 41 countries and is a publicly traded company, listed on the New York Stock Exchange as "MS."

37.     Morgan Stanley is incorporated in the state of New York, with its principal executive office located at 1585 Broadway, New York, New York 10036.  The Firm operates multiple offices throughout this district.

38.     Defendant James Gorman is an adult resident of New York and currently Morgan Stanley's CEO.

39.     Defendant Barry Krouk is an adult resident of New Jersey and is currently a MD, Chief Administrative Officer ("CAO"), Field Management at Morgan Stanley, within its Wealth Management division.

40.     At all times relevant herein, Morgan Stanley, Gorman and Krouk were and are "employers" of Ms. Booker and all putative collective members (in the case of Morgan Stanley and Gorman, and in some cases Krouk) whom she seeks to represent under all relevant statutes.

## ADMINISTRATIVE PREREQUISITES

41.     Ms. Booker has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").   Ms. Booker's submission includes facts supporting collective claims brought on behalf of Black female employees.

42.     On January 12, 2021, the EEOC issued Ms. Booker a Notice of Right to Sue. This Second Amended Complaint adds new claims under Title VII and is being filed within 90 days of the issuance of Plaintiff's Notice of Right to Sue.

43.     A copy of the original Complaint filed in this case was served upon both the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of the New York City Administrative Code.

44.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I.     Morgan Stanley's White Male-Centric Leadership

45.     There is no question that, historically and through the present. White men run Morgan Stanley and its various businesses, including its Wealth Management division.

46.     The lack of diversity with respect to gender and race within Morgan Stanley's Operating Committee is abundantly clear.  Prior to Gorman's recent announcement regarding Carol Greene-Vincent's fast-tracked promotion, 13 of the 16 (81.3%) Operating Committee members were men, and only three (18.8%) were women.   Furthermore, 14 of 16 (87.5%) members were White, two (12.50%) were Asian, and *none* were Black.

47.     Morgan Stanley's Operating Committee includes, among others, Gorman – CEO (male, White), Jeff Brodsky – Chief Human Resources ("HR") Officer (male, White), Eric

Grossman – Chief Legal Officer (male, White), and Andy Saperstein – Head of Wealth Management (male, White).

48.     Mr. Saperstein, who co-managed the Wealth Management division with a female executive named Shelley O'Connor from 2016 to 2019, on information and belief, has regularly held team meetings at his house on weekends with his and Ms. O'Connor's White male direct reports, but would not invite Ms. O'Connor to attend these weekend meetings.  Back in the office, Mr. Saperstein and Ms. O'Connor would hold team meetings to cover topics that had already been addressed by the White males in the group at their weekend pre-meeting at Mr. Saperstein's house.  Such conduct strongly demonstrates that the treatment of women in management positions as compared to similarly situated male peers was regularly "less than" treatment, and worse, many men knew about it but did nothing.

49.     With regard to Ms. Greene-Vincent, Gorman's alleged timeline of her promotion to the Operating Committee also strongly suggests that the treatment of women in management positions as compared to similarly situated male peers was regularly "less than" treatment, and worse, many men knew about it but did nothing.  First, Ms. Greene-Vincent was hired in June 2018.  At that time, Gorman said that she would start in the fall of 2018.  Gorman said that Ms. Greene-Vincent would report functionally to the Audit Committee, administratively to Gorman, and would also serve on the Management Committee, which is the larger, less prestigious group of senior leaders than the Operating Committee.

50.     Inexplicably, Ms. Greene-Vincent was forced to undergo a lengthy waiting period, from fall 2018 until June 2020, before she was moved up to a seat on the Operating Committee.  In contrast, her similarly situated White peers were placed onto the Operating Committee as soon as they were hired or immediately after being promoted to a positon that warranted a seat – there

was never any "waiting period." At all relevant times, Ms. Greene-Vincent's position, title and role as Audit Director, which should have been sufficient to justify her position on the Operating Committee, did not change.

51.     By way of example only, in contrast to Ms. Green-Vincent's treatment, in May 2018, Gorman announced the promotions of two White executives – Rob Rooney to Head of Technology and Clare Woodman, to Head of Europe, Middle East, and Africa ("EMEA") – but made it clear that they would both "continue to sit on the Firm's Operating Committee."  In other words, these two White executives had already been on the Operating Committee well before they were promoted to these new bigger and more visible roles.  Ms. Green-Vincent's role as Audit Director was, upon information and belief, substantially similar to the roles into which Mr. Rooney and Ms. Woodman were promoted.

52.     This chain of events begs the question: why did Ms. Greene-Vincent need to wait almost two years to be put on the Operating Committee?  Did she have to undergo some sort of a probationary period to see whether she "worked out"?  Indeed, upon information, none of the other White Operating Committee members have had to wait before taking their spot on the Operating Committee once a decision was made, again strongly suggesting an inference of discriminatory bias.

53.     Morgan Stanley's Board of Directors, unfortunately, suffers from the same lack of diversity as its Operating Committee.  Within the Board of Directors, as of January 1, 2020, ten of 14 (71.4%) members are men.  Moreover, ten of 14 (71.4%) members are White, three (21.4%) are Asian, and just one (7.2%) is Black.  Notably, since Morgan Stanley's inception in 1935, the Firm has only had *two* Black persons on its Board of Directors: Rayford Wilkins, Jr.,

who currently sits on the Board, and Charles Phillips, who was a Board member from 2006 to 2010.

54.     Despite operating for 85 years with numerous individuals (presently 14) serving on the Board at a time, a Black female never has served on Morgan Stanley's Board of Directors.

55.     The lack of representation of Black individuals in leadership roles at Morgan Stanley is further exacerbated when looking at the demographic make-up of their MDs.  Since 2012, Morgan Stanley has appointed **1,382 MDs**.  The total number of MDs at Morgan Stanley is not publicly known, but is likely multiple times this number.  However, there are **only 35 Black MDs** at the Firm in the U.S.

56.     Upon belief, in 2020, the Firm refuses to be transparent about the diversity of its MD ranks **because just 2.23% of the 1,382 MDs appointed since 2012 in the U.S. are Black, while around 97% are White**.

57.     Such a gross disparity is appalling.  Morgan Stanley needs to be held accountable to its employees, clients and the public.

## II.     Morgan Stanley's Failure to Turn Over Data Concerning its Employee Demographics

58.     Morgan Stanley claims that it fired Ms. Booker in December 2019 as part of a RIF, yet it failed to provide her with any of the required data.  Morgan Stanley has also recently publicly claimed that racial equality is important and a priority at Morgan Stanley.  Firing Ms. Booker, the employee who just months earlier had created a diversity initiative intended to address systemic race discrimination at Morgan Stanley against its Black FAs stands in direct contrast to such public proclamations.

59.     This contradiction raises further questions about who in fact was selected by the Firm to be part of the RIF, and particularly about how and why Ms. Booker was selected.

60.     Adding to the suspect nature of the purported need for the RIF and to Ms. Booker's inclusion therein is the fact that while Morgan Stanley claims that the layoffs were needed, on July 16, 2020, Gorman announced that the Firm generated a stunning profit of $3.2 billion, and that revenue increased about 30% to a "record" $13.4 billion.

61.     Earlier this year, in July 2020, New York City's Comptroller Scott M. Stringer wrote to 67 S&P 100 companies, including Morgan Stanley, that had issued public statements like the one issued by Gorman referred to *supra* at Paragraphs 1-3 demanding that they produce copies of their respective Consolidated EEO-1 Reports.[4]

62.     Until last week, Morgan Stanley had never publicly produced the information contained in its Consolidated EEO-1 Report that Mr. Stringer requested.  Specifically, Mr. Stringer wanted the Consolidated EEO-1 Report because it discloses data concerning **employee headcount numbers for each employment category (10 tiers)**, rather than merely percentage figures which are not helpful to ascertain meaningful, year-over-year comparisons.[5]

63.     Only with disclosure of the data contained in the EEO-1 Report, *i.e.*, employee headcount numbers over a number of employee levels (tiers), can any real analysis of diversity at Morgan Stanley be possible.

---

[4]     *See*  https://comptroller.nyc.gov/newsroom/comptroller-stringer-and-three-new-york-city-retirement-systems-call-on-67-sp-100-companies-who-issued-supportive-statements-on-racial-equality-to-publicly-disclose-the-composition-of-their-workforce/.

[5]     In his letters to the companies, Mr. Stringer said that without public disclosure of the Consolidated EEO-1 Report for 10 categories (tiers) of employees, "investors, employees and the public are unable to monitor, assess and benchmark" Morgan Stanley's "performance in hiring, retaining and promoting black employees, other employees of color and women in the U.S."  A sample letter was posted online by the Comptroller's office.  *See* https://comptroller.nyc.gov/wp-content/uploads/2020/06/SMS-to-Amazon-EEO-1-Disclosure-7.1.20-1.pdf?utm_source=Media-All&utm_campaign=7998b7d4c8-EMAIL_CAMPAIGN_2017_05_31_COPY_01&utm_medium=email&utm_term=0_7cd514b03e-7998b7d4c8-141571729.

64.     Ms. Booker, in her role as Head of Diversity, saw the actual employee headcount numbers at Morgan Stanley for years.  Because of her inside knowledge and ability to make year over year comparisons, Ms. Booker knew how dire the situation was and continued to be for Black FAs, Trainees, and especially for Black female employees.

65.     This knowledge propelled her determination to effectuate initiatives that could bring about change, *i.e.*, Project Genesis, and why she relentlessly advocated for the program to management.[6]

66.     In response to Mr. Stringer's request, just days ago for the first time, Morgan Stanley published its 2018 EEO-1 Report data which confirms the gross racial and gender disparities  at Morgan Stanley:

---

[6]     Out of an abundance of caution, Ms. Booker has opted to not disclose relevant demographic and headcount data in this pleading lest she be accused by Morgan Stanley of improperly disclosing proprietary information.  Ms. Booker is prepared to disclose such data to the Court if necessary or requested.



**EQUAL EMPLOYMENT OPPORTUNITY REPORT**

2018 EEO-1 Certified Employer Information Report for Morgan Stanley[7]



## III.   **Plaintiff Marilyn Booker**

67.    By any measure, Ms. Booker is one of the most highly-qualified, decorated and accomplished Black executives in corporate America today.

---

[7]    For original data, <u>see</u> Morgan Stanley's 2020 Diversity and Inclusion Report, p. 37 ([https://www.morganstanley.com/assets/pdfs/Morgan_Stanley_2020_Diversity_and_Inclusion_Report.pdf](https://www.morganstanley.com/assets/pdfs/Morgan_Stanley_2020_Diversity_and_Inclusion_Report.pdf)) (last accessed December 18, 2020).  Notably, the Firm included only 5 categories (tiers) of employees rather than the 10 requested by Mr. Stringer.

68.     Ms. Booker received her Bachelor of Arts degree in Political Science from Spelman College, graduating *magna cum laude*.  She then attended the Illinois Institute of Technology, Chicago-Kent College of Law, where she received her law degree.

69.     Ms. Booker became the first Black law clerk for a White judge in the then 110 year history of the Illinois Appellate Court.

70.     As a practicing attorney, Ms. Booker served as an Assistant Public Defender at the Cook County Public Defender's office in Chicago.  She then practiced at two private law firms -- Hinshaw & Culbertson LLP in its Municipal Finance Department, and Altheimer and Gray in its Bankruptcy Department.

71.     Ms. Booker continued her career in service by serving as Senior Vice President of Minority Business Development for James H. Lowry & Associates, a role she held until she joined Morgan Stanley in 1994 (where she would remain for the next 26 years).  In this role, Ms. Booker worked to promote minority and women-owned businesses by working with major corporations to develop strategies to increase their level of sourcing to such businesses, and to identify growth areas in which she matched minority and women-owned businesses with corresponding contracting opportunities.

72.     Ms. Booker is also a qualified financial investment advisor and holds Series 7, 9, 10 and 66 licenses.

73.     Further demonstrating her commitment to improving the lives and financial wellbeing of minorities -- not only at Morgan Stanley but in the financial sector as a whole -- Ms. Booker has also spoken on the subjects of diversity and wealth in a range of prestigious venues.

74.     For instance, in February 2008, Ms. Booker testified before the United States House of Representatives Financial Services Subcommittee on "Diversity in the Financial Services Sector."  She has also appeared on NPR during a program entitled "The State of Black America" in 2019, on The Steve Harvey Morning Show, and on ABC World News Tonight during a segment on "Women and the Workforce".

75.     Ms. Booker has also been recognized as one of National Urban League's 2019 Women of Power, as Harvard College Black Men's Forum's "Woman of the Year," as a Stillman College "Alabama Female Firsts - Women's Dimensions of Leadership" Awardee, as a Savoy magazine "Top 100 Most Influential Blacks in Corporate America," as one of Uptown Professional "100 Top Executives in America," by Network Journal as one of its "25 Influential Black Women in Business," and as an Outstanding Leader in Diversity by the Association of Black Women Attorneys.

76.     Ms. Booker is also a member of the Executive Leadership Council, and served as Co-Chair of the Apollo Theater's Women's Committee, a Trustee of the Morgan Stanley Foundation, a Member of the Morgan Stanley Benefit Plan Administrative Committee, a Board Member of the New York Urban League, and a Board Member of the Arthur Ashe Institute of Health.

77.     Ms. Booker has also published numerous articles in Morgan Stanley Today, including an article entitled, *On a Mission to Make A Difference: Marilyn Booker Empowers Communities* (February 2018).  She has also been featured in various books, including in a chapter entitled "Mo' Money, Mo' Problems – The Economics of Being Black and Buying Black" in *Conversations in Black* by Ed Gordon (2020), and in a chapter entitled "Changing the

Face of Wall Street" in *Change Agent: A Life Dedicated to Creating Wealth for Minorities,* by James H. Lowry (2019).

78.     Within the past three years alone, Ms. Booker has been asked to write at least six articles for, and has been profiled several times, in Morgan Stanley Today.  Very few, if any, of her White peers, including White male peers within the Wealth Management division, have enjoyed such fanfare.  Notably, on December 9, 2019, the day she was notified that her employment would be terminated, Ms. Booker was putting the final touches on two additional articles that Morgan Stanley was to publish.  The articles were eventually published on December 17, 2019 and December 23, 2019, after the date she was fired.

A.     **Ms. Booker's Employment at Morgan Stanley**

i.     **Ms. Booker Serves as Morgan Stanley's First Global Head of Diversity, and Then Leads the Urban Markets Group**

79.     In 1994, Ms. Booker was hired as Morgan Stanley's first diversity officer and held the title of Global Head of Diversity.  From 1994 to 2010, Ms. Booker grew the diversity department from one assistant to a team of over 15.  The programs Ms. Booker initiated during this time received recognition and awards from numerous external organizations, and her relentless work towards advocating for minority employees at Morgan Stanley enjoyed wide success.

80.     Ms. Booker also fulfilled multiple additional roles during this time, which included Head of Supplier Diversity, Work Life, Human Resources Policy and she was the Equal Employment Opportunity (EEO) Officer for the Firm.   In these roles, Ms. Booker worked to:

- Develop strategic diversity initiatives;

- Design and deliver career development and diversity training programs;

- Manage Firm-wide diversity campus recruiting;

- Develop a lateral diversity recruiting program;

- Provide guidance on compensation and promotion issues relative to the Firm's diverse employees;

- Conduct analysis of diversity metrics to keep business units apprised of progress or lack thereof;

- Work with Morgan Stanley's Legal and Human Resources departments to manage risk on sensitive employee relations issues;

- Create and manage the Firm's Supplier Diversity Program and assist minority and women-owned businesses in securing procurement opportunities with Morgan Stanley;

- Manage Human Resources Policy and draft an Employee Policy Handbook, and

- Manage the Firm's Affirmative Action Plans, community outreach and contributions to diverse communities.

81.    In particular, Ms. Booker was very involved in the compensation and promotion process.  She was often able to get minority employees placed on lists for promotions who were not initially on those lists, and was able to secure raises in compensation for employees of color to levels that were commensurate to that of White employees, particularly White men, with similar roles and performance achievements.

82.    This included, amongst other people, Carla Harris, a Black female.  At the time Ms. Booker joined Morgan Stanley in 1994, Ms. Harris was an Associate at the Firm.  Ms. Booker had to personally fight every year with Ms. Harris's direct managers to ensure that Ms. Harris was paid at a rate comparable to her White counterparts.  Ms. Booker also had to fight each year that Ms. Harris was "time eligible" to become promoted with her class to ensure that she received the promotion she deserved.  Ms. Booker recognized that Ms. Harris never received the same opportunities as her White male counterparts. Understandably, Ms. Harris recognized

these disparities in opportunities based on race and gender, and complained to Ms. Booker about this repeatedly.

83.     In or about 1999, Ms. Harris was eventually promoted to MD after Ms. Booker spoke to Joe Perella, the then-head of the Investment Banking Division, and implored him to promote Ms. Harris.  Even though she was promoted, Ms. Harris remained underpaid relative to her White male peers, but Ms. Booker continued to advocate for her.  Ms. Harris would later work in in the Wealth Management division for a few years between 2015 and 2018 and complained to Ms. Booker on numerous occasions about how "these white boys," referring to White male leaders in the group, did not "get it" and "could care less" about diversity and Black people.  In fact, because Ms. Harris became exhausted with fighting these battles in Wealth Management, she eventually moved out of the division in 2018.

84.     Similarly, Ms. Booker recruited a Black female named Brooke Reid in 1994 out of college into Morgan Stanley's first class of Richard B. Fisher Scholars, a program Ms. Booker worked on to identify and hire top Black talent for the Firm.  Ms. Reid had a stellar education and career – she graduated from Howard University, from Harvard Business School, and thereafter worked at Enron.  Later, she returned to Morgan Stanley as a Vice President in December 2001.  Ms. Reid was ultimately promoted to Managing Director and did a short stint in the Wealth Management division.  She ended up leaving Morgan Stanley in 2015, and the Firm failed to make an effort to retain her.

85.     In contrast, in September 2006, Ms. Booker was forced to hire a White female for her team named Caroline Gundeck, who knew Gorman.  At that time, Gorman was running the Wealth Management division. Ms. Booker did not want to hire Ms. Gundeck because she did not believe that Ms. Gundeck would be a strong performer.  However, Ms. Booker was told by Jeff

Brodsky, the head of HR for Wealth Management at the time and a person who was and remains very close to with Gorman, that she did not have a choice because *Gorman wanted Ms. Gundeck hired*.

86.     In Ms. Gundeck's performance reviews, including the one issued to her in December 2007, Ms. Booker noted that she was a poor performer.  This was not the sole opinion of Ms. Booker as the review was jointly drafted by Ms. Booker and Adam Kudelka, who, at the time, worked in Human Resources within Wealth Management.

87.     In or about November/December 2007, Ms. Booker attended a dinner in which she sat next to Gorman.  At the dinner, Gorman asked Ms. Booker how Ms. Gundeck was doing. Despite knowing his personal interest in Ms. Gundeck's hiring, Ms. Booker gave Gorman her honest assessment, namely, that there were performance issues.  Gorman just smiled and nodded his head.  To this date, Ms. Gundeck is still employed at Morgan Stanley, despite having held at least six or seven different positions since joining the Firm.

88.     During Ms. Booker's tenure in the Diversity seat, from 1994-2010, she had the backing of, and did very well under, the regimes of three different CEOs -- Dick Fisher, Phil Purcell, and John Mack.

89.     In 2010, Gorman became CEO of Morgan Stanley.  Before his promotion to CEO, Gorman was co-President and responsible for overseeing the Firm's Global Wealth Management and Investment Management businesses.

90.     Shortly after the change in leadership, inexplicably, Gorman removed Ms. Booker as Global Head of Diversity.  She was moved into a brand-new group called the Office of Development.

91.     Ms. Booker was told that in this new position, she was to focus on teaching financial literacy and developing external relationships with community minority groups.

92.     Tellingly, Morgan Stanley's lack of commitment to diversity at the time was clear, as the Office of Development was eliminated in 2011.  As a result, Ms. Booker's "new" position was short-lived.

93.     The elimination of this department forced Ms. Booker to search for a new job. Recognizing Ms. Booker's undeniable value to the Firm, John Mack, Morgan Stanley's outgoing CEO, helped create a position for Ms. Booker to lead yet another newly created group called the Urban Markets Group ("Urban Markets").

94.     In this capacity, Ms. Booker was tasked with leading a small "team" of minority FAs into minority communities to advocate and message about fiscal responsibility.  Ms. Booker devised and delivered financial education programs to urban communities in partnership with individuals, non-profit organizations, small businesses, trade organizations and financial, educational and health institutions.

ii.     **Ms. Booker's Revolving Door of White Male Bosses**

95.     Unfortunately, Morgan Stanley believed that the Urban Markets department, tasked with meaningfully impacting minority communities, needed to be supervised by White men.  Perhaps this was so because there simply were no employees of color at such senior levels. Regardless, shockingly, from the creation of the Urban Markets group until her firing, Ms. Booker had _eight_ different bosses during her eight-year tenure.

96.     It was a virtual revolving door of White men (and one token White woman) to whom Ms. Booker had to answer.  It was clear from this constant turnover that Morgan Stanley's management never fully supported Urban Markets.

97.     Sadly, what also is clear is that none of these White men or the lone White woman believed that lingering too long as the supervisor of the head of Urban Markets was a positive career move. If Morgan Stanley leadership actually valued this initiative, such rampant turnover never would have happened.

98.     Regardless, no one at Morgan Stanley truly cared about the diversity initiatives Ms. Booker spearheaded, nor felt compelled to be associated alongside her work. Morgan Stanley intended on doing nothing more than to pay lip service to its supposed commitment to helping minority communities or minority employees.

99.     Ms. Booker was left to navigate this series of disinterested supervisors and operate the Urban Markets group without meaningful feedback or continuity of leadership. Not surprisingly, her small "team" never amounted to more than only two FAs hired early in her tenure.

### iii.     Ms. Booker is Paid Less Than Similarly Situated White Men

100.     Equally concerning is the fact that from the time she started in Urban Markets and for the eight years she remained in this role before her December 2019 ouster, her salary was essentially held flat. At the same time, the Firm slashed her budget, year over year. The economic reality was that the compensation Morgan Stanley paid Ms. Booker was "less than" what was paid to similarly situated males, particularly White males.

101.     These White male peers at the MD level within the Wealth Management division and who performed substantially similar work/job responsibilities as Ms. Booker, and/or held a substantially similar title, or had substantially similar skillsets, experience level/backgrounds and work terms and conditions as her but were paid more than her include, but are not limited to:

- Ralph Balzano, Regional Director

- David Bokman, Head of Ultra High Net Worth Resources

- Sal Cucchiara, Head of Wealth Management Technology

- Marc Dextraze, (promoted in 2020),  Investment Solutions

- Daniel Dibiasio, Head of Multi-Family Office

- Michael Dibiasio, Private Bank

- Tom Duffy, Private Bank

- Jed Finn, Chief Operating Officer ("COO") of Wealth Management

- Ben Firestein,  Head of National Recruiting

- Larry Frers,     Head of Wealth Management, Human Resources

- Nelson Gaertner, Regional Director

- Barry Goldstein, COO Private Bank

- Paul Halpern, Head of Deposits & Banking

- Chris Scott Hansen, Head of Portfolio Trading

- Eric Heaton, Private Bank

- Michael Hennessy, Head of Operational Risk

- Ben Huneke, Head of Investment Solutions

- Matt Jones, Head of Strategy

- Barry Krouk, CAO Field Management

- Adam Kudelka, Former COO of Wealth Management, now Head of Compensation

- David Lessing, COO of Wealth Management

- Vince Lumia,  Head of Field

- Kevin Lynyak, Managed Advisory

- Jim McCarthy, Management

- Brian McDonald, Head of Corporate Solutions

- Paul McGeary, Regional Sales

- Bill McMahon, No Known Role but given title Vice Chairman

- Jeff McMillian, Chief Analytics and Data

- Sean Maher, Capital Markets

- Rob Meredith, Regional Director

- Chris O'Dea, Capital Markets

- Curt Peterson, Regional Director

- Jason Pizzorusso, Chief Financial Officer ("CFO") Wealth Management

- Paul Servidio (promoted in 2020), Head of Fixed Income Sales

- Rick Skae, No Known Role but given title Vice Chairman

- Daniel Skelly (promoted in 2020), Head of Market Research

- Darren Spencer, Capital Markets

- Jim Tracy, Director of Consulting Group

- Paul Vienick, Head of Digital Investment

102. The above list, which is not exclusive, are all White men. Like Ms. Booker, these White men are or were MDs within the Wealth Management division. These White men were in substantially similar positions as Ms. Booker, or in positions with substantially similar responsibilities, skillsets and experience/backgrounds, but they were paid more than Ms. Booker. Not only were these substantially similarly situated White men subject to better terms and conditions of compensation, including, in most instances, by being paid commissions or other

remuneration for the assets under management they brought to the Firm, but they also were provided countless opportunities for advancement that Ms. Booker was not provided.

103.    For instance, in contrast to these similarly situated White men in substantially similar roles who received regular if not annual raises in compensation, Ms. Booker's salary remained essentially flat throughout the time she was an MD in the Wealth Management division.  Furthermore, in contrast to these similarly situated White men in substantially similar roles who were given higher and higher business development budgets each year, Ms. Booker's business development budget was cut year after year.

104.    Additionally, in contrast to the White men in substantially similar roles, Ms. Booker was not paid commissions or other remuneration for the assets under management she brought to the Firm, the number for which is estimated at over $200 million.

105.    Had Ms. Booker been a male employee at Morgan Stanley, she would have been paid almost twice what Morgan Stanley paid her (and likely more).  Ms. Booker is entitled to an award for this pay inequity differential.

### iv.    Repeated Efforts to Force Change Are Ignored by Morgan Stanley Leaders

106.    As Morgan Stanley knows, in recent years Ms. Booker internally made repeated attempts to force awareness of racial inequality and create change.

107.    For instance, in 2013, Ms. Booker, with the support of television personality Steve Harvey, proposed creating a mass mutual fund initiative to market to Black and minority communities to help constituents in those communities begin to and become educated in investing.  To have mass market appeal, the minimum investment was set at just $5,000.  Ms. Booker coordinated several meetings and performed a tremendous deal of analysis, only to hit a brick wall at Morgan Stanley.  In fact, Ms. Booker was told by the then-current Chief Marketing

Officer that Steve Harvey was not "consistent with our brand or our audience," and thus, she did not support having him as a spokesperson for any Morgan Stanley initiative. Ms. Booker was also told that the $5,000 amount was too small and would not work with Morgan Stanley. Ms. Booker's initiative was "dead on arrival" and never allowed to go anywhere.[8]

108.    Moreover, for years, Ms. Booker tried to convince Morgan Stanley to work with prominent Black National Basketball Association ("NBA") legend Earvin "Magic" Johnson, a highly successful businessperson. In October/November 2016, Ms. Booker tried to get Mr. Johnson on the docket to speak at some of Morgan Stanley's conferences. Morgan Stanley never asked Mr. Johnson to speak, nor were any other high-profile Black speakers invited.

109.    On another instance, Ms. Booker tried to convince Morgan Stanley to sponsor a business conference that Mr. Johnson organized, which would have resulted in tremendous exposure in the Black community for Morgan Stanley, with Mr. Johnson serving as a *de facto* spokesperson for the Firm.

110.    As part of her efforts, Ms. Booker arranged a luncheon in December 2017 with Mr. Johnson and many of the Firm's Management Committee members. Mr. Johnson and his team talked about a potential partnership with Morgan Stanley, and he also offered to speak at the Firm and help with any marketing or other Firm initiatives. While Management Committee members were very excited about the photo opportunity with Mr. Johnson, the Firm ultimately failed to partner with Mr. Johnson.

---

[8]     Disgustingly, four years later, in 2017, Morgan Stanley launched an initiative called "Access Investing" -- a mass mutual fund product with a minimum investment of $5,000. The target demographic for this promotion, however, was Millennials, *i.e.*, persons who generally reached adulthood in the early 21st century. Morgan Stanley had ripped off Ms. Booker's proposal aimed at financially empowering the Black and minority communities. To add insult to injury, no one at Morgan Stanley even so much as asked Ms. Booker whether she was interested in managing the initiative (her idea originally), much less to even be on the team.

111. Specifically, Tom Nides ("Nides"), a member of the Firm's Management Committee who had oversight over marketing efforts and was a close confidant of Gorman, convened a small group to decide whether the Firm would work with Mr. Johnson.  Ms. Booker urged Nides in late-January 2018 to move quickly because there were other firms that Mr. Johnson was speaking with, but Nides failed to act quickly.  Eventually, because of Morgan Stanley's complete lack of action, Mr. Johnson partnered with another firm in early February 2018.  Once again, Ms. Booker's efforts at marketing Morgan Stanley to the Black and minority communities with the goal of financially empowering its constituents hit a brick wall.

112. Notably, Carla Harris, who was a part of this small group deciding whether Morgan Stanley would work with Mr. Johnson, was visibly upset by the Firm's stagnancy and later told Ms. Booker in May 2018 that the Firm "did not get it" and missed a great opportunity to further its purported diversity efforts.

113. Ms. Booker later learned that Mandell Crawley ("Crawley"), a male Black MD who also had close ties to Gorman, bragged about how he worked with Nides and "killed" the Magic Johnson partnership deal for Ms. Booker.  Crawley, who is also the head of Private Wealth Management, has bragged about his close ties to Gorman, including about how he has ridden in the Morgan Stanley corporate jet with Gorman to go a PGA Tour golf tournament, and how Gorman had confided in him the sensitive details (which he then repeated) surrounding the controversial 2017 termination of former Tennessee Congressman Harold Ford, Jr. from the Firm.

114. Moreover, on December 11, 2017, trying every way she could to get Morgan Stanley to work with Mr. Johnson, Ms. Booker sent Vince Lumia ("Lumia"), a senior Executive in the Wealth Management division, an email that discussed Mr. Johnson.  Ms. Booker told

Lumia that Mr. Johnson had offered to be a consultant and help Morgan Stanley capture more market share in the sports and entertainment arena.  However, Lumia did not take Ms. Booker up on her offer to work with Mr. Johnson.

115.    Similarly, in December 2019, shortly before Ms. Booker's employment at the Firm was terminated, Ms. Booker contacted Nides about another opportunity for Morgan Stanley to partner with Mr. Johnson regarding a conference Mr. Johnson wanted to hold for notable alumni of the Los Angeles Lakers NBA franchise, including Kareem Abdul-Jabber and Pat Riley.  Unsurprisingly, Nides never responded to Ms. Booker's outreach.

116.    Nides himself would harass Ms. Booker on account of her gender nearly each time the two would have a meeting, including as recently as May 2018, as he started virtually each meeting held between them by asking Ms. Booker *who she was dating.*  Nides also subjected her to less than treatment by commenting on her clothes, shoes and/or purses and the respective costs of these items.  At no time during Ms. Booker's employment at Morgan Stanley did she witness Nides comment to men about what they were wearing or opine on the cost of what they were wearing.

117.    Notably, while Ms. Booker's efforts to bring Mr. Johnson into the fold failed, Morgan Stanley did not hesitate to hire the British White professional golfer Justin Rose as a spokesperson.  It goes without saying that Mr. Rose was believed to be better recognized among the community of White male affluent golf aficionados, and not most members of the Black and minority communities.

118.    As recently as March 2020, Morgan Stanley has said the following about Mr. Rose[9]:

- "In December 2017, Rose was named a brand ambassador for Morgan Stanley, which has been a Proud Partner of PGA TOUR's THE PLAYERS® Championship since 2016 and **which has always celebrated the game of golf**.

- "Morgan Stanley and Justin Rose: A Winning Team;"

- **"I can't think of a better ambassador for the Morgan Stanley brand than Justin,"** says Mandell Crawley, Head of Private Wealth Management at Morgan Stanley.

119.    Ms. Booker also made repeated complaints about the outrageously low number of Morgan Stanley clients who were Black.  Indeed, even though Steve Harvey was a Morgan Stanley client (because of Ms. Booker's efforts and the relationship she fostered with him), she could not persuade the Firm's Investment Banking Division to do a deal with him in 2013/2014. This was emblematic of Ms. Booker's constant struggle to get Morgan Stanley to market to and work with Black people.

120.    Importantly, as Ms. Booker became more vocal internally about the need for Morgan Stanley to support Black employees and Black causes, her ability to effectuate change decreased under Gorman's leadership.  In particular, Ms. Booker's budget was inexplicably slashed each year, and by 2019, was 71% lower than what it had been at the time she started working in the Wealth Management division role in 2011. Such budget reductions made it harder each year for Ms. Booker to do her job.

---

[9]      https://www.morganstanley.com/articles/justin-rose-morgan-stanley#:~:text=In%20December%2C%202017%2C%20Rose%20was,celebrated%20the%20game%20of%20golf.

121.   In 2017, the two White males overseeing Ms. Booker's role, Bill McMahon ("McMahon") and Rick Skae ("Skae"), cut her budget in half, severely curtailing her ability to do her job.  Tellingly, despite there being supposed "budgetary constraints," when McMahon's and Skae's roles were eliminated in mid-2017, and Ms. Booker was removed from reporting to them, these same two White men were not fired or subject to pay cuts; instead, they "failed up" by being promoted to Vice Chairmen in the Wealth Management division.  With no explanation, Ms. Booker learned that these two White men would "continue to have a strong presence in the field and play critical senior leadership roles moving forward" despite not even having specific job functions.  Upon belief, they are still employed by Morgan Stanley, and are essentially "floating around" from role to role.

122.   An example of what it means to enjoy "male White privilege" could not be more vivid.

123.   Likewise, Adam Kudelka ("Kudelka"), one of Ms. Booker's bosses in her revolving door of eight bosses in eight years in her Urban Markets role was, prior to 2007, in a junior role relative to Ms. Booker.  He became her peer through approximately 2015, and then became her boss from 2015 to 2016.

124.   In the last approximately seven years, Kudelka has bounced around between at least four different roles, surviving Reduction-in-Force ("RIF") exercise over RIF exercise, and is now, beginning in 2018, Global Head of Compensation, a major role within Human Resources. He received opportunities to consistently move on to different roles -- opportunities that Ms. Booker never received.  Similar to McMahon, Skae and other White males, he was repeatedly given the "benefit of the doubt" and was allowed to remain at the Firm despite rolling out of job after job.

125.    Notably, since Gorman started as Morgan Stanley's CEO in 2010 the Firm's diversity efforts have gone noticeably <u>backwards</u>.

126.    Morgan Stanley is estimated to have **16,000 FAs**.  Upon belief, there are only around **100 Black FAs**.  That is, 0.63%, or **less than 1% of all FAs are Black, while about 99% of Morgan Stanley's FAs are White**.

127.    Disturbingly, the percentage of Black FAs is far less than it was when Ms. Booker was Global Head of Diversity from 1994 through 2010.

128.    Moreover, in 2010, when Gorman assumed the CEO role, Morgan Stanley had approximately 1,600 MDs.  While Morgan Stanley does not publish data about the total number of MDs it has, the total number of MDs is likely double, if not triple, this figure currently.

129.    However, currently, there are just 35-41 Black MDs out of multiple thousands of MDs.  Further, there are currently just four Black MDs in Wealth Management (including one Black female who was just promoted in January 2020), and only two Black MDs in Investment Banking.  When Ms. Booker was Global Head of Diversity *over ten years ago*, Morgan Stanley had at least four Black MDs in Investment Banking.  The bulk of the Black MDs at Morgan Stanley are in non-revenue areas like Operations and Finance, while only one Black MD is in the Legal department, and only one Black MD is in Research and has worked only in London.

130.    Clearly there has been absolutely no progress with respect to Morgan Stanley's diversity efforts under Gorman's leadership.  Instead, the Firm is backsliding.

v.    <u>The Marginalized and Disfavored Urban Markets Group</u>

131.    For years, Morgan Stanley hurled blatant unequal treatment against the marginalized and disfavored Urban Markets group, and specifically towards Ms. Booker.

132.    By way of example only, in 2013, Morgan Stanley subjected Ms. Booker and a Black male colleague to horrific and blatant discriminatory treatment in connection with the procurement of Webster University ("Webster") as a client, and Webster's investments of over $90 million with Morgan Stanley.

133.    Specifically, a White male Morgan Stanley executive and others at Morgan Stanley, including a White advisor from Morgan Stanley's Graystone Consulting Group, intentionally bulldozed Ms. Booker and her Black male colleague by attempting to take credit for the origination of Webster as a client and its tens of millions of dollars to invest.

134.    Ms. Booker expressly conveyed to multiple White Morgan Stanley managers and executives that this was happening *because* she and her Black male colleague were Black and being subjected to mistreatment based on their minority status.  Ultimately, Ms. Booker and her Black male colleague succeeded in securing Webster as a client.

135.    Rather than reward Ms. Booker for bringing in Webster and its $90 million to invest, Morgan Stanley stood by and did nothing when one of the White male executives ran around and told employees that Ms. Booker:

**"Pulled my pants down and ripped me a new asshole."**

136.    Egregiously, at that time and in the years since, Morgan Stanley failed to pay Ms. Booker even *one dollar* in commissions for the over $90 million of Webster's investment, or, for that matter, the many other millions in assets that she brought into the Firm.

137.    No non-discriminatory reasons motivated Morgan Stanley's conduct surrounding Webster, including the White male executive's disgusting statements.

### vi     **Project Genesis**

138.    In June 2019, Krouk, a White male, supervised Ms. Booker.  Ms. Booker complained to Krouk about how she was troubled by the unequal and marginalized treatment she saw inflicted on minority FAs and Trainees.

139.    On too many occasions, Ms. Booker watched as White male leadership repeatedly advanced and supported White FAs and Trainees, while ignoring minority FAs and Trainees.

140.    In fact, Ms. Booker herself has, throughout the years, referred several qualified Black candidates for Morgan Stanley's FA training program, but only one person has ever been hired, and that was a person that she hired into her own group in September 2013.  Whenever Ms. Booker would refer these qualified Black candidates, she would receive vague feedback about how these individuals did not meet initial criteria or did not pass an initial test that was being administered.  It was incredibly disheartening to Ms. Booker that the high number of qualified minority candidates she was sponsoring could not get through the initial hiring process.

141.    Notably, within the last year, several Black FAs, who will be referred to as FA1, FA2, FA3, and FA4,[10] have gone to Ms. Booker with concerns about how difficult it is to be a Black FA at Morgan Stanley, and how they are slighted and treated differently than their White FA peers.  The topics of these complaints Ms. Booker has fielded range from unfair commission splits, to being blocked from attending meetings, to not having mentors, to not being asked to join FA teams.

142.    For several years before he was promoted to the prestigious role of Head of National Recruiting for the Wealth Management division in January 2020, Ben Firestein ran one

---

[10]    These FAs will not be identified herein to prevent acts of retaliation against them. Plaintiff is prepared to disclose the names of these FAs to the Court *in camera*.

of the largest offices in the wealth management system, but in his office, there were only *two* Black FAs – both of whom Ms. Booker brought into the office and worked on Ms. Booker's team.  That an executive with such an abysmal track record of recruiting diverse talent into his team would be promoted by Morgan Stanley to the position of *Head of National Recruiting* for the entire Wealth Management division is outrageous.

143.    Ms. Booker had a plan to help reduce the unlawful bias and told Krouk about her plan.  Specifically, Ms. Booker told Krouk that, in response to the rampant bias against minority FAs and Trainees, she wished to create "Project Genesis" to address their uniformly shared experiences, including, *inter alia*: (i) constant feelings of isolation and lack of support; (ii) inability to get onto FA teams; and (iii) barriers in their attempts to partner with White FAs on new business opportunities, such as repeatedly being subjected to unfair commission splits, and in some occasions, exclusion from new client meetings.

144.    Ms. Booker's observations and proposed reforms in 2019 were consistent with what other courts have determined to be common sense means of reducing unconscious and conscious bias from thwarting the success of Black FAs before they even have a chance to compete on a level playing field.

145.    Indeed, in a case involving substantially similar claims about unequal conduct towards financial advisors at Merrill Lynch, Judge Posner of the Seventh Circuit Court of Appeals wrote:

> [I]f as a result of racial preference at the team level black brokers . . . find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in.

*See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489-490 (7th Cir. 2012).

146.   Ms. Booker asked Krouk if Morgan Stanley would support this initiative, and if so, whether she could have help collecting and analyzing data needed for Project Genesis. Initially, Krouk identified a couple of analysts who could help Ms. Booker.  Krouk also told Ms. Booker that he wanted his Chief Operating Officer, Naeema Huq Abrar (a South Asian female), and the Head of Diversity for Wealth Management, Kara Underwood (a White female), to be present at meetings about Project Genesis.

147.   Although Ms. Underwood and Ms. Abrar appeared to support the initiative, it quickly became clear to Ms. Booker that, in keeping with how the Firm marginalized the efforts of the Urban Markets group over the prior eight years, these women wanted to avoid any outward association with Project Genesis.  For example, between July and November 2019, Ms. Booker noticed that Ms. Abrar and Ms. Underwood would be increasingly unavailable to meet to discuss Project Genesis, or would cancel meetings at the last minute.

148.   Ms. Booker also found that Krouk was either unhelpful or resistant to her efforts to move forward with the project.  Tellingly, Krouk told Ms. Booker not to talk about Project Genesis with anyone else.  On this point, Krouk rejected Ms. Booker's request to present Project Genesis to senior management, falsely claiming that she needed to present to him first.

149.   On November 18, 2019, Ms. Booker finally met with Ms. Abrar and Ms. Underwood to go over a draft presentation of Project Genesis.  When Ms. Booker raised her desire to present Project Genesis to senior management, Ms. Abrar and Ms. Underwood similarly resisted this proposal.  Instead, the two women told Ms. Booker that she needed to wait until after she presented it to Krouk, which would be sometime *the following year*.  Ms. Booker

objected to this delay and indicated that she would talk to Krouk about moving forward sooner.

150.    A few weeks later, Ms. Booker and the analysts who were assigned to work on Project Genesis discussed *via* email an article in The Washington Post reporting that only two of the 15 largest banks agreed to share federal diversity reports.  Unsurprisingly, Morgan Stanley was not one of the two.

151.    Because the article discussed the systemic discriminatory treatment Blacks in wealth management constantly endure, the response to the article by one of the analysts noted that the article "speaks directly to everything you've been saying and the need for Genesis!"

152.    The article also discussed a 2016 discrimination lawsuit brought by seven Black FAs alleging they "were less likely than White peers to be connected with the clients of departing brokers and assigned to high-producing teams, making it more difficult for them to earn equal pay and remain at the firm."  The lawsuit at issue was *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 60 (S.D.N.Y. 2016).

153.    These concerns are precisely what Project Genesis intended to address. Abhorrently, in the Washington Post article, Morgan Stanley claimed it allocated "'substantial resources' to its diversity efforts" and was "making steady progress."  The utter hollowness of such a self-serving position is clear when, just days later, Morgan Stanley would unlawfully terminate Ms. Booker.

**B.    Ms. Booker's Termination**

154.    A meeting was scheduled on December 9, 2019, for what Ms. Booker believed was a meeting with Krouk to finally discuss Project Genesis and how to present it to Morgan Stanley senior management.  When Ms. Booker arrived at his office, Krouk walked her to a nearby conference room where JoAnne Ceriello, a MD in Human Resources, was waiting.

Shamefully, Krouk, too embarrassed to look Ms. Booker in the eye, immediately left, and Ms. Ceriello told Ms. Booker that she was fired.  Although Ms. Booker made requests about alternative positions, including as an FA with no base pay, Ms. Ceriello rejected her proposals and told Ms. Booker there were no other options.

155.    Ms. Booker was completely blindsided.

156.    At the time she was fired, Ms. Booker was the only Black female MD in Morgan Stanley's Wealth Management division's New York City offices.  Despite her longevity, loyalty and stellar performance record, Morgan Stanley offered no explanation for her expulsion other than to vaguely say that her position – which is one that primarily helps Black people and people of color gain financial literacy and acumen – had to be eliminated as part of a RIF exercise. Disturbingly, her forced exit came shortly after her complaints about the systemic mistreatment of Black FAs and Trainees.

157.    Notably, Morgan Stanley could have easily found a way to retain Ms. Booker.  In fact, she offered to work on 100% commission as an FA, yet Defendants still humiliatingly wanted her out.  Indeed, the head of the Apollo Group at Morgan Stanley, Steve Condos, said he would have taken Ms. Booker on his team in a heartbeat, but no one asked him or gave him notice that Ms. Booker was being terminated.  He even acknowledged that there was room to hire someone else on his team.  Yet, Morgan Stanley, in line with its repugnant track record, had decided it had had enough of Ms. Booker and her efforts at addressing the systemic racial inequality that existed at the Firm once and for all.

158.    In addition, to add insult to injury and underline how Morgan Stanley's assertion that Ms. Booker had to be fired in connection with a RIF  is pretextual, in the ensuing months, Morgan Stanley published job postings for a number of positions Ms. Booker could have

performed, including, but not limited to: Alternative Investments Specialist – Wealth Management Operations; Head of Wealth Management Digital Content; Field Management, Operational Risk; Strategic Execution and Integration – Workplace Solutions Group; Head of Regulatory Liquidity Planning & Coverage; International Senior Lending Advisor (Transactor); and IT Sourcing Manager, U.S. Tax Operations – Client Service Director.

159.    Moreover, any contention that Ms. Booker was terminated because she was not generating revenue for Morgan Stanley in her role in the Urban Markets Group would be unfounded and pretextual.  In particular, during the time Ms. Booker reported into Krouk, she was not subject to *any* revenue target.  Even so, by December 2019, Ms. Booker had been responsible for bringing in nearly $200 million in assets under management ("AUM") to Morgan Stanley attributable to the Urban Markets Group.

160.    If anything, Krouk consciously chose not to give Ms. Booker any revenue targets in any of the three annual and three midyear performance reviews he gave her.  Rather, Ms. Booker was always transparent with Krouk about the clients whom she had a hand in bringing into the Firm and the corresponding AUM during their regularly scheduled biweekly one-on-one meetings, and Krouk never expressed any concerns or reservations about Ms. Booker's performance.

161.    Further, and to be clear, Ms. Booker was indeed "rocking the boat" and creating discomfort amongst the Firm's White-male dominated leadership with her push to implement Project Genesis.  Any claim by Morgan Stanley that Project Genesis aligned with the Firm's ongoing FA Trainee diversity initiatives would be untrue.  Had Ms. Booker not been stymied in her efforts to implement Project Genesis, the Firm's *modus operandi* of systemic racial

discrimination and marginalization of Black FAs and FA Trainees would be disrupted and impacted.

162.    In fact, after Ms. Booker told Ms. Underwood, the Head of Diversity for the Wealth Management Division, about Project Genesis in late June/early July 2019, Ms. Underwood's response was that Project Genesis was needed, and she urged Ms. Booker to "keep pushing" and stated that "change happens when you disrupt."  Ms. Underwood's reaction and comment underscored how Project Genesis did not align with any diversity-related initiatives Morgan Stanley may have had in place at the time because there were none.

163.    Likewise, as alluded to above, in December 2019, when Ms. Booker sent a Washington Post article about the lack of diversity on Wall Street and the roadblocks faced by Black FAs to one of the Analysts working with her on Project Genesis who was a White female, the Analyst's response was, "The statistics are all-around disappointing, but the part about Morgan Stanley in the end is really bad.  It speaks directly to everything you have been saying about the need for Genesis!"  This response, again, demonstrated how Project Genesis did not align with any diversity initiatives Morgan Stanley may have had in place at that time.

164.    Notably, upon information and belief, at least one (and likely many others) firm in the financial services industry similar to Morgan Stanley, J.P. Morgan Chase & Co., does in fact implement many of the initiatives in relation to their own FAs that Ms. Booker advocated for via Project Genesis, such as guaranteed annual salaries to FAs that do not decrease over time, and extra help to develop business such as corporate credit cards and monthly business development allowances.  In other words, any assertion by Morgan Stanley that Project Genesis was not realistic or scalable is not supported given that at least one comparable financial services firm

has adopted the same policies and practices aimed at improving diversity and inclusion in their own FA ranks proposed in Project Genesis.

165.    Furthermore, it bears noting that at no point did Krouk ever give Ms. Booker *any* feedback, much less any "constructive feedback" on how to get senior management approval of Project Genesis, further underscoring how Krouk and other decision makers at the Firm held animus against Ms. Booker for aggressively advocating for Project Genesis.  In addition, any contention by Morgan Stanley that Krouk may have had legitimate questions about Project Genesis, including whether the plan could be successfully implemented and whether it was cost effective, is belied by the fact that no such concerns were ever brought up by him to Ms. Booker.

166.    In fact, during one instance in September 2019 in which Ms. Booker lobbied for a meeting with senior Morgan Stanley management to present Project Genesis, she noted to Krouk that she planned to travel to Los Angeles and hoped to meet with Magic Johnson to ascertain if he would be open to supporting Project Genesis from a marketing perspective.  Yet, Krouk specifically and sternly instructed Ms. Booker to "not talk to anyone" about Project Genesis, without any explanation or feedback on Ms. Booker's idea.  This was another example of how the Firm had no interest in supporting Ms. Booker in her diversity initiatives embodied in Project Genesis.

167.    Furthermore, Morgan Stanley continued to retaliate against Ms. Booker between December 9, 2019 and her official last day, March 9, 2020, including by causing her unnecessary harm by removing her profile from the Morgan Stanley website when, at a minimum, she was set to remain working at the Firm until March 9, 2020.  Moreover, in January 2020, Morgan Stanley abruptly deactivated Ms. Booker's email account, office phone, and mobile work phone, which meant that she had to repeatedly request to gain access back to her email account and office

phone just to be able to continue working until her official last day.  She ultimately was unable to get her mobile phone reactivated, which forced her to have to go into the office every day just to keep up with and respond to emails.

## IV.    Ms. Booker is Not Alone in Her Experiences at Morgan Stanley

168.    Sadly, Ms. Booker is not the only minority employee to face institutional barriers at Morgan Stanley.  Rather, throughout her tenure at the Firm, Ms. Booker watched as minority employees struggled to advance.

169.    The ongoing and ubiquitous racial disparities that Ms. Booker experienced throughout her tenure at Morgan Stanley are relevant and critical to her underlying claims of racial discrimination and retaliation in this action.

170.    By way of example only, the EEOC previously commenced a class-wide lawsuit against Morgan Stanley alleging discrimination in promotion and compensation that involved allegations of systemic bias against female employees.  Specifically, the EEOC's lawsuit alleged that Morgan Stanley discriminated against women in its Institutional Equity Division ("IED") with respect to promotion, compensation and the terms, conditions and privileges of employment.  *See EEOC, et al., v. Morgan Stanley & Co., et al.*, No. 01 Civ. 8421 (S.D.N.Y. Sept. 10, 2001).  In 2004, a settlement was reached in the form of a Consent Decree, pursuant to which Morgan Stanley established a total settlement fund of $52 million, with $40 million allocated to compensate female employees that submitted similar claims of discrimination, $2 million designated towards internal programs designed to enhance the compensation and

promotional opportunities for female employees within Morgan Stanley, and $12 million allocated to the lead class representative, Allison Schieffelin.[11]

171.    Ms. Booker was selected by the EEOC to serve as the Ombudsperson as part of Morgan Stanley's settlement with the EEOC, and as a result was privy to confidential information and data.

172.    Following this settlement with the EEOC, in June 2006, female Morgan Stanley FAs challenged unequal pay and account distributions in a class action sex discrimination lawsuit entitled *Augst-Johnson v. Morgan Stanley & Co.*, No. 06 Civ, 1142 (D.D.C), which settled in April 2007 for $46 million.

173.    Around the same time, Morgan Stanley settled a discrimination class action lawsuit for a class of 1,300 African American and Latino employees for $16 million.  *See Jaffe v. Morgan Stanley $ Co.*, No. 3:06 Civ. 03909 (TEH) (N.D. Cal.).  As part of this settlement, Morgan Stanley agreed to programmatic relief that the parties represented would improve opportunities for African American (and Latino) FAs.

174.    However, Morgan Stanley failed to comply with the consent decrees and programmatic relief to which it agreed to in the *Jaffe* and *Augst-Johnson* settlements, and  Black FAs remained excluded from the Firm's racially segregated partnerships or teams and continued to have substantially lower earnings and higher attrition than White FAs.[12]

---

[11]     *See*  https://www.eeoc.gov/eeoc/newsroom/release/7-12-04.cfm.  The Consent Decree provided for an outside monitor to supervise Morgan Stanley's efforts towards the advancement of women for only three years after the settlement.

[12]     While Ms. Booker was privy to certain knowledge about these resolutions, the consent decree enforcement was handled by one or more third-party/outside monitors.  Ms. Booker was not privy to the content of nor received any reports from any outside monitor.

175.    Morgan Stanley's failure to provide equal opportunities to Black employees and to abide by the spirit of its agreements on the *Jaffe* and *Augst-Johnson* cases was so abysmal that Morgan Stanley agreed to extend the consent degrees.  However, at the same time, in 2015, in an effort to preclude further legal action, the Firm rolled out mandatory arbitration agreements with class and collective action waivers, which denied employees access to court for civil rights violations, and to deny its employees any ability to join together to challenge Firm-wide discrimination or achieve injunctive relief.

176.    Then, in 2016, the action entitled *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS) (S.D.N.Y. 2016) ("*Frazier*"), was commenced in which seven former Black FAs alleged facts shockingly similar to the reasons that supported Ms. Booker's development and advocacy of Project Genesis.

177.    *Frazier* is relevant to Ms. Booker's case because it provides context for her claim that Morgan Stanley not only completely rejected the purpose behind Project Genesis, but why her creation of the program and advocacy to implement it propelled her expulsion from the Firm in December 2019.

178.    *Frazier* was filed by Black FAs to seek redress for the harm they alleged was caused by systemic racial segregation throughout the Firm's FA teams (also internally referred to as "partnerships").

179.    Substantially similar to what Ms. Booker knew and witnessed at Morgan Stanley over the years and on a continuing basis, these Black FAs alleged that their persistent exclusion from successful teams essentially guaranteed that Black FAs would have much lower earnings and higher attrition than White FAs.

180.    Critically, *Frazier* was filed in 2016, after prior class action lawsuits alleging the same systemic discrimination were resolved and consent decrees put in place in order to alleviate Morgan Stanley's perpetual racial, and gender, bias.

181.    The claims in *Frazier* included allegations that Morgan Stanley refused to abide by the consent decrees, and intentionally persisted in rampant exclusion of Black FAs from successful teams.  *See Frazier*, Third Amended Complaint at ¶¶ 30-40, Docket No. 60 (filed June 6, 2016).

182.    It is relevant that, in the three years after *Frazier* was commenced, Ms. Booker continued to witness overwhelming evidence that Black FAs and Trainees were not receiving the support necessary to have a chance at succeeding at the Firm.

183.    While Morgan Stanley was busy fighting *Frazier* and forcing as many plaintiffs in that case as possible into confidential arbitration, any admission that Project Genesis warranted implementation threatened to show the veracity of the allegations in *Frazier*.  Morgan Stanley could not let that happen.

184.    In addition to firing Ms. Booker in December 2019, and quashing any internal dissemination or discussion about Project Genesis, Morgan Stanley continues to actively litigate against the *Frazier* plaintiffs.  *See Frazier,* Dkt. No. 169 (October 20, 2020 entry concerning Revised Case Management Plan and Scheduling Order).

185.    The Third Amended Complaint in *Frazier* details the chain of events leading up to the organized effort to unwittingly dupe the Firm's thousands of employees into forced arbitration.  *See Frazier,* Third Amended Complaint, at ¶¶ 21-25.

186.   This protocol continues through the present, thereby precluding the vast majority of Morgan Stanley employees from commencing an action in court or joining an ongoing collective action, such as Ms. Booker's case.

187.   Worse, the horrific numbers about how many minority employees succeed at Morgan Stanley speak for themselves.  Among the Morgan Stanley wealth advisors recognized in the 2019 Forbes Top Wealth Advisors List, there are only five (5) Black FAs among the combined 487 FAs on all the teams.

188.   Additionally, one of the plaintiffs in *Frazier*, Kwesi Coleman, recounted in a Washington Post article (referenced above) that "his white colleagues excluded him from conversations after team meetings and a manager only shared a potential client lead with him once - a database of alumni of historically Black colleges."   In the lawsuit, Mr. Coleman explained that he knew when joining Morgan Stanley that he would have to work harder because of his skin color, but what he "didn't expect was to be basically held back [and] to have opportunities withheld."

189.   Nadia Jones, who worked at Morgan Stanley as a Senior Diversity Officer from October 2014 through April 2016, distributed a departure memo shortly before she left the Firm describing the resistance to diversity efforts and racist treatment that she encountered while at the Firm.  Specifically, Ms. Jones wrote:

- You cannot begin to imagine how it feels for a woman of color to be constantly reminded that neither your credentials, nor your title, nor your professional accolades, nor your expertise gleaned both from your professional and social experiences as a woman of color, are enough to counteract the pervasive and systemic biases that run throughout this organization.

- Never in my 8 years of doing this work nor in my 38 years of being a Black woman have so many white people, men in particular, told me how to do my job and where best to focus

my efforts to help diverse advisors--without consulting, mind you, a single diverse advisor in making that determination.

- The dismissal and/or punting of concerns that I have raised-whether that be around the process of strategic leads or syndicate, or whether diversity is a quantifiable premium in this industry (as it has suited managers to be compensated on diversity, but not the diverse advisors themselves)-illustrate this firm's lack of commitment to creating sustainable change. In fact, the vary [sic] notion of equity for diverse advisors and managers is oftentimes met with arrogant disapproval.

- Because this firm is not about deliberately taking a chance on a person of color (as you all have increasingly done for white women, though nowhere near the proportional rate you have done so for white men) by providing them with a safety net should they stumble, but more importantly by ensuring that you have provided them with the resources to succeed. Because D&I work in its purest form is more than the numbers--it's more than the scorecard. It's about what will truly help diverse advisors, not about moving the ever-present, yet mythical, needle.

- The net number of diverse advisors has barely changed in nearly a decade and that's because while we are focusing a lot of time on recruiting a diverse workforce, we have done little to nurture those very advisors who are already here.

190.    Ms. Jones left Morgan Stanley.

191.    Similarly, Sandra Richards, head of Morgan Stanley Global Sports & Entertainment and a Black female, who was hired by Ms. Booker when Ms. Booker was in her diversity officer position, has complained to Ms. Booker numerous times, even as recently as February 2019, about how she has been discriminated against at the Firm because she is a Black woman.  In 2019, one of her bosses, Jim McCarthy, a White male manager within the Wealth Management Division, on information and belief, even referred to her as acting like an "angry Black woman."    Ms. Richards also complained several times about being treated poorly/differently than White employees, and even complained to the head of HR for Wealth

Management, Larry Frers.  For a period, Ms. Richards was on a team headed by Crawley where she was the only Black female on the team, and she complained to Ms. Booker about how she was treated much more poorly and differently than his White female direct reports.  The instances in which she contacted Ms. Booker while she was in an agitated state about how poorly she was being treated by the Firm, how Morgan Stanley did not care about Black people, or how she was about to resign from the Firm are too numerous to count.

192.   Ms. Richards even resigned from the Diversity Council and as Chair of the Multicultural Employee Networking Group because of how disgusted she was at the endemic discrimination at Morgan Stanley, and was tired of "play[ing] house Negro."

193.   Furthermore, in spring 2017, Kim Hatchett, a current Black female Executive Director at Morgan Stanley within the Wealth Management division, invited Ms. Booker to lunch at the Harvard Club.  During this lunch, she disclosed to Ms. Booker how one of the White male advisors with whom Ms. Hatchett partnered had done something on a piece of business that was illegal and/or unethical, but that the White male managers within the Wealth Management division swept this incident under the rug.  Reasonably, this upset Ms. Hatchett and she told Ms. Booker that if she (Ms. Hatchett) had done what this White male advisor had done, she likely would have been fired, and that the White male advisor was unquestionably receiving preferential treatment on account of his sex and race.  Sadly this is just one of examples of "less than" treatment for Black women at Morgan Stanley.

194.   Many of the Black females at Morgan Stanley, exhausted from fighting discriminatory battles to no avail, especially after reaching management levels, have simply left. One Black female Morgan Stanley Executive Director named Paula Campbell Roberts has complained to Ms. Booker on an annual basis about the disparate treatment she experienced

during her tenure at the Firm, about not receiving the same opportunities and equal pay as her White peers, and for not being promoted to MD. Fed up with the discrimination at Morgan Stanley, Ms. Roberts eventually left the firm in December 2016.

195.    In addition, Lybra Clemons, who held a senior level diversity and inclusion role under Susan Reid, the current Global Head of Diversity who Gorman recently placed onto the Management Committee,[13] told Ms. Booker on numerous occasions, including as recently as January 2017, that the Firm was not serious about diversity, and that Ms. Reid would never do anything to "rock the boat" (unlike Ms. Booker), and therefore Ms. Reid was the perfect person in that seat from Morgan Stanley's perspective. Notably, even after Ms. Booker left the role of Global Head of Diversity, minority employees would still confide in Ms. Booker about the discrimination they faced, leaving Ms. Booker with the unsolicited task of talking these employees "off the ledge." This further demonstrated how these employees had no confidence in bringing their concerns to Ms. Reid or to the Firm's HR department. Ms. Clemons, who was very talented, eventually left Morgan Stanley.

196.    Similarly, another Black female Executive Director at Morgan Stanley who joined the firm almost 13 years ago has repeatedly complained to Ms. Booker about not being paid fairly in comparison to her White and male peers and about not being promoted to MD.

---

[13]    Notably, Ms. Reid, the current Global Head of Diversity, has repeatedly confided in Ms. Booker about how her job was akin to "pushing a rock up a hill" due to the difficultly she was facing in creating an impact at the Firm. In fact, just in July 2019, a little over four months before Ms. Booker was fired, Ms. Reid spoke on a Wealth Management division panel and praised Ms. Booker for laying the foundation for diversity at Morgan Stanley without which she would not be able to do her job – a sentiment that others on the panel, including Ms. Underwood, Head of Diversity for Wealth Management, echoed.

## V.   Morgan Stanley Must Abolish Arbitration for Race Discrimination Claims

197.   Shamelessly, in the wake of the public outcry after George Floyd's murder, as discussed above, Gorman has been on a new publicity campaign designed to cast Morgan Stanley as a corporation committed to diversity issues.[14]

198.   Notwithstanding this hollow talk, Morgan Stanley remains on the bottom rung of this social justice movement.

199.   Indeed, for over 20 years, Morgan Stanley has repressed its Black employees by forcing them to litigate race and national origin claims in confidential arbitration.[15]

200.   Forced arbitration as a term of employment means that Black employees that experience discrimination because of the color of their skin have no choice but to hide their legal claims from the public, causing many to decline to even press their complaints knowing how the odds are already grossly stacked against them.

201.   This deliberately chosen, clandestine method of repression has systemically allowed Morgan Stanley to get away with the horrific marginalization and disparagement of its Black employees, and perpetuated the gross disparity between White employees and Black employees in the terms and conditions of their employment.[16]

---

[14]   *See* Morgan Stanley CEO Moved by Protests to Promote Two Black Staffers, by Thornton McEnery, N.Y. Post, June 9, 2020, accessible at https://nypost.com/2020/06/09/morgan-stanley-ceo-pushes-for-racial-equality; Morgan Stanley Commits $5 Million to NAACP Legal Defense and Education Fund (LDF), June 9, 2020, accessible at https://www.morganstanley.com/press-releases/morgan-stanley-commits--5-million-to-naacp-legal-defense-and-edu.

[15]   Morgan Stanley has systematically forced individual arbitration on employees for years, but especially since 2015, for all types of discrimination protected under federal, state and municipal laws.

[16]   For example, five Black Morgan Stanley employees recently lost their bid to litigate their racial discrimination claims against Morgan Stanley in court as a result of the judges in their case enforcing arbitration clauses that purportedly applied to them. *See Lockette v. Morgan Stanley,*

202.    It is well-known that Black employees, who are told that it is the Firm's "policy" to litigate discrimination claims in confidential arbitration, do not believe any meaningful choice exists to object to such a policy, and fear that asking Morgan Stanley to exclude them (opt-out) from the mandatory arbitration policy will "rock the boat" and perhaps cast them as a troublemaker.   Indeed, there is no protection whatsoever afforded to Morgan Stanley employees who avail themselves of the proffered "opt-out" provision, meaning that such employees could be fired for refusing to agree to arbitrate their claims and there would be absolutely no recourse.

203.    Unless Morgan Stanley abolishes forced arbitration for its Black employees, including members of Black EPA Collective and Black NYEPA Class (described below), any purported claim of "meaningful efforts" to fight against racism means nothing.   Gorman, senior leaders, and Morgan Stanley's Board know how many tens of thousands of employees it has forced into mandatory arbitration agreements, and therefore they fully understand precisely how it systemically silences stories like Ms. Booker's and countless others before her.

204.    Even in the wake of #MeToo and the public's realization that forcing female employees that experience sexual assaults and battery at the workplace into arbitration is both tremendously harmful and contrary to all notions of justice, Morgan Stanley continues the practice for its female employees and members of the Black EPA Collective and Black NYEPA Class.

205.    As such, Morgan Stanley continues to deny Black employees a basic and constitutional right to a jury of their peers in court.   No amount of "lip service" and feigned support for Black people and Black causes can undue this grave yet easily preventable injustice.

---

No. 18 Civ. 876 (JGK), 2018 WL 4778920, at *1 (S.D.N.Y. Oct. 3, 2018). See also *Frazier, et al. v. Morgan Stanley*, No. 16 Civ. 804 (RJS), Dkt. No. 104 (S.D.N.Y. Nov. 29, 2018).

206.    It is the epitome of hypocrisy for Morgan Stanley to hold itself out to the public, shareholders, investors and clients as a company that is genuinely interested in advancing racial justice when it is hiding from public accountability and transparency.

207.    **If Morgan Stanley really wanted to do something to address racial injustice, they would make the decision <u>today</u> to eliminate arbitration of all discrimination claims going forward and release the thousands of Black employees bound by silence.**

208.    Upon belief, over 35,000 employees at Morgan Stanley are subject to confidential arbitration.

209.    Being an employer of that magnitude and scope carries with it a moral obligation to lead by example and be at the forefront of social justice movements.

210.    To be clear, and so there is no doubt, Ms. Booker is <u>not</u> subject to a binding arbitration agreement, despite any meritless arguments Morgan Stanley may raise to the contrary, as there was never any "meeting of the minds" between Ms. Booker and Morgan Stanley that any claims she held against Morgan Stanley, including those alleged herein, would be required to be asserted in arbitration.

<u>**COLLECTIVE AND CLASS ACTION ALLEGATIONS**</u>
**(Equal Pay Act and New York Equal Pay Claims)**

211.    The Ninth Cause of Action alleged in this action is being prosecuted as a collective action pursuant to the Equal Pay Act, 29 U.S.C. §206 *et seq.* on behalf of a collective of Black female employees who have been, are now or will be employed by Morgan Stanley in New York at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Black EPA Collective").  This Collective, upon information and belief, consists of more than 40 Black females.

212.    The Tenth Cause of Action alleged in this action is being prosecuted as a class action pursuant to the New York Equal Pay Act, NYLL § 194 *et seq.* on behalf of a class of Black female employees who have been, are now or will be employed by Morgan Stanley in New York at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Black NYEPA Class").  This Class, upon information and belief, consists of more than 40 Black females.  Ms. Booker incorporates by reference the allegations from the preceding paragraphs, including those alleging common patterns, practices and/or policies by Morgan Stanley resulting in unlawful discrimination and retaliation, as if fully set forth herein.

213.    The discriminatory employment practices that disproportionately affect Black female employees and cause them to be paid less than similarly situated men at Morgan Stanley exist in connection with subjective decision-making about:

- Compensation, including hourly pay, salary base pay, discretionary bonuses;
- Hiring;
- Development;
- Advancement;
- Opportunities for mentor/mentee relationships;
- Promotions;
- Work assignments;
- Level of responsibility;
- Client introductions;
- Client pitches;
- Opportunities to socialize at company events;
- Opportunities to socialize at company events with clients;
- Internal committee appointments and/or the exclusion from such committees;
- Demotions;
- Failing to prevent, address, properly investigate and/or take remedial action regarding claims of discrimination against Black employees; and
- Terminations, including through reductions-in-force ("RIFs").

214.   The subjective decision-making about the items listed above regularly involves bias and unconscious bias by the individuals at Morgan Stanley that have the power and authority to render such decisions.

215.   As such, the systemic discriminatory practices that disproportionately affect Black female employees' compensation as compared to similarly situated men at Morgan Stanley include, *inter alia*:

- Discretionary hiring practices that disfavor Black female employees;
- Discretionary compensation policies that disfavor Black female employees;
- Discretionary performance evaluation systems that disfavor Black female employees;
- Discretionary promotion systems that disfavor Black female employees; and
- Discretionary termination practices that disfavor Black female employees.

216.   This discrimination is intensified and perpetuated by Morgan Stanley's repeated failures regarding the ability to prevent, address, properly investigate and/or take remedial action when Black female employees complain about discrimination.

217.   Repeatedly, Morgan Stanley has failed to prevent, address, properly investigate and/or take remedial action when other employees report incidents to Morgan Stanley that suggest racially motivated bias.

218.   Importantly, as set forth in this Amended Complaint, based on the inexplicable, massive disproportionate lack of representation of Black employees, male and female, at every level of Morgan Stanley's hierarchy (including, but to a somewhat lesser extent, the bottom-most tiers), Morgan Stanley was on notice but failed to take corrective action to remedy the horrific racial discrimination.

219. The internal statistical data that shows that Black employees clearly were disfavored as compared to White employees is overwhelming and has existed for decades.

220. Upon belief, in 2020, even less Black employees, male and female, are in managerial and leadership roles at Morgan Stanley than *in 2005*. This backsliding contributed to and perpetuates the unequal pay given to Black female employees.

221. Morgan Stanley claims that it supports Black female employees as they develop, but in reality, only those in leadership positions, predominantly White men, have the authority to make meaningful client contacts, engage in business pitches, invite potential clients or existing clients to exclusive social events, such as, by way of example only, outings at private golf clubs, charity golf tournaments at private country clubs and attendance at professional sports events.

222. Without the same opportunities to secure substantial new business, network and maintain client relationships, as are given to White employees, primarily men, the perpetual state of lower compensation, lower levels of responsibilities, titles and roles for Black female employees at Morgan Stanley is a cruel reality.

223. Such systemic failures allow managers and senior executives, predominantly White, to perpetuate race and gender discrimination against Black female employees that has and continues to cause them to experience the following, *inter alia*:

- Unequal hourly wages for substantially the same work as compared to male, primarily White employees;
- Unequal base salary for substantially the same work as compared to male, primarily White employees;
- Unequal performance evaluations as compared to male, primarily White employees;
- Unequal bonuses for substantially the same work as compared to male, primarily White employees;
- Unequal benefits and other forms of compensation as compared to male, primarily White employees;
- Unequal opportunities for business development opportunities as compared to male, primarily White employees; and

- Unequal opportunities for advancement as compared to male, primarily White employees.

224.    The above conduct resulted in subjecting Black female employees to lesser terms and conditions of employment.

225.    Upon belief, Morgan Stanley subjected Black female employees at all levels to such unequal pay, including, but not limited to, administrative assistants, associates, vice presidents, executive directors and MDs.  The pay disparity as compared to men, primarily White, is especially egregious for these Black women that occupy some of the lower paid positions at Morgan Stanley.

226.    Morgan Stanley's systemic discrimination against the Black EPA Collective and Black NYEPA Class is continuing in nature.  The Black EPA Collective and Black NYEPA Class members were paid less and denied promotions at a greater rate by Morgan Stanley than were similarly-situated male employees, primarily White, despite performing similar or the same work, and having comparable or better experience and qualifications.

227.    Morgan Stanley's discrimination against Plaintiff and the Black EPA Collective and Black NYEPA Class was the result of common patterns, practices and/or policies, and acquiescence to and ratification of such patterns, practices and/or policies.  The claims of Plaintiff stated herein are essentially the same as those of the other Black EPA Collective and Black NYEPA Class members.

228.    The Black EPA Collective and Black NYEPA Class is readily ascertainable, and the names and addresses of the Black EPA Collective and Black NYEPA Class members are readily ascertainable from Morgan Stanley's records and files.

229.    Common questions of law and fact predominate with respect to Plaintiff and the Black EPA Collective and Black NYEPA Class, who worked in New York and were subject to substantially similar Firm employment patterns, practice and/or policies.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Section 1981)**
***Against All Defendants***

230.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

231.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of Section 1981 by, inter alia, denying her the equal terms and conditions of employment because of her race and/or color (Black) and subjecting her to a hostile work environment because of her race.

232.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

233.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

234.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Section 1981)**
***Against All Defendants***

235.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each

of the preceding paragraphs as if fully set forth herein.

236.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of Section 1981, including, most recently, terminating Plaintiff's employment.

237.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

238.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

239.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of Title VII)**
***Against Defendant Morgan Stanley***

240.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

241.    By the actions described above, among others, Defendant Morgan Stanley discriminated against Plaintiff based on her gender, race and/or color in violation of Title VII, including, but not limited to, by terminating Plaintiff's employment.

242.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

243.     As a direct and proximate result Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

244.     Plaintiff is further entitled to an award of punitive damages as Defendant's unlawful conduct was and remains reckless, wanton and/or malicious.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
***Against Defendant Morgan Stanley***

245.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

246.     By the actions described above, Defendant Morgan Stanley retaliated against Plaintiff based on her protected activities in violation of Title VII, including, but not limited to, by terminating Plaintiff's employment.

247.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

248.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

249.     Plaintiff is further entitled to an award of punitive damages as Defendant's unlawful conduct was and remains reckless, wanton and/or malicious.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
*Against All Defendants*

250.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

251.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her race and/or color (Black), and gender, and subjecting her to a hostile work environment.

252.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

253.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of monetary damages and other relief.

254.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of NYSHRL)
*Against All Defendants*

255.    Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

256.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including, most recently, terminating Plaintiff's employment.

257.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

258.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

259.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation**
**in Violation of the NYSHRL)**
***Against Defendants Gorman and Krouk***

260.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

261.    By the actions described above, among others, Defendants Gorman and Krouk knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYSHRL.

262.    As a direct and proximate result of Defendants Gorman and Krouk's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary

and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

263.    As a direct and proximate result of Defendants Gorman and Krouk's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

264.    Defendants Gorman and Krouk's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Discrimination in Violation of NYCHRL)
### *Against All Defendants*

265.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

266.    By the actions detailed above, among others, Defendants have discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying her the equal terms and conditions of employment because of her race and/or color (Black), and gender, and subjecting her to a hostile work environment.

267.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

268.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and

severe emotional distress, for which she is entitled to an award of monetary damages and other relief.

269.    Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## NINETH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)
*Against All Defendants*

270.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

271.    By the actions detailed above, among others, Defendants have retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, most recently, terminating Plaintiff's employment.

272.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

273.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

274.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(Aiding and Abetting Unlawful Discrimination and Retaliation**
**in Violation of the NYCHRL)**
***Against Defendants Gorman and Krouk***

275.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

276.    By the actions described above, among others, Defendants Gorman and Krouk knowingly or recklessly aided and abetted and directly participated in the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

277.    As a direct and proximate result of Defendants Gorman and Krouk's unlawful actions in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and severe emotional distress for which she is entitled to an award of damages.

278.    Defendants Gorman and Krouk's unlawful actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Violations of the Equal Pay Act)**
**(Individual and Collective Claims)**
***Against all Defendants***

279.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

65

280.     The claims brought herein under the Equal Pay Act, 29 U.S.C. § 206 *et seq*., are brought on behalf of Plaintiff and all members of the Black EPA Collective.

281.     During the period of the employment of Plaintiff and all members of the Black EPA Collective, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. § 206 *et seq*.  During that time, Defendants required Plaintiff and the members of the Black EPA Collective to perform the same or substantially the same job position as male, primarily White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and the members of the Black EPA Collective at a rate of pay, including salary and bonus, less than such male, primarily White, employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

282.     Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiff and the members of the Black EPA Collective on the basis of their gender and by paying Plaintiff and the Black EPA Collective members a lesser rate of pay, including salary and bonus, than that paid to male, primarily White, employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

283.     By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. § 206 *et seq*.

284.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff and the Black EPA Collective members have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

285.    Plaintiff and the members of the Black EPA Collective are further entitled to liquidated damages, reasonable costs and attorneys' fees.

### TWELFTH CAUSE OF ACTION
**(Violations of New York Equal Pay Law)**
**(Individual and Class Claims)**
***Against all Defendants***

286.    Plaintiff hereby repeats. reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

287.    During Plaintiff's period of employment and the period of employment for the Black NYEPA Class, Defendants were subject to the provisions of the New York Pay Equity Law, New York Labor Law § 194 *et seq.* ("New York Labor Law").  Defendants required Plaintiff and members of the Black NYEPA Class to perform the same or substantially the same job position as male and White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff and the members of the Black NYEPA Class at a rate of pay, including salary and bonus, less than such male and White employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a *bona fide* factor other than gender or race, such as education, training, or experience.

288.    Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiff and members of the Black NYEPA Class on the basis of their gender and race by paying them a lesser rate of pay, including salary and bonus, than that paid to male and White employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishment.

289.    By the actions described above, among others, Defendants have violated the New York Labor Law.

290.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiff and members of the Black NYEPA Class have suffered, and continue to suffer, harm for which they are is entitled to an award of monetary damages and other relief.

291.    Plaintiff and members of the Black NYEPA Class are further entitled to liquidated damages, reasonable costs and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Black EPA Collective and Black NYEPA Class, prays that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiff and the Black EPA Collective and Black NYEPA Class for all monetary and/or economic damages;

E.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the Black EPA Collective and Black NYEPA Class for all non-monetary and/or compensatory damages;

F.      An award of liquidated damages;

G.      An award of punitive damages;

H.      Prejudgment interest on all amounts due;

I.      An award of costs that Plaintiff and the Black EPA Collective and Black NYEPA Class incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 14, 2021
     New York, New York                    Respectfully submitted,

                                     **WIGDOR LLP**

                                     By: _____

                                         Jeanne M. Christensen
                                       Tanvir H. Rahman

                                       85 Fifth Avenue
                                       New York, NY 10003
                                     Telephone: (212) 257-6800
                                     Facsimile:  (212) 257-6845
                                     jchristensen@wigdorlaw.com
                                     trahman@wigdorlaw.com

                                     *Counsel for Plaintiff and the Proposed Black EPA Collective and Black NYEPA Class*