**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**MARILYN BOOKER**, individually, and on behalf of   :
similarly situated Black female employees,              :
                                                :    Civil Action No.: 20-cv-02662
                            Plaintiff,     :    (KAM)(LB)
                                                  :
                  v.                             :
                                                  :
**MORGAN STANLEY & CO. LLC**, **JAMES**         :
**GORMAN,** in his individual and professional      :
capacities, and **BARRY KROUK,** in his individual   :
and professional capacities,                   :
                                                  :
                           Defendants.     :
                                                  :
-------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

**WIGDOR LLP**

Jeanne M. Christensen
Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiff and the Proposed*
*Black EPA Collective and Black NYEPA*
*Class*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS .....................................................................................................1

    A.    A Race-Based and Gender-Based Hostile Work Environment Permeated Morgan Stanley ...................................................................................................2

    B.    Ms. Booker's Repeated Efforts to Force Change Are Ignored ...............................4

    C.    Ms. Booker's Termination ........................................................................................5

ARGUMENT ..................................................................................................................5

    A.    The Pleading Standard for Employment Discrimination Claims ...........................5

    B.    The Complaint Alleges Facts That Support A Minimal Plausible Inference of Discrimination ....................................................................................................7

          i.    The "Play No Role" Standard Under the City HRL ..................................13

    C.    The Complaint Sufficiently Alleges A Workplace Hostile to Black Female Employees ..............................................................................................................14

    D.    Dismissal Is Improper for Alleged Time-Barred Conduct ...................................17

    E.    Ms. Booker Has Pleaded Viable Individual Claims for Unequal Pay ..................19

    F.    Ms. Booker's Class and Collective Claims Are Viable ........................................25

          i.    Ms. Booker Has Pleaded Sufficient Facts to State Individual Claims Under the EPA and NYEPA ...........................................................26

          ii.    The Collective Is Based on Sex and Not on Race as Defendants Argue ........................................................................................................26

    G.    Ms. Booker Does Not Need to Allege "But For" Causation Under § 1981 At This Pleading Stage ..........................................................................................27

    H.    Gorman is Individually Liable Under The EPA, NYEPA, § 1981, The NYSHRL, and The NYCHRL ..............................................................................27

    I.    Gorman and Krouk are Individually Liable as Aiders and Abettors ....................29

i

CONCLUSION............................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

Adams v. Delta Airlines, Inc.,
   2017 WL 9674513 (E.D.N.Y. Dec. 18, 2017) ........................................................................ 27

Adejare v. St. Charles Hosp. & Rehab. Ctr.,
   2017 WL 2559937 (E.D.N.Y. June 13, 2017) ...................................................................... 17

Albunio v. City of New York,
   16 N.Y.3d 472 (2011) ........................................................................................................ 14

Bennett v. Health Mgt. Sys., Inc.,
   92 A.D.3d 29 (1st Dept. 2011) ..................................................................................... 14, 24

Bonner v. Guccione,
   1997 WL 362311 (S.D.N.Y. July 1, 1997) ......................................................................... 28

Campbell v. Corr. Med. Care, Inc.,
   2014 WL 2608334 (June 11, 2014) ................................................................................... 26

Castro v. Yale University,
   No. 20 Civ. 330 (JBA), 2021 WL 467026 (D. Conn. Feb. 9, 2021) ........................................ 18

Dawson v. N.Y. City Transit Auth.,
   624 F. App'x 763 (2d Cir. 2015) ......................................................................................... 7

De La Pena v. Metropolitan Life Ins. Co.,
   953 F.Supp.2d 393 (E.D.N.Y. 2013) .................................................................................. 17

Dechberry v. New York City Fire Dept.,
   124 F.Supp.3d 131 (E.D.N.Y. 2015) .................................................................................. 16

Doe v. Columbia University,
   831 F.3d 46 (2d Cir. 2016) ......................................................................................... 6, 7, 12

E.E.O.C. v. Port Auth. of New York & New Jersey,
   768 F.3d 247 (2d Cir. 2014) .............................................................................................. 25

Edwards v. Jericho Union Free Sch. Dist.,
   904 F.Supp.2d 294 (E.D.N.Y. 2012) .................................................................................. 27

Farmer v. Shake Shack Enters., LLC,
    473 F.Supp.3d 309 (S.D.N.Y. 2020)........................................................................... 29

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)...................................................................................... 29

Fisher v. Vassar College,
    114 F.3d 1332 (2d Cir.1997)................................................................................... 7, 8

Gorokhovsky v. N.Y.C. Housing Auth.,
    552 Fed. App'x 100 (2d Cir.2014)............................................................................... 6

Husser v. New York City Dept. of Educ.,
    137 F.Supp.3d 253 ................................................................................................... 23

Lenzi v. Systemax, Inc.,
    944 F.3d 97 (2d Cir. 2019)................................................................................... 20, 21

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015)............................................................................... 6, 9, 10

Magnotti v. Crossroads Healthcare Mgmt. LLC,
    2016 WL 3080801 (E.D.N.Y. May 27, 2016) .......................................................... 28

Mudholkar v. Univ. of Rochester,
    261 Fed. App'x 320 (2d Cir. 2008) .......................................................................... 26

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    715 F.3d 102 (2d Cir. 2013)......................................................................... 14, 15, 23

Minto v. Molloy College,
    2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019) ........................................................ 13

Morse v. Fidessa Corp.,
    2018 N.Y. Slip Op 05975 (1st Dept. 2018) ............................................................. 14

Ravina v. Columbia Univ.,
    No. 16 Civ. 2137 (RA), 2020 WL 1080780 (S.D.N.Y. Mar. 6, 2020) .................... 8, 9

iv

Russell v. Cnty. of Nassau,
    696 F. Supp. 2d 213 (E.D.N.Y. 2010) ...................................................................... 27

Richard v. N.Y.C. Dep't of Educ.,
    No. 16 Civ. 957 (MKB), 2017 WL 1232498, at n.15 (E.D.N.Y. Mar. 31, 2017)..................... 16

Schaper v. Bronx Lebanon Hosp. Ctr.,
    408 F.Supp.3d 379 (S.D.N.Y. 2019)........................................................................ 28

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997)................................................................................ 16

Segal v. City Univ. of New York,
    2019 WL 2372979, (E.D.N.Y. June 4, 2019) ...................................................... 24, 25

Springs v. City of New York,
    2020 WL 3488893 (S.D.N.Y. June 26, 2020) ........................................................ 17

Suri v. Grey Global Group, Inc.,
    164 A.D.3d 108 (1st Dept. 2018)........................................................................... 16

Thior v. JetBlue Airways, Inc.,
    2016 WL 5092567 (E.D.N.Y. Sept. 19, 2016) ........................................................ 17

Underwood v. Roswell Park Cancer Institute,
    No. 15 Civ. 684 (FPG), 2017 WL 131740............................................................... 18

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015)................................................................................... 7

Vivenzio v. Syracuse,
    611 F.3d 98 (2d Cir. 2010)................................................................................... 6

Washington County v. Gunther,
    452 U.S. 161 (1981)...................................................................................... 21, 23

Weinreb v. Xerox Bus. Servs.,
    323 F.Supp.3d 501 (S.D.N.Y. 2018)...................................................................... 25

Weinstock v. Columbia Univ.,
    No. 95 Civ. 0569 (JFK), 1996 WL 658437 (S.D.N.Y. Nov. 13, 1996) .................................... 20

Williams v. Classic Sec.,
    2019 WL 4511953 (S.D.N.Y. Sept. 19, 2019) .................................................................... 13, 14

Williams v. New York City Hous. Auth.,
    61 A.D.3d (1st Dept. 2009), *lv. denied* 13 N.Y.3d 702 (2009) ................................................ 14

Williams v. Victoria's Secret,
    2017 WL 384787 (S.D.N.Y. Jan. 27, 2017) ............................................................................ 12

Wu v. Good Samaritan Hosp. Med. Ctr.,
    815 Fed. App'x 575 (2d Cir. May 20, 2020) .......................................................................... 25

Yan v. Ziba Mode, Inc.,
    2016 WL 1276456 (S.D.N.Y. Mar. 29, 2016) ........................................................................ 12

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) ................................................................................................. 27

**Other Authorities**

N.Y. Lab. Law § 194(1) .................................................................................................................. 26

Plaintiff Marilyn Booker ("Ms. Booker") respectfully submits this memorandum of law in opposition to Defendants Morgan Stanley & Co. LLC ("Morgan Stanley" or the "Firm"), James Gorman ("Gorman"), and Barry Krouk's ("Krouk") (collectively "Defendants") Partial Motion to Dismiss (the "Motion") Ms. Booker's Amended Complaint (the "Complaint" or "Compl.").[1]

## PRELIMINARY STATEMENT

In support of their Motion, Defendants misstate the relevant legal standards on a motion to dismiss, ignore well-pleaded factual allegations contained in the Complaint and mischaracterize many of the facts that they do reference. Quite simply, Ms. Booker exceeds what is required of her at this notice pleading stage and more than sufficiently alleges plausible claims. For the reasons set forth herein, the Motion should be denied in its entirety.

## RELEVANT FACTS

Ms. Booker began working at Morgan Stanley in 1994 as Global Head of Diversity, and was promoted to Managing Director ("MD") in 1999. Compl., ¶¶ 71, 79, 83. In 2010, Gorman became Morgan Stanley's CEO. Compl., ¶ 89. Shortly after, Gorman inexplicably removed Ms. Booker as Global Head of Diversity and moved her into a new group that was eliminated a year later. Compl., ¶¶ 90-92. Ms. Booker then moved into a newly created group called the Urban Markets Group ("Urban Markets"), where she was tasked with leading a small team of minority

---

[1]    Defendants' Partial Motion to Dismiss does not seek to dismiss the following causes of action: Second (retaliation in violation of Section 1981 as to Morgan Stanley and Krouk), Fourth (retaliation in violation of Title VII), Sixth (retaliation in violation of the New York State Human Rights Law ("NYSHRL") as to Morgan Stanley or Krouk), Seventh (aiding and abetting unlawful discrimination and retaliation in violation of the NYSHRL as to retaliation claims against Krouk), Ninth (retaliation in violation of the New York City Human Rights Law ("NYCHRL") as to Morgan Stanley and Krouk), and Tenth (aiding and abetting unlawful discrimination and retaliation in violation of the NYCHRL as to retaliation claims against Krouk). Motion, pp. 21-30. Accordingly, those federal, state and city causes of action remain.

Financial Advisors ("FAs") into minority communities to advocate about fiscal responsibility. Compl., ¶¶ 93-94. For the next eight years, her salary was held flat, while her departmental budget was slashed each year despite her requests for increased funding.  Compl., ¶¶ 11, 100. Ms. Booker's White male peers were, in most instances, paid commission and other remuneration for the assets under management they brought to Morgan Stanley, whereas at no time during her employment did Ms. Booker receive such commission or remuneration.  Compl., ¶¶ 102-104.   Likewise, her White male peers were provided countless opportunities for advancement that Ms. Booker was not provided.  Id.  Similarly situated White men also received regular, if not annual, raises in compensation that Ms. Booker was not provided. Id.

### A.   A   RACE-BASED   AND   GENDER-BASED   HOSTILE   WORK ENVIRONMENT PERMEATED MORGAN STANLEY

Ms. Booker alleges that Morgan Stanley has fostered an environment in which females and racial minorities are repeatedly subjected to "less than" treatment as compared to their male and White peers.  For example, Ms. Booker alleges that the Firm's White male co-Head of Wealth Management, Andy Saperstein, would, from 2016-2019 when he co-managed the division with a woman named Shelley O'Connor, regularly hold team meetings at his house on weekends with his and Ms. O'Connor's White male direct reports but would not invite Ms. O'Connor to attend.  Compl., ¶ 48.  Mr. Saperstein and Ms. O'Connor would then hold team meetings at the office to cover topics that had already been addressed by the White males in the group at their weekend pre-meeting at Mr. Saperstein's home.  Id.  As another example, Ms. Booker alleges how women at Morgan Stanley are required to wait longer periods of time before receiving promotions, as was the case for Carol Greene-Vincent, a Black female who was forced to undergo a lengthy, almost two-year waiting period before she was moved up to the Operating Committee.  Compl., ¶¶ 49-52.  In contrast, her similarly situated White peers were placed onto

2

the Operating Committee when hired or immediately after being promoted to a position that warranted a seat, and were not subjected to any gratuitous "waiting period."  Id.

Ms. Booker also details how she was frequently harassed by Tom Nides ("Nides") about *who she was dating*, **what clothes she was wearing, and how much her attire cost**.  Compl., ¶ 116.  Ms. Booker did not witness Nides make such comments to men.  Id.  Moreover, Ms. Booker details how, for years, under Gorman's leadership, the Urban Markets group was disfavored.  She provides specific examples of "less than" treatment, including facts about how she and a Black male colleague were subjected to blatantly discriminatory treatment regarding their work to procure Webster University ("Webster") as a client.  Compl., ¶¶ 132-137.  Ms. Booker complained to multiple White managers about the mistreatment due to their minority status.  Id.  After Ms. Booker and her Black male colleague succeeded in securing Webster as a client, the Firm stood by and did nothing when one of the White male executives who tried to steal credit for Webster openly told employees that Ms. Booker ***"pulled my pants down and ripped me a new asshole."***  Compl., ¶¶ 134-135.

Ms. Booker, time and again, watched as White male leadership advanced and supported White FAs and FA Trainees, while ignoring minority FAs and Trainees.  Compl., ¶¶ 138-141.  In fact, of the several qualified Black candidates for Morgan Stanley's FA training program that Ms. Booker referred, only one person was ever actually hired, and that person was hired into Ms. Booker's group.  Compl., ¶ 140.  Notably, Black FAs told Ms. Booker about how difficult it was for a Black FA at Morgan Stanley to succeed. Compl., ¶¶ 141-143.[2]

---

[2]     Moreover, Ms. Booker further alleges how, despite repeated class action lawsuits against the Firm that resulted in promises by Morgan Stanley to improve the opportunities it affords to its African American (and Latino) FAs, Black FAs remained excluded from the Firm's racially

In addition, the Complaint contains specific examples of other Black female executives that faced discrimination and harassment because of their race and/or gender, including:

- Nadia Jones who alleged that the Firm's White leadership was resistant to diversity efforts and that she encountered racist treatment and systemic biases throughout Morgan Stanley. Compl., ¶ 189.

- Sandra Richards who complained to Ms. Booker numerous times about how she was discriminated against because she was a Black woman, including how a White male boss referred to her as acting like an "angry Black woman." Compl., ¶ 191.

- Paula Campbell Roberts complained to Ms. Booker repeatedly about the disparate treatment she experienced at the Firm, including about not receiving the same opportunities and equal pay as her White peers, and for not being promoted to MD. Compl., ¶ 194.

- Lybra Clemons told Ms. Booker on numerous occasions that the Firm was not serious about diversity, and that Ms. Reid would never do anything to "rock the boat." Compl., ¶ 195.

- Another Black female repeatedly complained to Ms. Booker about not being paid fairly in comparison to her White and male peers, as well as about not being promoted to MD. Compl., ¶ 196.

## B.   MS. BOOKER'S REPEATED EFFORTS TO FORCE CHANGE ARE IGNORED

The Complaint details the many ways that Ms. Booker tried to force awareness of racial inequality and create change at the Firm. Compl., ¶¶ 106-121. For years, Ms. Booker tried to convince Morgan Stanley to work with Black National Basketball Association ("NBA") legend Earvin "Magic" Johnson, a highly successful businessperson. Compl., ¶ 108. Each time, Ms. Booker's efforts were thwarted. Compl., ¶¶ 108, 109, 114, 115. In contrast, the Firm did not hesitate to hire the British White professional golfer Justin Rose as a spokesperson. Compl., ¶ 117-118.

---

segregated partnerships or teams, and continued to have substantially lower earnings and higher attrition than White FAs. Compl., ¶¶ 170-174.

In June 2019, Ms. Booker again complained to Defendant Krouk, her White male supervisor, about the unequal treatment of minority FAs and Trainees. Compl., ¶ 138. As detailed, the allegations describe how Krouk thwarted her efforts to promote "Project Genesis." Compl., ¶¶ 138-155. Ultimately, Ms. Booker's efforts to push Project Genesis before senior management led to a meeting on December 9, 2019 where she was told of her termination. Id. It was obvious that Ms. Booker was "rocking the boat" and creating discomfort amongst the White-male dominated leadership with her push to implement Project Genesis. Compl., ¶¶ 161-163. Notably, at no point did Krouk ever give Ms. Booker any feedback, much less any "constructive feedback," on how to eventually obtain senior management approval of Project Genesis. Compl., ¶ 165-166.

### C.      MS. BOOKER'S TERMINATION

On December 9, 2019, during what Ms. Booker thought would be a meeting with Krouk about Project Genesis, Ms. Booker was abruptly told that she was being fired. Compl., ¶ 154-155. When she asked if she could take on an alternative position, such as an FA with no base pay, the Firm rejected her proposals, and told her there were no other options. Id. At the time, Ms. Booker was the only Black female MD in Wealth Management division's NYC office. Morgan Stanley offered no explanation other than to vaguely state that her position – which is one that primarily helps Black people and people of color gain financial literacy and acumen – had to be eliminated as part of a reduction-in-force ("RIF") exercise. Compl., ¶ 156.

### ARGUMENT

### A.      THE PLEADING STANDARD FOR EMPLOYMENT DISCRIMINATION CLAIMS

Erroneously, Defendants ask this Court to apply a heightened pleading standard to Ms.

Booker's individual employment discrimination claims.[3]  Defendants want Ms. Booker to allege facts sufficient to sustain the ultimate burden <u>to prove her employment discrimination claims</u> rather than the minimal inference of discriminatory intent required at the pleading stage.  The rule for employment discrimination cases is well-established at the motion to dismiss stage:

> Until the defendant furnishes a nondiscriminatory reason for the adverse action it took against the plaintiff, the plaintiff needs to present only *minimal* evidence supporting an inference of discrimination in order to prevail.

<u>Doe v. Columbia University</u>, 831 F.3d 46, 54 (2d Cir. 2016).  In <u>Doe</u>, the Second Circuit emphasized the lenient pleading standard that it had detailed in <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 307-08 (2d Cir. 2015):

> In <u>Littlejohn</u>, we clarified that <u>Iqbal</u> applies to employment-discrimination complaints brought under Title VII. To the same extent that the <u>McDonnell Douglas</u> temporary presumption reduces the facts a plaintiff would need to show to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be pleaded under <u>Iqbal</u>. Because [t]he discrimination complaint, occurs in the first stage of the litigation . . . the complaint also benefits from the temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. … In other words, at the 12(b)(6) stage of a Title VII suit, ***allegation of facts supporting a minimal plausible inference of discriminatory intent*** suffices as to this element of the claim because this entitles the plaintiff to the temporary presumption of <u>McDonnell Douglas</u> until the defendant furnishes its asserted reasons for its action against the plaintiff.

---

[3]     Discrimination claims pursuant to Section 1981, Title VII and the NYSHRL are analyzed by the same standards, and Ms. Booker therefore refers to her discrimination claims under these statutes collectively.  <u>See</u> <u>Vivenzio v. Syracuse</u>, 611 F.3d 98, 106 (2d Cir. 2010).  NYCHRL claims are afforded a more "liberal, independent construction" and "are to be evaluated separately from federal and state law claims.  <u>Gorokhovsky v. N.Y.C. Housing Auth.</u>, 552 Fed. App'x 100, 101 (2d Cir.2014).

<u>Doe</u>, 831 F.3d at 54-55.[4]   The Second Circuit explained that "for this reason, we have often vacated 12(b)(6) and 12(c) dismissals of complaints alleging discrimination." <u>Id.</u> at n.8; <u>see also</u> <u>Dawson v. N.Y. City Transit Auth.</u>, 624 F. App'x 763, 770 (2d Cir. 2015) ("At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face….").   Further, the Second Circuit in <u>Doe</u> held:

> The role of the court at [the pleading] stage of the proceedings ***is not in any way to evaluate the truth as to what really happened***, but merely to determine whether plaintiff's factual allegations are sufficient to allow the case to proceed.

<u>Doe</u>, 831 F.3d at 59 (emphasis added).

### B.   THE COMPLAINT ALLEGES FACTS THAT SUPPORT A MINIMAL PLAUSIBLE INFERENCE OF DISCRIMINATION

Pursuant to these Second Circuit standards, Ms. Booker's allegations far exceed what is necessary to satisfy notice at the pleading stage for her individual discrimination claims.   "To prove a Title VII racial (or sex) discrimination claim, the plaintiff must prove the following elements to make out a *prima facie* case: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."   <u>Fisher v. Vassar College</u>, 114 F.3d 1332, 1344 (2d Cir.1997).   Defendants do not dispute elements of Ms. Booker's *prima facie* case, namely that she is a Black female, that she was qualified for her position and role at Morgan Stanley, or that she was fired.[5]   Thus, the only issue to be decided is whether, collectively, the allegations meet the exceedingly low burden as to whether her

---

[4]      Notably, "the plausibility standard is not akin to a probability requirement." <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 87 (2d Cir. 2015).

[5]      As set forth in the Complaint, she was told of her termination on December 9, 2019 but her administrative final last day at Morgan Stanley was March 9, 2020.  Compl., ¶ 167.

termination "occurred under circumstances giving rise to an inference of discrimination." Fisher, 114 F.3d at 1344.

Preliminarily, it is important to note that Defendants *have not moved to dismiss Ms. Booker's retaliation claims*. This is significant because, unquestionably, Ms. Booker's retaliation claims involve a common core of facts that are "inextricably intertwined" with her disparate treatment, harassment, and unequal pay claims, and therefore, the evidence that Ms. Booker will need to prove her retaliation claims will "significant[ly] overlap" with the proof she would need to prove her other claims. See Ravina v. Columbia Univ., No. 16 Civ. 2137 (RA), 2020 WL 1080780, at *12 (S.D.N.Y. Mar. 6, 2020) (finding that plaintiff's successful retaliation claim was "inextricably intertwined" with failed discrimination claim because of "significant overlap" between "elements necessary to prove discrimination and retaliation under the NYCHRL," as "[t]o prove the former claim, [plaintiff] had to establish that [the defendant] treated her "less well" at least in part because of her gender, while to prove the latter claim, she had to establish that she suffered one or more actions []that were reasonably likely to deter a person from pursuing a claim of discrimination."). As just one example, in order for Ms. Booker to rebut any legitimate, non-discriminatory reasons Defendants put forth as to why she was fired, it will be necessary for the parties to take discovery concerning, *inter alia*, Ms. Booker's history of performance, her compensation history, including as compared to that of her peers. Because the theories and proof underlying Ms. Booker's claims "significantly overlap" and are "inextricably intertwined," her claims should all proceed to discovery so that a complete factual record can be developed that will allow each claim to be adjudicated on its merits.

Without repeating Ms. Booker's Complaint in its entirety, overwhelming facts are pled that support a minimal plausible inference that her termination "occurred under circumstances

giving rise to an inference of discrimination."  Id.  By way of example only, she gives details about specific "less than" treatment:

> [A]s [she] became more vocal internally about the need for Morgan Stanley to support Black employees and Black causes, her ability to effectuate change decreased under Gorman's leadership.    In particular, [her] budget was inexplicably slashed each year, and by 2019, was 71% lower than what it had been at the time she started working in the Wealth Management division role in 2011. Such budget reductions made it harder each year for [her] to do her job.

Compl., ¶ 120.   This allegation alone supports her claims that the Firm was decreasing its commitment to: (i) devote funds to "Black employees and Black causes;" (ii) Black employees generally; and (iii) support Ms. Booker's role specifically.   As an example of the overlapping nature of many of the allegations, these same facts are relevant to any claim by the Firm that she was paid less than other MDs because of purported performance-based reasons.  Ms. Booker was forced to do "more" with "less" year after year.  Similarly, Ms. Booker alleges that her White male peers did not have their employment terminated when their positions experienced budgetary cuts:

> "...these same two White men were not fired or subject to pay cuts; instead, they 'failed up' by being promoted to Vice Chairmen in the Wealth Management division. … [w]ith no explanation, Ms. Booker learned that these two White men would 'continue to have a strong presence in the field and play critical senior leadership roles moving forward' despite not even having specific job functions."

Compl., ¶¶ 121-124.  Such an allegation of relevant preferential treatment is precisely what is required by Ms. Booker at this stage.  Indeed, Ms. Booker alleges that her White male peers received favorable treatment as compared to her with no identifiable explanation other than the fact that she is a Black female. See also Compl., ¶¶ 22-24 (as to Black male employees); Littlejohn, 795 F.3d at 312 (an inference of discrimination can be drawn from more favorable

treatment of employees not in the plaintiff's protected group).  Ms. Booker provides names, positions, and compares budget cuts impacting their roles as compared to hers.  Compl., ¶ 121-124.  The Complaint constitutes "notice pleading" in the Second Circuit and her individual discrimination claims survive dismissal.

Moreover, Defendants overlook the fact that Ms. Booker's protected complaints were ubiquitous.  She alleges that she repeatedly complained about problems at Morgan Stanley directly relevant to race:

- "Ms. Booker also made **repeated complaints** about the outrageously low number of Morgan Stanley clients who were Black."  Compl., ¶ 119.

- "[T]his was emblematic of Ms. Booker's **constant struggle** to get Morgan Stanley to market to and work with Black people."  Id.

- "[A]s Ms. Booker became **more vocal internally about the need for Morgan Stanley to support Black employees and Black causes**…."  Compl., ¶ 120.

- "…Ms. Booker complained to Krouk about the unequal and marginalized treatment inflicted on minority FAs and Trainees."  Compl., ¶ 138.

- "Ms. Booker had a plan to help reduce the unlawful bias and told Krouk [her White male boss] about her plan."  Compl., ¶¶ 138, 143.

Simply put, Ms. Booker's allegations smack of her witnessing textbook discrimination in the workplace and speaking up about it – something that ultimately cost her job.  These allegations bolster Ms. Booker's claims of unlawful bias to her individually and also support the inference that such discrimination contributed to her unlawful termination:

- "Ms. Booker also found that Krouk was either unhelpful or resistant to her efforts to move forward with the project.  **Tellingly, Krouk told**

**Ms. Booker not to talk about Project Genesis with anyone else.**" Compl., ¶¶ 148, 166.

- "Ms. Abrar and Ms. Underwood **similarly resisted this proposal**. Instead, the two women told Ms. Booker that she needed to wait until … sometime *the following year*." Compl., ¶ 148.

- **"At the time she was fired, Ms. Booker was the only Black female MD in Morgan Stanley's Wealth Management division's New York City offices.** Morgan Stanley offered no explanation for her expulsion other than to vaguely say that her position – **which is one that primarily helps Black people and people of color gain financial literacy and acumen** – had to be eliminated as part of a RIF exercise." Compl., ¶ 156.

It is confounding that Defendants assert that Ms. Booker offers no "fact-specific allegations of a causal link between Defendant's actions and Plaintiff's race [or sex]." Motion, p. 15. Although Ms. Booker offers multiple facts that, if taken as true, suggest unlawful bias specific to her own position, the Complaint also includes a plethora of examples of insidious bias against other Black females. By way of example only, the Complaint includes allegations about a Black female executive named Carol Greene-Vincent:

- Gorman's alleged timeline of her promotion to the Operating Committee also strongly suggests that the treatment of women in management positions as compared to similarly situated male peers was regularly "less than" treatment, and worse, many men knew about it but did nothing.

- Inexplicably, Ms. Greene-Vincent was forced to undergo a lengthy waiting period – from fall 2018 until June 2020 – before she was moved up to a seat on the Operating Committee. In contrast, her similarly situated White peers were placed onto the Operating Committee as soon as they were hired or immediately after being promoted to a positon.

- None of the other White Operating Committee members have had to wait before taking their spot on the Operating Committee once a decision was made.

Compl., ¶¶ 49-54.

The allegations describe differential treatment as between a Black female and her White peers.  See also Compl., ¶¶ 22-24, 121-124.  Such alleged conduct is precisely what the anti-discrimination laws were designed to eradicate.  Contrary to Defendants' claims, Ms. Booker is not required to prove race and gender bias in her Complaint.  Rather, she needs "to present only *minimal* evidence supporting an inference of discrimination in order to prevail." Doe, 831 F.3d at 54.  Undeniably, the facts suggest a level of harm directed at Black female employees of which Ms. Booker was aware.  Compl., ¶¶ 48, 82-84.  Further, the Complaint includes examples of how White female and male employees were not subjected to discriminatory, or "less than" treatment.  See Compl., ¶¶ 48, 51, 85-87, 121-124.  These facts more than raise an inference of discrimination for Ms. Booker's individual claims to move beyond the pleading stage.

The cases that Defendants cite in support of their Motion are all distinguishable.  The facts in this case are nothing like Yan v. Ziba Mode, Inc., 2016 WL 1276456 (S.D.N.Y. Mar. 29, 2016) where the plaintiff's co-workers made occasional comments about the plaintiff's accent and his difficulty in communicating with clients.  Id. at *4.  In Yan, the complaint failed to allege who made the comments, how often and in what context.  Id.  In contrast, Ms. Booker provides facts that Nides asked her who she was dating *at virtually every meeting* the two had.  Moreover, unlike Yan, the sexual context of Nides' comments are clear.

Likewise, Williams v. Victoria's Secret, 2017 WL 384787 (S.D.N.Y. Jan. 27, 2017) is distinguishable from the instant case.  In Williams, a decision-maker repeatedly said, ***when referring to himself***, that he was 36 years of age and "getting old."  Id. at *9.  Under these facts, the court concluded that the statements were not actionable.  Id.  Here, Ms. Booker did not make remarks about herself.  Rather, she was subjected to sexist and racist comments *that were actually about her*.  She was repeatedly asked about who she was dating and had a White male

employee say that Ms. Booker: "Pulled down my pants and ripped me a new asshole."  Compl., ¶¶ 116, 135.  At this stage, such comments are far more than sufficient to support an allegation of discrimination.

Defendants also cite <u>Williams v. Classic Sec.</u>, 2019 WL 4511953 at *4 (S.D.N.Y. Sept. 19, 2019) which is distinguishable.  In <u>Williams</u>, the plaintiff failed to allege any factual details regarding his claim that similarly situated employees of different races were treated differently than he was.  <u>Id.</u> at *4.  In contrast to <u>Williams</u>, Ms. Booker provides ample facts regarding the preferential treatment White male employees received at Morgan Stanley, including higher wages, promotions (even despite poor performance), being given the "benefit of the doubt," and having illegal or unethical treatment ignored.  Compl., ¶¶ 100-05, 121-24, 189-96.

Defendants' reliance on <u>Minto v. Molloy College</u>, 2019 WL 4696287 (E.D.N.Y. Sept. 26, 2019) is even more misplaced.  <u>Minto</u> involved claims brought by students after being expelled from their academic program for poor grades.  <u>Id.</u> at *2.  None of the <u>Minto</u> plaintiffs alleged any facts connecting their race to the expulsion.  <u>Id.</u> at *2-3, 11.  Unlike the <u>Minto</u> plaintiffs, Ms. Booker offers more facts than needed to suggest that her termination was discriminatory. Compl., ¶¶ 100-05, 121-24, 138-67, 189-96.

### i.  The "Play No Role" Standard Under the City HRL

Defendants ignore the fact that under the NYCHRL (the "City HRL"), Ms. Booker's individual discrimination claims are subject to a "play no role" standard.  Specifically, on March 8, 2016, the City HRL was amended by Local Law No. 35 ("Law 35").[6]  Law 35 amended the Code to give courts "additional guidance for the development of an independent body of jurisprudence… that is maximally protective of civil rights in all circumstances."  Law 35, § 1.

---

[6]     <u>See</u> Administrative Code of City of NY § 8-107, *et seq*., (the "Code").

A report by the Committee on Civil Rights accompanied Law 35 (the "Committee Report"). The Committee Report explained that Law 35 was passed because of the failure of courts to interpret the City HRL "liberally and independently of similar federal and state provisions," and in so doing, were failing to "fulfill the uniquely broad and remedial" purposes of the law.

Critically, Law 35 ratified three decisions under the City HRL, collectively referred to by courts as the "Committee Report cases:" (i) Albunio v. City of New York, 16 N.Y.3d 472 (2011); (ii) Bennett v. Health Mgt. Sys., Inc., 92 A.D.3d 29 (1st Dept. 2011), *lv. denied* 18 N.Y.3d 811 (2012); and (iii) Williams v. New York City Hous. Auth., 61 A.D.3d (1st Dept. 2009), *lv. denied* 13 N.Y.3d 702 (2009). Law 35 legislatively overruled prior cases using stricter standards than the Committee Report cases. See Morse v. Fidessa Corp., 2018 N.Y. Slip Op 05975 at *4 (1st Dept. 2018) (earlier cases using stricter standards are "legislatively overruled.").

In Williams, the court held that the "severe or pervasive" or "some significant role" standard does not apply to the City HRL. Id., 61 A.D.3d at 76. Specifically, the City HRL mandates that discriminatory conduct, including conduct stemming from assumptions based on stereotypes, has "no role" in the workplace. To prevail on liability, a "plaintiff need only show differential treatment, that she is treated less well, because of a discriminatory intent." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 116 (2d Cir. 2013). Under this standard, the allegations in the Complaint more than satisfy the notice pleading requirements.

### C. THE COMPLAINT SUFFICIENTLY ALLEGES A WORKPLACE HOSTILE TO BLACK FEMALE EMPLOYEES

The Complaint contains more than ample facts that infer that Ms. Booker and other Black female employees experienced unlawful bias and harassment. Ms. Booker alleges in detail how Nides, a member of the Management Committee and close confidant of Gorman, harassed her on account of her gender nearly each time the two would have a meeting. Compl., ¶¶ 111, 116. She

14

also alleges that Nides subjected her to gender biased treatment by commenting on her clothes, shoes and purses.  At no time did she witness Nides make similar comments to male employees. Compl., ¶ 116.  This is not a workplace where discrimination payed "no role."

The Complaint sets forth allegations describing how other Black female employees told Ms. Booker about their own experiences of bias at Morgan Stanley.  In turn, such evidence is directly relevant to Ms. Booker's own perceptions and experiences in the workplace.  For example, at ¶ 189, Ms. Booker alleges the following:

> • Nadia Jones, a Senior Diversity Officer at Morgan Stanley wrote: You cannot begin to imagine how it feels for a woman of color to be constantly reminded that neither your credentials, nor your title, nor your professional accolades, nor your expertise gleaned both from your professional and social experiences as a woman of color, are enough to counteract the pervasive and systemic biases that run throughout this organization.  Never in my 8 years of doing this work nor in my 38 years of being a Black woman have so many White people, men in particular, told me how to do my job and where best to focus my efforts to help diverse advisors….

Examples of other discriminatory treatment include the allegations about Sandra Richards, a Black female.  Ms. Richards complained to Ms. Booker numerous times – as recently as February 2019 – about how she has been discriminated against at the Firm because she is a Black woman. Compl., ¶¶ 191-192.  Ms. Richards told Ms. Booker that her White male boss, Jim McCarthy, referred to her as acting like an "angry Black woman."  Id., ¶ 191.  Ms. Richards also complained about being treated poorly/differently than White employees, and even complained to the head of HR for Wealth Management, Larry Frers.  Id.  As alleged, she complained *too many times to count*.  Id.

Other examples of Black female employees suffering "less than" treatment and marginalization based on their sex and color in the Complaint include allegations at ¶¶ 193-196. Importantly, Ms. Booker need not have been present when the alleged conduct occurred to her

Black female coworkers for these events to be relevant to her claims of unlawful treatment.   See, e.g., Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) (second-hand knowledge of racially charged joke or derogatory comment can impact work environment); Richard v. N.Y.C. Dep't of Educ., No. 16 Civ. 957 (MKB), 2017 WL 1232498, at n.15 (E.D.N.Y. Mar. 31, 2017) (statements made to coworker outside plaintiff's presence relevant because "the mere fact that the plaintiff was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim.").   In sum, more than enough allegations regarding race and gender discrimination are contained in the Complaint such that "notice pleading" is provided as to this claim.   See Suri v. Grey Global Group, Inc., 164 A.D.3d 108, 115 (1st Dept. 2018) ("the City HRL speaks to unequal treatment and does not distinguish between sexual harassment and hostile work environment.   It contains no prohibition on conflating claims.   Rather the 'overall context in which [the challenged conduct occurs] cannot be ignored'").

Defendants claim that Ms. Booker experienced nothing more than petty slights or trivial inconveniences.   The cases cited in support of this meritless claim are all distinguishable.   The facts here are completely different from those in Dechberry v. New York City Fire Dept., 124 F.Supp.3d 131, 158 (E.D.N.Y. 2015) in which the plaintiff described "conflicts with her colleagues" and failed to "specify or describe the defendant's conduct, the level of severity, pervasiveness, or frequency of the alleged harassment" and failed to "allege that any mistreatment was on account of her race or disability."   In contrast to the Dechberry plaintiff, Ms. Booker alleges ample facts to describe the Defendants' conduct and bias.   Ms. Booker's facts amount to much more than "conflicts with colleagues."

16

Defendants similarly cite to <u>Springs v. City of New York</u>, 2020 WL 3488893 at \*8 (S.D.N.Y. June 26, 2020).  The <u>Springs</u> plaintiff however, alleged that a supervisor commented on the texture of his hair on a single occasion and co-workers once cooked beef in the same pan used to cook bacon even though they knew plaintiff was Muslim and could not eat pork.  <u>Id.</u> at \*2.  In contrast to the two singular incidents in <u>Springs</u>, Ms. Booker presents facts that the marginalization of Black females was ubiquitous and ongoing.  Compl., ¶¶ 100-105, 116, 120-121, 135.

The remaining decisions cited by Defendants similarly are inapplicable.  <u>See</u> <u>Thior v. JetBlue Airways, Inc.</u>, 2016 WL 5092567 at \*5 (E.D.N.Y. Sept. 19, 2016) (plaintiff's supervisor and training partner had mocked his accent once over a nine-year period); <u>Adejare v. St. Charles Hosp. & Rehab. Ctr.</u>, 2017 WL 2559937 at \*3 (E.D.N.Y. June 13, 2017) (plaintiff failed to include any facts at all about her work environment); <u>De La Pena v. Metropolitan Life Ins. Co.</u>, 953 F.Supp.2d 393, 415 (E.D.N.Y. 2013) (plaintiff merely perceived the defendants' actions to be disrespectful towards him, embarrassed him in front of his peers, and a supervisor made a single politically incorrect statement).

### D.     DISMISSAL IS IMPROPER FOR ALLEGED TIME-BARRED CONDUCT

Defendants contend that dismissal of Ms. Booker's individual discrimination claims is warranted because the allegations involve certain "non-actionable" discrete acts.  This argument is meritless.[7]  Unquestionably, the Complaint contains numerous acts that took place within the applicable statutes.  Moreover, at the motion to dismiss stage, where the Complaint contains at least one act that is alleged to have fallen within the statutory period, it is not necessary to decide

---

[7]     Notably, Defendants fail to even attempt to distinguish which specific allegations they believe are time-barred under which laws Plaintiff brings claims under: Title VII, Section 1981, NYSHRL or NYCHRL.

if "discrete discriminatory acts are not actionable if time barred." See Castro v. Yale University, No. 20 Civ. 330 (JBA), 2021 WL 467026, at *9 (D. Conn. Feb. 9, 2021) (denying motion to dismiss hostile work environment claim after "examining 'the totality of the circumstances'"). The court in Underwood v. Roswell Park Cancer Institute, No. 15 Civ. 684 (FPG), 2017 WL 131740, at *11, and at n.8 (W.D.N.Y. Jan. 13, 2017), on a motion to dismiss, held:

> "Determining whether the action is a discrete 'unlawful employment practice' under Morgan may depend on the specific nature of that action and other surrounding circumstances. Therefore the Court need not identify, at this early stage of the litigation, the specific allegations … barred by the statute of limitations. …. The Court is also mindful of the fact that even if some of the actions …are time-barred, the statute of limitations **does not bar him from using those acts 'as background evidence in support of a timely claim.'** Thus, early resolution of all the statute of limitations issues in this case would not have a significant effect on the scope of discovery."

In sum, Morgan Stanley's position that the Complaint lacks any specific allegations about race or sex discrimination is incorrect and unsupported.  What is true, however, is that Ms. Booker's experiences fall squarely within what the Second Circuit recently described as a "mosaic" of discriminatory events.  In Khanna v. MUFG Union Bank N.A., No. 19 Civ. 893 (summary order) (2d Cir. Nov. 19, 2019), a gender and race discrimination case under Title VII, the Second Circuit held:

> [F]acts alleged in [plaintiff's] Complaint show the sort of 'mosaic' of intentional discrimination based on 'bits and pieces' of evidence that we expect to see in a discrimination case because 'clever men easily conceal the motivations.'

Similarly, Ms. Booker's allegations constitute "bits and pieces" of evidence that together, under a lens of the totality of circumstances, show the sort of "mosaic" of intentional discrimination that is required at this notice pleading stage.  Contrary to Defendants' characterizations of her

allegations, rarely does evidence of discrimination, whether based on gender, race or both, manifest itself in overt bias.

### E.   MS. BOOKER HAS PLEADED VIABLE INDIVIDUAL CLAIMS FOR UNEQUAL PAY

Ms. Booker's claims include allegations that Morgan Stanley failed to pay her wages equal to wages paid to men (primarily White men) for substantially equal work, and denied her equal advancement opportunities.[8]   At the core, her claims are that had she been a man at Morgan Stanley in her position (especially a White man), she would have been paid more.   Ms. Booker does not know (nor is there any way for her to know) at this pre-discovery phase just how much more she would have been paid had she been a man.   Of course Ms. Booker is not in possession of the documents maintained in the ordinary course of Morgan Stanley's business related to compensation.   Predictably, Morgan Stanley wants nothing more than to keep such information secret.   This data is part of Morgan Stanley's "black box" system of base salary and subjective bonuses that allowed the harm against Ms. Booker to occur in the first place.   Morgan Stanley fails to offer a shred of evidence that compensation information for its "highest" earners is not in fact kept a tight secret – yet, it simultaneously claims that Ms. Booker cannot proceed because she does not have access to such information.

Ms. Booker was privy to specific compensation information during her tenure and alleges that she has first-hand knowledge that Black employees were not paid as much as White peers. Compl., ¶¶ 81-84.   Yet, aware that Morgan Stanley would argue that she has violated her promises to keep proprietary information confidential if she included it in her Complaint, she omitted specific references to salaries and bonuses.   Morgan Stanley cannot have it both ways:  it

---

[8]      Ms. Booker's unequal pay claims fall under Title VII, NYSHRL, NYCHRL, the NYLL and the EPA.

cannot threaten her should she disclose the numbers, yet argue for a Rule 12 (b)(6) dismissal for failure to state a claim by omitting compensation numbers.

Here, Ms. Booker alleges not only that Morgan Stanley paid her less than comparable men, but that it denied her career opportunities on account of her gender, race and, ultimately, unlawfully fired her.  Indeed, "[t]he very essence of [a discrimination claim] is comparative evidence:  Was the [p]laintiff treated differently from persons not in [her] protected group?" Weinstock v. Columbia Univ., No. 95 Civ. 0569 (JFK), 1996 WL 658437, at *9 (S.D.N.Y. Nov. 13, 1996).  Morgan Stanley limited its arguments to dismiss Ms. Booker's pay disparity/unequal pay claims at this pleading stage by citing to case law pertaining to the federal EPA and largely avoiding the more lenient proof needed under the federal, state and city anti-discrimination laws. The Second Circuit in Lenzi v. Systemax, Inc., 944 F.3d 97 (2d Cir. 2019), clarified this critical issue of proof for lower courts by holding that a plaintiff alleging unequal pay claims under Title VII, as opposed to the EPA, does not need to make a showing that:

> [S]he performed equal work but received unequal pay. …[r]ather, all Title VII requires a plaintiff to prove is that her employer "discriminate[d] against [her] with respect to [her] compensation ... because of [her] ... sex."

Id. at 110.  In Lenzi, the Second Circuit broadened the circumstances under which a plaintiff can bring pay inequity claims:

> If a plaintiff were first required to establish an EPA violation, she would be without redress under those circumstances, even if her employer flatly "admitted that her salary would have been higher had she been male" … [f]or example, an employer might "hire[ ] a woman for a unique position in the company," but then pay her less than it would "had she been male."

Id.  In other words, grafting the EPA's "equal work" standard onto Title VII would mean:

> [T]hat a woman who is discriminatorily underpaid could obtain no relief - no matter how egregious the discrimination might be - unless her employer also employed a man in an equal job in the same establishment, at a higher rate of

pay." Such a rule finds no support in the text of Title VII and would "deprive victims of discrimination of a remedy, without clear congressional mandate."

Id. at 110 (citing Washington County v. Gunther, 452 U.S. 161, 178-79 (1981)).

Defendants seek to do exactly what the Lenzi court held was wrong.  Defendants know that Ms. Booker worked in a "unique and newly created role."  Compl., ¶¶ 93-94.  The Firm knows that Ms. Booker cannot point to a man that worked in her position *because she was the only employee that occupied the position*.  Dismissing Ms. Booker's claims of unequal pay at this stage because she cannot point to a male employee in her role would "deprive victims of discrimination of a remedy, without clear congressional mandate."  Lenzi 944 F.3d at 110.  Importantly, allowing her claims under the EPA to continue would have no impact on the scope of discovery and cause no undue hardship to Morgan Stanley.

At this pleading stage, it is Defendants, not Ms. Booker, that possess all of the relevant base pay and bonus information.  Expecting the Court to "*evaluate the truth as to what really happened*," and *decide* that Ms. Booker's allegations are not true or will never lead to evidence to substantiate her claims is a frivolous request.  Despite the handicap of no access to data, Ms. Booker states a claim upon which relief can be granted because she named nearly 40 White male comparators who were similarly situated but compensated at higher levels. Compl., ¶ 101.  Other facts suggesting an inference of discrimination regarding pay include:

- "… for the eight years [Ms. Booker] remained in this [MD] role before her December 2019 ouster, her salary was essentially held flat.  At the same time, the Firm slashed her budget, year over year.  Compl., ¶ 100.

- "These White male peers at the MD level within the Wealth Management division, performed substantially similar work/job responsibilities as Ms. Booker, …. but were paid more than her [list of male MDs]."  Compl., ¶ 101.

- "The above list, **which is not exclusive**, are all White men."  Compl., ¶ 102.

- **"At the time she was fired, Ms. Booker was the only Black female MD in Morgan Stanley's Wealth Management division's New York City offices."** Compl., ¶ 156.

It is critical context that Ms. Booker was the only Black female in Wealth Management in NYC. Simply no rational business necessity exists for the need to have more than 40 White male MDs but only one Black female MD in the NYC office.  It is improbable, if not impossible, for senior leadership, including Gorman, not to have noticed that the non-hiring and non-retention of Black female MDs was so shockingly low.    It is undisputed that the Firm's record of retention and advancement of Black women is abysmal.   It is common sense that a workplace run exclusively by White men, with an absence of meaningful Black female influence is more likely to result in an environment where Black women face challenges and hurdles that White men simply do not experience.  Without any objective metrics accounting for the vast disparity, it is clear that Black females (as well as Black males), are virtually absent from the Firm's leadership ranks.  Compl., ¶¶ 19, 45-47, 53-56, 125-129, 142.  The disparity cannot be an accident.  And it is a situation created over many years.  Gorman has been the CEO for over a decade.  It is impossible that Gorman failed to notice that the persons he has decided are worthy of his trust are overwhelmingly White men.  No legitimate basis exists for the fact that in 85 years no Black female has ever sat on the Firm's Board of Directors.  Compl. ¶ 54.  Under no circumstances would virtually every MD in NYC's Wealth Management division need to be a White male, and not a Black female.  Yet this is exactly the position that Ms. Booker worked in day in and day out – until she suddenly was cast out.   A fact-finder easily could consider these facts relevant, in the totality of the circumstances, and shed light on the Firm's motivations in connection with the decision to select Ms. Booker for termination.  If the marginalization of Black female employees was tolerated, and the numbers speak for themselves, more likely than not White employees felt

emboldened to operate based on stereotypes that negatively impacted Black women, including Ms. Booker. The gender and race statistics show a degree of White male dominance that is shocking.   For decades, the Firm actively has refused to release the data about its racial and gender composition at all levels, including management. Compl., ¶¶ 6, 61-66, 125-130.

Additionally, it defies common sense to suggest that the named 40 White male MDs in the NYC office of Morgan Stanley suffered "flat" compensation for 8 years, like Ms. Booker experienced.  Similarly, it is highly unlikely that all 40 White male MDs in the NYC office of Morgan Stanley suffered decreases in their annual budgets yet were expected to produce more for 8 years, like Ms. Booker experienced.  See Compl., ¶¶ 100, 103.  Defendants do not claim that there was no pay disparity.   Ms. Booker clearly alleges facts that, if true, suggest an inference of discriminatory bias, and she should be permitted to take discovery on the issue.

For the reasons above it is not necessary to address each of Defendants' EPA related arguments, especially as to her burden of proof rather than her "notice pleading" requirements. However, it bears noting that under the federal, state and city laws, including the NYLL, Ms. Booker ultimately need not prove that she performed equal work, only that the work was "comparable."  Washington Cty. v. Gunther, 452 U.S. 161, 178-79 (1981).  Under Title VII, an employer is liable where sex was a motivating factor for the pay disparity.  See Husser v. New York City Dept. of Educ., 137 F.Supp.3d 253, 270.  Under the City and State laws, an employer is liable where there is evidence that it treated the employee "less well at least in part 'because of her gender.'"   Mihalik v. Credit Agricole Cheuvreaux, N.A., Inc., 715 F.3d 102, 110 (2d Cir. 2013) (citing Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 39-40 n.27 (1st Dept. 2009)).  In other words, because "discrimination shall play no role in decisions relating to employment," even "partial discrimination" (i.e., where the employer has "multiple or mixed

motives for [its] action") is prohibited.  Bennett v Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 120 (1st Dept. 2011).  Moreover, these statutes do not merely prohibit disparate pay, they make it unlawful for an employer to discriminate with respect to any term or condition of employment.

Equally probative as to her individual pay claims is the information that Ms. Booker was privy to in connection with countless other employees' compensation amounts.  Specifically, Ms. Booker alleges that:

- "Ms. Booker was very involved in the compensation and promotion process. She was often able to get minority employees placed on lists for promotions who were not initially on those lists, and was able to secure raises in compensation for employees of color to levels that were commensurate to that of White employees. This included, amongst other people, Carla Harris, a Black female. ... Ms. Booker had to personally fight every year with Ms. Harris's direct managers to ensure that Ms. Harris was paid at a rate comparable to her White counterparts."  Compl., ¶¶ 81-82.

Ms. Booker further alleges that, in contrast to White male MDs, she was not paid commissions or other remuneration for the assets under management she brought to the Firm, which estimates totaled over $200 million.  Compl., ¶ 104.  Had Ms. Booker been a male employee, she contends she would have been paid almost twice what Morgan Stanley paid her (and likely more). Compl., ¶ 105.

All the EPA and NYEPA cases Defendants cite in support of their Motion are distinguishable.  Segal v. City Univ. of New York, 2019 WL 2372979, (E.D.N.Y. June 4, 2019) is not only distinguishable, but it provides support for Ms. Booker's case.  The Segal plaintiff failed to allege the necessary elements required to state an EPA claim, much less facts to support those allegations.  Id. at *4.  Helpfully, the Court made clear that "a plaintiff is not required to establish an Equal Pay Act violation conclusively," and must simply "plausibly allege sufficient factual matter to provide fair notice [to the defendant] of the basis for [the plaintiff's] claims."

Id. (citing E.E.O.C. v. Port Auth. of New York & New Jersey, 768 F.3d 247, 256 (2d Cir. 2014)). Here, Ms. Booker named dozens of comparators within the Wealth Management division with similar experience, education, skillsets, and responsibilities.  Compl., ¶¶ 100-105.

The remaining decisions Defendants cite similarly do not support dismissal.  See Weinreb v. Xerox Bus. Servs., 323 F.Supp.3d 501, 518-19 (S.D.N.Y. 2018) (plaintiff failed to allege any facts about comparators except to state that "male employees with female spouses receive unequal benefits."); Wu v. Good Samaritan Hosp. Med. Ctr., 815 Fed. App'x 575, 581 (2d Cir. May 20, 2020) (plaintiff only alleged that she was paid less than similarly situated male employees without providing any details about comparators).

Ultimately, the scope of discovery as to whether Morgan Stanley discriminated against Ms. Booker in connection with her status as a Black female, both in terms of what ultimately caused her termination as well as the conditions of her employment, will necessarily involve discovery about her compensation relative to her White peers, including White male MDs.  As such, allowing her claims under the more stringent requirements of the EPA to proceed will not broaden the scope of discovery.

## F.     MS. BOOKER'S CLASS AND COLLECTIVE CLAIMS ARE VIABLE

As Ms. Booker has pleaded sufficient individual EPA and NYEPA claims, she has accordingly also pleaded sufficient class and collective EPA and NYEPA claims.  Defendants only offer two arguments in support of dismissing Ms. Booker's class and collective claims: (i) that Ms. Booker has failed to state individual EPA and NYEPA claims; and (ii) that a Black collective is not legally cognizable under the EPA.  Neither argument compels a dismissal of Ms. Booker's class and collective claims.

### i. Ms. Booker has Pleaded Sufficient Facts to State Individual Claims Under the EPA and NYEPA

As described in detail above, Ms. Booker properly pleaded claims under the EPA and the NYEPA, and therefore her class and collective claims must also survive.

### ii. The Collective is Based on Sex and Not on Race as Defendants Argue

Defendants further argue that Ms. Booker's EPA collective claim fails because "a Black collective is not legally cognizable under the EPA." Motion, p. 12. Ms. Booker does not dispute that the EPA applies only to gender-based pay disparity claims, or that the NYEPA covers race-based disparate pay claims arising after October 8, 2019 when the NYEPA was amended to include additional protected categories such as race (see N.Y. Lab. Law § 194(1)); however, since Ms. Booker was employed at Morgan Stanley subsequent to October 8, 2019, and alleges that she was paid less than similarly situated White employees, she can properly represent a class of Black and other employees of color who were disparately paid because of their race. Moreover, Ms. Booker has pleaded a legally cognizable collective of more than 40 *female employees* who are paid less than their male counterparts. By describing the women in the collective as "Black," Ms. Booker is merely identifying the specific group of women, *i.e.*, Black women, who belong to the proposed collective.

The cases Defendants cite are unpersuasive. In Mudholkar v. Univ. of Rochester, the plaintiff did not make any sex-based claims, and "instead argu[ed] for the expansion of existing law and/or the establishment of new law because racial, ethnic, and age discrimination are no less reprehensible than sex discrimination." 261 Fed. App'x 320, 323 (2d Cir. 2008). Likewise, in Campbell v. Corr. Med. Care, Inc., the plaintiff "alleged that she was paid less than other employees because of her race, not gender." 2014 WL 2608334, at *2 (June 11, 2014). Finally, in Russell v. Cnty. of Nassau, a Black male plaintiff's EPA claims failed because he failed to

26

allege discrimination based on sex.  696 F. Supp. 2d 213, 244 (E.D.N.Y. 2010).  Defendants do not cite, and we are not aware of, any case prohibiting the use of a race-based modifier to identify the specific category of women belonging to a putative collective/class pursuant to the EPA or NYEPA.

### G.   MS. BOOKER DOES NOT NEED TO ALLEGE "BUT FOR" CAUSATION UNDER § 1981 AT THIS PLEADING STAGE

Defendants frivolously argue that Ms. Booker's § 1981 claims should be dismissed at this pleading stage because she fails to allege that "but for" her race, she would not have been subjected to unequal treatment, and that "but for" her complaint of unequal treatment, she would not have been terminated.  "But for" causation is an *evidentiary* standard that is adjudicated at the *summary judgment* stage after discovery has taken place, and is *not* a pleading standard. Indeed, "'but-for' causation does not require *proof* that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).  In other words, "but for" does not mean *only*, and regardless, this is not an evidentiary, *i.e.*, proof standard, and not the standard on a motion to dismiss.

### H.   GORMAN IS INDIVIDUALLY LIABLE UNDER THE EPA, NYEPA, § 1981, THE NYSHRL, AND THE NYCHRL

Defendants move to dismiss Ms. Booker's claims against Gorman on the grounds that Ms. Booker does not plead that Gorman was personally involved in any discriminatory or retaliatory conduct.  Motion, p. 26.  This, however, is not the correct standard for liability. Individuals are liable as employers under the NYSHRL where "they themselves have the authority to hire and fire employees," (Edwards v. Jericho Union Free Sch. Dist., 904 F.Supp.2d 294, 304 (E.D.N.Y. 2012)), and "had some ... connection [to] the underlying [claim]." Adams v.

Delta Airlines, Inc., 2017 WL 9674513, at *9 (E.D.N.Y. Dec. 18, 2017).  Where it is plausible that the individual defendant "was involved in or at least condoned" the actions against the plaintiff, a motion to dismiss should be denied.  Magnotti v. Crossroads Healthcare Mgmt. LLC, 2016 WL 3080801, at *3 (E.D.N.Y. May 27, 2016).  Under the NYCHRL, the evidentiary threshold to hold individuals accountable is even lower.  See Schaper v. Bronx Lebanon Hosp. Ctr., 408 F.Supp.3d 379, 395 (S.D.N.Y. 2019) (discussing the "broader basis for direct individual liability" under the NYCHRL to those without "ownership or decision-making authority").

To determine individual liability under the EPA and NYEPA, courts examine "the economic realities of the workplace, including whether the individual has operational control of the defendant corporation" or "controls significant functions of the business or determines salaries and makes hiring decisions."  Bonner v. Guccione, 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997).  Here, Gorman is the CEO and exercises operational control over the Firm.  Prior to his promotion to CEO, Gorman oversaw the Wealth Management division where Ms. Booker worked, and Gorman personally removed Ms. Booker from her role as Global Head of Diversity.  Moreover, as the only Black female MD in Wealth Management, Ms. Booker had a visible and prominent role at the Firm.  Ms. Booker was not an anonymous back-office employee. Gorman had close ties to Ms. Booker's male MD peers, including Mandell Crawley, who allegedly flew with Gorman on the Firm's private jet to a golf tournament, during which Gorman confided in him the sensitive details about the Firm's controversial firing of a former Tennessee Congressman.  Compl., ¶ 113.  Given these facts, it is implausible that Gorman had *no involvement* in the Firm's decision to abruptly terminate Ms. Booker.  Ms. Booker's allegations regarding Gorman's atrocious record on matters of diversity, also make it plausible that Gorman played a meaningful role in Ms. Booker's termination.  At a minimum, since it is Defendants

28

who hold all the information concerning the individuals who were involved in her termination decision, Ms. Booker should be permitted to take limited discovery on this issue, which would allow Ms. Booker to be able to fairly oppose Defendants' position, with little to no prejudice to Defendants.

## I.     GORMAN AND KROUK ARE INDIVIDUALLY LIABLE AS AIDERS AND ABETTORS

Because Ms. Booker has pleaded plausible discrimination claims, and because Defendants do not even contest that Ms. Booker's retaliation claim is somehow deficient, Krouk and Gorman are properly included in this action as aiders and abettors.  Krouk and Gorman are alleged to have carried out or been involved in Ms. Booker's termination and other adverse actions against her, which is more than enough to meet the standard for aiding and abetting liability.  Under the NYSHRL and the NYCHRL, it is "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."  Farmer v. Shake Shack Enters., LLC, 473 F.Supp.3d 309, 337 (S.D.N.Y. 2020).  At the pleading stage, a plaintiff must merely allege that the defendant actually participated in the conduct giving rise to the discrimination claim.  Id.  Indeed, an individual can be held liable as an aider or abettor even where that individual "lacked the authority to either hire or fire the plaintiff."  Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004).

Ms. Booker more than sufficiently alleged that Gorman and Krouk were involved in her termination.  Defendants do not contest that Krouk was Ms. Booker's direct manager at the time of her termination.  Krouk also actively stymied Ms. Booker from being able to present Project Genesis to the Firm's senior management at every chance he had.  As to Gorman, for the reasons articulated above, it is more than plausible that Gorman had involvement in the decision to terminate Ms. Booker, a long-standing and visible MD in the Wealth Management division that

29

he previously oversaw, and who he personally removed from her previous role as Global Head of Diversity.  At the initial pleading stage, these facts are more than sufficient to state claims against Krouk and Gorman as aiders and abettors.

## **CONCLUSION**

For the reasons set forth herein, Defendants' Partial Motion to Dismiss should be denied in its entirety.

Dated: February 26, 2021
           New York, New York                          Respectfully submitted,

                                                       **WIGDOR LLP**

                                                       By: _____

                                                            Jeanne M. Christensen
                                                            Tanvir H. Rahman

                                                       85 Fifth Avenue
                                                       New York, NY 10003
                                                       Telephone: (212) 257-6800
                                                       Facsimile:  (212) 257-6845
                                                       jchristensen@wigdorlaw.com
                                                       trahman@wigdorlaw.com

                                                       *Counsel for Plaintiff and the Proposed
                                                       Black EPA Collective and Black NYEPA
                                                       Class*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2021, I caused true and correct copies of Plaintiff's

Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss to be served via

electronic mail on:

Grace E. Speights (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel: 1.202.739.5189
Email: grace.speights@morganlewis.com

Michael S. Burkhardt
1701 Market Street
Philadelphia, PA 19103-2921
Tel: 1.215.963.5130
Email: michael.burkhardt@morganlewis.com

Nicole M. Zito
101 Park Avenue
New York, NY 10178-0060
Tel: 1.212.309.6707
Email: nicole.zito@morganlewis.com

*Attorneys for Defendants*

_____
Jeanne M. Christensen